# EXHIBIT A



## PARTICIPATION AGREEMENT

**Member Name:** **CATHOLIC HEALTH INITIATIVES**

**Effective Date:** **JANUARY 1, 2016**

# TABLE OF CONTENTS

1.  Definitions. ...........................................................................................................................4

2.  Purchase of Products and Services; Facilities. ..............................................................7

3.  Term...................................................................................................................................9

4.  HPG's Responsibilities..................................................................................................10

5.  Representations, Warranties and Covenants of Participant. .......................................14

6.  GPO Fees, Rebates, and Global Sourcing Fees. ...........................................................17

7.  Termination.....................................................................................................................19

8.  Access to Books and Records........................................................................................21

9.  Confidentiality. ..............................................................................................................21

10. Attorneys' Fees. .............................................................................................................23

11. Force Majeure. ...............................................................................................................23

12. Notices. ...........................................................................................................................23

13. Entire Agreement; Amendment. ...................................................................................24

14. Assignment. ....................................................................................................................24

15. No Third-Party Beneficiaries.......................................................................................25

16. Severability.....................................................................................................................25

17. Governing Law. ..............................................................................................................25

18. Consent to Jurisdiction. ................................................................................................25

19. Waiver of Jury Trial......................................................................................................25

20. Rights Cumulative; Waiver. .........................................................................................26

21. Headings. ........................................................................................................................26

22. Counterparts; Methods of Execution. .........................................................................26

23. Audit Rights....................................................................................................................26

24. Data.................................................................................................................................27

25. Drug Enforcement Administration Registration Numbers. .........................................27

26. Names and Logos. ................................................................................................27

27. CHI Standards of Conduct. .................................................................................27

28. Ethical and Religious Directives. .......................................................................28

29. Invalidity/Excluded Provider Assurances.........................................................28

30. Responsibility for Own Acts. .............................................................................29

31. Good Faith and Fair Dealing. .............................................................................29

32. Independent Contractors. ...................................................................................29

33. Non-Discrimination. ...........................................................................................29

34. Compliance with All Laws, Regulations, and Standards. .................................29

Exhibits



## HPG PARTICIPATION AGREEMENT

This Participation Agreement (this "Agreement") is entered into as of January 1, 2016 (the "Effective Date") by and between **Catholic Health Initiatives** ("Participant"), with its principal place of business located at 198 Inverness Drive West, Englewood, CO 80112 and **HealthTrust Purchasing Group, L. P.**, a Delaware limited partnership ("HPG"), with its principal place of business located at 155 Franklin Road, Suite 400, Brentwood, Tennessee 37027, for the purposes of permitting Participant and its facilities to obtain certain products and services under Vendor Contracts between HPG and Vendors.

## W I T N E S S E T H:

**WHEREAS**, HPG is a "group purchasing organization" that is structured to comply with the requirements of the "GPO safe harbor" regulations regarding payments to group purchasing organizations set forth in 42 C.F.R. §1001.952(j) and that maintains agreements with vendors for purchasing on a national basis various products, supplies, materials, dietary products, pharmaceutical products, equipment and services used by hospitals and other healthcare facilities as part of a group purchasing program; and,

**WHEREAS**, pursuant to a Participation Agreement dated April 18, 2007, Participant has been a member of HPG, participating in HPG's group purchasing program, and purchasing products and services under HPG Vendor Contracts in accordance with the terms and conditions thereof;

**WHEREAS**, Participant desires to renew and extend its membership in HPG pursuant to the terms set forth herein;

**NOW, THEREFORE,** in consideration of the premises and the mutual agreements and covenants hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Definitions.**

As used herein, the following terms have the following meanings:

1.1    "Affiliate" means, with respect to a specified person or entity, any person or entity that is Controlled by another specified person or entity.

1.2    "Agreement" means this Participation Agreement, including Exhibits and any addendum, as amended from time to time pursuant to Section 13 hereof.

1.3 "BAA" means a Business Associate Agreement entered into between HealthTrust and a Vendor to address possible disclosure of Protected Health Information under HIPAA by a Facility to a Vendor.

1.4 "Calendar Quarter" means the three-month period commencing on the first day of each of January, April, July and October.

1.5 "Compliance Level" has the meaning set forth in paragraph 5.4 hereof.

1.6 "Control(s)" or "Controlled" means a person or entity that has the power, directly or indirectly, to direct or cause the direction of the management and policies of such other person or entity, whether through ownership of voting securities, by contract or otherwise, and with respect to a non-for-profit entity, the ability to direct or cause the direction of the board of directors.

1.7 "Controlling Ownership Interest" means Control through majority ownership of voting securities and with respect to a non-for-profit entity, the ability to direct or cause the direction of the board of directors.

1.8 "Custom Agreements" means those contracts or amendments to Vendor Contracts negotiated by Purchaser or by HealthTrust on behalf of Purchaser in order to obtain certain additional commitments, and to implement special pricing and terms under the HealthTrust Vendor Contracts exclusively for Participant and its Facilities. Custom Agreements are executed by Purchaser and HPG, as well as the applicable Vendor.

1.9 "Custom Resource(s)" means HPG employees who are assigned to work exclusively for Participant to negotiate, support, implement and manage Custom Agreements for Participant and its Facilities.

1.10 "Dedicated Resource" means those HPG Employees assigned as an Account Director and a Clinical Account Director and dedicated to working primarily in support of contracts for Participant and its Facilities under HPG Vendor Contracts and Custom Agreements.

1.11 "Effective Date" means the date indicated in the preamble paragraph of this Agreement.

1.12 "Event of Force Majeure" has the meaning set forth in Section 11 hereof.

1.13 "Facility" or "Facilities" means Participant, the Participant hospitals and, other Participant healthcare facilities or healthcare providers, and other Affiliates of Participant listed on Exhibit A hereto as amended from time to time pursuant to Section 2.6, which will participate in the Program. A Facility shall include any distribution centers(s) qualifying as an Affiliate and only servicing other Facilities.

1.14 "GPO Affiliation Certificate" means a certificate in the form set forth as Exhibit B hereto.

1.15 "GPO Fees" has the meaning set forth in Section 6 hereof.

1.16 "HCA" means HCA Holdings Inc., a Delaware corporation, and any successor thereto.

1.17 "HealthTrust" or "HPG" means HealthTrust Purchasing Group, L.P., a Delaware limited partnership.

1.18 "HPG Website" means the portion of HPG's website (www.healthtrustpg.com) that is restricted to access by participants in HPG. All references to "HPG website" or "HPG's website" shall be deemed to mean "HPG Website" as defined herein, including subsequent versions thereof.

1.19 "HPG Vendor Lists" has the meaning set forth in Section 4.1.

1.20 "HIPAA" means the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. §1320d.

1.21 "Newly Acquired Facilities" means Facilities where the Participant has acquired a Controlling Ownership Interest in the Facility after the Effective Date of this Agreement, and does not include Facilities that become Affiliates merely by contract or other non-ownership arrangement.

1.22 "PHI" means Protected Health Information or individually identifiable health information.

1.23 "Participant" means the entity indicated in the preamble paragraph of this Agreement.

1.24 "Partnership Agreement" means the Second Amended and Restated Limited Partnership Agreement of HealthTrust Purchasing Group, L.P. dated April 18, 2007, as amended from time to time; or a replacement partnership agreement duly executed by all partners of HealthTrust.

1.25 "Party or Parties" means HealthTrust and Participant individually as a Party or collectively as Parties.

1.26 "Products and Services" means the products, supplies, materials, dietary products, pharmaceuticals, equipment and services, including distribution services, available pursuant to the Vendor Contracts specified in the HPG Vendor Lists and the Custom Agreements.

1.27 "Program" means the group purchasing program conducted by HPG, pursuant to which Participant and its Facilities are provided access to the Vendor Contracts to purchase Products and Services.

1.28 "Term" means the period this Agreement is in effect as provided in Section 3, subject to any extensions or renewals, and subject to the termination provisions of Section 7.

1.29 "Vendor(s)" or "HealthTrust/HPG Vendor(s)" means the supplier(s) of Products and Services under HealthTrust/HPG Vendor Contracts.

1.30 "Vendor Contracts" or "HealthTrust Vendor Contracts" means the purchasing agreements between Vendors and HealthTrust for the purchase of Products and Services, as well as any other agreements related thereto, such as, but not limited to,

BAAs, which are listed on the HealthTrust Website, as updated from time to time by HealthTrust. Vendor Contracts, for clarity, includes those contracts with Vendors for non-clinical products and services which HealthTrust sometimes refers to as "CoreTrust" contracts.

## 2. **Purchase of Products and Services; Facilities.**

2.1 Effective Date. Participant and Facilities shall be eligible to purchase Products and Services under the Program as set forth in this Agreement commencing on the Effective Date. As of the Effective date, this Agreement shall replace and supersede the April 18, 2007 HealthTrust Participation Agreement, and all amendments thereto, entered into between the Parties, which agreement shall be deemed terminated subject to any survival provisions in such agreement.

2.2 It is the intent of the Parties to establish a business relationship that complies with the Medicare anti-kickback statute, set forth in 42 U.S.C. §1320a-7b(b). The parties agree that, for the purposes of this Agreement, HPG is acting as a group purchasing organization. The Parties intend to comply with the requirements of the "GPO safe harbor" regulations regarding payments to group purchasing organizations set forth in 42 C.F.R. §1001.952(j) and the Parties believe that this Agreement satisfies those requirements.

2.3 Subject to the terms, conditions and exclusions set forth in this Agreement, and except for Participant's membership in Cardinal Health 188 LLC, doing business as VitalSource (hereinafter referred to as "VitalSource"), for the purchase of oncology, rheumatology and other specialty pharmaceutical products, Participant hereby engages HPG to act as its exclusive independent group purchasing organization, and to provide access to the Vendor Contracts, pursuant to which Participant and its Facilities will purchase Products and Services available thereunder for use in the Facilities. Participant hereby authorizes HPG, as its agent for such purposes, to (i) negotiate the terms of and enter into Vendor Contracts, and to cancel or modify any Vendor Contracts as it deems necessary, advisable or appropriate; (ii) receive rebates from Vendors based on Participant's purchases under Vendor Contracts, for payment by HPG to Participant pursuant to Paragraph 6.2, and (iii) to receive from Vendors, distributors, and e-commerce companies, data relating to purchases of Products and Services under Vendor Contracts by Participant and Facilities.

2.4 The Facilities identified on Exhibit A hereto (i) shall have access to, and be deemed participants in the Program, (ii) shall have the right to purchase Products and Services, and (iii) shall be subject to all terms and conditions of this Agreement applicable to Participant.

2.5 Each Facility shall execute and deliver to HPG the GPO Affiliation Certificate (a copy of which is attached as Exhibit B) prior to being granted access to the Program.

2.6 If Participant, or any Facilities in which Participant has a Controlling Ownership Interest, acquires any new hospital or other healthcare facility, or enters into an agreement to manage the supply chain function of an independent healthcare provider, Participant shall advise HealthTrust in writing of such event within ninety (90) days following closing of the transaction. Unless otherwise mutually agreed, HealthTrust and Participant shall enter into an amendment adding such entity as a Facility effective not

Case 3:21-cv-00460   Document 1-1   Filed 06/10/21   Page 8 of 39 PageID #: 21

later than one hundred eighty (180) days following the date of such closing; or in the event such entity is subject to a membership agreement with another GPO signed prior to the closing date, not later than ninety (90) days following the expiration of the then existing term of the GPO membership agreement for such entity. Facilities must qualify as Affiliates of Participant and Participant must be able to meet its obligations under Section 5.6, as to any entity listed as a Facility in Exhibit A.

2.7     Any Facilities divested by Participant or its parent Affiliate, or which no longer qualify as an Affiliate of Participant, shall be removed from participation under this Agreement at the conclusion of the transition period described as follows. In this event, Participant shall use its best efforts to provide HPG with written notice thereof prior to the closing date of such divestiture or date of ceasing to be an Affiliate of Participant ("Divestiture Date") but in no event more than thirty (30) days after the Divesture Date. Any such divested Facility shall have the right to remain a party to this Agreement and to continue to participate under this Agreement for an eighty (180) day transition period following the Divestiture Date, unless otherwise agreed to by the parties. As of the date of its divestiture, it will be deemed that this Agreement will have been partially assigned to the divested Facility and have a term of one hundred twenty (120) days from the date of divestiture. Any extension of such term shall be only by written amendment executed by HPG and the divested Facility. Participant shall have no obligations related to the divested entity for its compliance with the terms of this Agreement after such divestiture.

2.8     No Separate Agreements. Except for Custom Agreements, Participant and its Facilities shall not (itself or through third parties) negotiate amendments (including pricing amendments) or modifications to HealthTrust Vendor Contracts or separate agreements with HealthTrust Vendors for Products and Services without the prior written approval of HealthTrust. Custom Agreements that seek to modify or amend HealthTrust Vendor Contracts shall be subject to the approval and countersignature of HealthTrust, and stand-alone Custom Agreements shall be subject to the approval of HealthTrust. HealthTrust agrees not to unreasonably withhold approval of or restrict use of Custom Agreements. Notwithstanding the foregoing, it is understood that Participant shall only negotiate Custom Agreements through its Custom Resources, as described in Section 2.10 below and only with respect to areas where HealthTrust does not have an agreement, where the HealthTrust Vendor Contracts indicates an "optional source" award designation, Physician Preference Product Categories (defined below) and those medical/surgical products agreements where the terms of the applicable HealthTrust Vendor Contract permit members to negotiate pricing amendments and/or Participant may seek to drive enhanced formulary and MWBE compliance. "Physician Preference Products Categories" is defined as limited to the following products: orthopedic, spine and neuro implants; other implantable devises (e.g., shoulder, urological, cosmetic); osteobiologics (e.g., demineralized bone matrix (DBM), bone cement); pacemakers, ICD, LVAD; stents (e.g., CV, urological, GI); valves; synthetic grafts; CV supplies (e.g., balloons, guidewires, hunts); and robotics.

2.9     Dedicated Resources. At its sole cost and expense and fully-funded by HPG out of HPG's GPO Fees (i.e. not withheld from GPO Fees payable to Participant) for the Term of this Agreement, HealthTrust shall provide Dedicated Resources in the form of (i) a dedicated Account Director, (ii) a dedicated full-time Clinical Account Director, to support Participant and its Facilities with matters related to HPG Vendor Contracts and

Custom Agreements in compliance with HPG policies and procedures.

2.10 <u>Custom Resources</u>. HPG shall maintain and co-manage with Participant a team of Custom Resources, dedicated to the negotiation, implementation, management and support of Custom Agreements on Participant's behalf in compliance with HPG policies and procedures. Custom Resources shall have access to de-identified data maintained by HealthTrust for purposes of benchmarking and to evaluate sourcing opportunities. All expenses related to such Custom Resources, including salary, benefits and a portion of overhead expenses allocated to such additional resource, shall be mutually agreed to by HealthTrust and Participant and fully funded by Participant through withholding such amounts from the GPO Fees payable to Participant by HealthTrust. Custom Resources shall have an office location as reasonably determined by Participant.

2.11 <u>Office Arrangements</u>. For both Dedicated Resources and Custom Resources, if Participant desires for these resources to have an office location at other than an HPG facility, Participant shall be responsible for the costs of such office space. For avoidance of doubt, HPG's offices located in Schaumberg, Illinois are considered an HPG facility.

## 3. <u>Term</u>.

3.1 <u>Term</u>. Subject to termination under Section 7 hereof, the term of this Agreement shall commence on the Effective Date ("Initial Term") and end January 1, 2021, with automatic renewals thereafter for terms of one (1) year each ("Renewal Term"). This Agreement shall not auto-renew more than five times. HealthTrust and Participant shall each have the right to provide notice of non-renewal by providing written notice to the other at least ninety (90) days prior to the end of the Initial Term or any subsequent one year Renewal Term thereof. In the event mutual agreement for renewal does not occur after the fifth one (1) year renewal term, and Participant continues to participate in the Program, then this Agreement shall remain in effect and automatically renew on a month to month basis with either Party having the right to terminate this Agreement on at least thirty (30) days prior notice.

3.2 <u>Custom Agreements</u>. In the event this Agreement expires or is terminated without being replaced by a new participation agreement, any Custom Agreement entered into by Participant or any of its Facilities under any Vendor Contract shall terminate concurrently with this Agreement unless such Custom Agreement (i) expressly provides that it survives termination of this Agreement, or (ii) has a stated term related to the purchase or lease of capital equipment and does not have any automatic termination provision in the event Participant and/or Facilities no longer participate in the Program.

3.3 <u>Survival</u>. To ensure regulatory compliance and to permit Participant and its Facilities to meet their contractual commitments to HealthTrust Vendors: (i) if a Vendor permits Participant to actually purchase Products and Services under any HealthTrust Vendor Contracts after the designated termination or expiration date for this Agreement; or (ii) Participant or any Facility has an obligation to purchase Products or Services under its own commitment under a HealthTrust Vendor Contract or Custom Agreement, then Participant remains a member of the Program and this Agreement remains in effect on a non-exclusive basis for such limited purposes and for so long as such purchases continue.

4.      **HPG's Responsibilities.**

4.1     Access to the HealthTrust Website.  HealthTrust shall provide Participant with access to the HealthTrust Website.  HealthTrust maintains a current list of HealthTrust Vendor Contracts on the HealthTrust Website which are hereby incorporated as part of this Agreement ("HPG Vendor Lists"). The HealthTrust Website also provides access to Products and Services, pricing, delivery, ordering requirements and other terms thereof, available for purchase under Vendor Contracts, which can be accessed in the secure section of HealthTrust's Website under the tab titled "Contracts". HealthTrust shall notify Participant of new Vendor Contracts and shall periodically update the HealthTrust Website to provide a current list of HealthTrust Vendor Contracts.  The parties to this Agreement hereby agree that, upon posting an updated list of HealthTrust Vendor Contracts on the HealthTrust Website, this Agreement shall be deemed amended to incorporate such updated list of HealthTrust Vendor Contracts.  Participant and its Facilities agree: (i) to periodically (at least annually) check such website to obtain a copy of this updated list of HealthTrust Vendor Contracts; and (ii) to comply with all terms and conditions of access and use of the HealthTrust Website, as provided on such HealthTrust Website. In the event of a conflict between the terms and conditions of access and use of the HealthTrust Website and the provisions of this Agreement, this Agreement shall govern.

4.2     HPG shall provide information and documentation to assist Participant and Facilities in its transition to and participation in the Program. For Facilities that, after the Effective Date, become an Affiliate through a contractual or other relationship but do not constitute a Newly Acquired Facility, HPG shall provide account management assistance with in-service training for onboarding of the Facilities to the Program.

4.3     Newly Acquired Facilities.  For Newly Acquired Facilities only, HPG agrees to provide a committed team and project management to facilitate onboarding of Newly Acquired Facilities of the Participant as provided below:

4.3.1   In collaboration with Participant, HPG will develop a timeline and project management plan to effectively transition each Newly Acquired Facility to full participation in the Program.   The project management plan shall utilize conversion mapping and savings analytics with prioritization where savings can be achieved and ongoing project management tracking (i.e. performance monitoring).  The timeline shall be mutually agreed to by the parties before implementation of the plan to allow for appropriate loading of contract pricing by Vendor and Distributors, but in no event shall the timeline require less than 60 days' notice to Vendors for pricing to become effective for such Newly Acquired Facility.  As a part of the project management plan, HPG agrees to provide onsite systems training to the Newly Acquired Facility.

4.3.2   On a case by case basis, HPG may, in its sole and absolute discretion, consider assisting Participant with the cost of converting a Newly Acquired Facility from a different group purchasing organization, based on the economics of the conversion; provided that in no instance shall such assistance be greater than 50% of the conversion costs.

4.4     HPG shall notify each of the Vendors under the Vendor Contracts that Participant and

Case 3:21-cv-00460   Document 1-1   Filed 06/10/21   Page 11 of 39 PageID #: 24

its Facilities are participating in those agreements.

4.5 HealthTrust Conferences. HealthTrust may host conferences in which educational presentations are provided for members and HealthTrust Vendors participate in a vendor event in which their products and services are featured to member attendees. In such event, a limited number of Participant representatives may be permitted to attend such conferences with HealthTrust underwriting a portion of the costs thereof. The number of Participant representatives invited and the costs covered shall be at the discretion of HealthTrust, but will generally be comparable to that provided other members of HealthTrust of similar size as Participant.

4.6 Participant acknowledges that HPG and partners in HPG have Affiliates that provide healthcare services. Certain of these Affiliates may, from time to time, make proposals to, or do business with, Participant or its Affiliates. Participant and its Affiliates shall not be required to accept any such proposal, or to do any such business, as a result of this Agreement or any other business relationship between HPG and Participant and their respective Affiliates. It is understood by the parties that execution of this Agreement does not give rise to any obligation whatsoever, either express or implied, on the part of Participant or any of its Affiliates to provide any business or referrals to HPG, any partner in HPG, or any Affiliates of HPG or any Affiliates of such partner.

4.7 Commencing the Effective Date and for the balance of the Term, HPG agrees to pay to Participant eighty percent (80%) of the GPO Fees received by HPG from HPG Vendors in connection with purchases under HPG Vendor Contracts by Participant and Facilities. HPG shall make payments of such GPO Fees, together with supporting documentation, directly to Participant for Participant and all Facilities, not less frequently than monthly, with payment due for all such GPO Fees processed by the fifteenth (15th) day of each month, as soon as possible thereafter, but in no case later than thirty (30) calendar days following the end of the month in which such GPO Fee is processed, provided all required documentation for proper allocation is received by HealthTrust from the Vendor. Participant acknowledges that such amounts received shall be considered a discount and that it intends to comply with the requirements stated in Paragraph 6.4 of this Agreement. Notwithstanding the foregoing, no GPO Fees will be shared with Participant under any pharmacy benefit management agreement or any other agreement where the products and/or services are governed by ERISA, as well as any insurance programs offered by HealthTrust. In such cases, HealthTrust will use commercially reasonable efforts to have the Vendor reduce the costs of Products and Services by an amount approximately equal to eighty percent (80%) of the GPO Fee payable by the Vendor.

4.8 Market Competitiveness Guarantee. Except as excluded below, HPG agrees that to the extent any other participant of HPG receives a higher percentage of GPO Fees as provided for in Section 4.7 above, HPG agrees to amend this Agreement and provide such percentage to Participant. This guarantee shall not apply to a higher percentage of GPO Fees given to (i) founding/originating partners of HPG or (ii) partners with obligation to fund HPG overhead costs.

4.9 Periodic Reviews. HPG will participate in bi-annual performance and strategy discussions with Participant and such other periodic leadership meetings that may be deemed necessary by the Parties. Additionally, the Parties will, on a quarterly basis,

conduct supply chain reviews. HPG will facilitate a collaborative forum for discussions of supply-chain best practices, and provide support for the creation of formal supply-expense management process. HPG will evaluate the potential for shared space/operations to support a Participant central distribution model.

4.10 <u>Partnership Interest</u>. In accordance with the Partnership Agreement, Participant shall retain its 5.166% limited partnership interest in HealthTrust. Such limited partnership interest currently provides that Participant receives 5.166% of the Non-Partner Healthcare Products GPO Fees (as defined in the Partnership Agreement) that exceeds the amount of $26,991,088.00 in any calendar year, subject to the terms of the Partnership Agreement. In addition, subject to consent by the Partners of HealthTrust, HealthTrust agrees to amend the Partnership Agreement such that commencing January 1, 2016 Participant shall receive 5.166% of the Non-Partner Business Products GPO Fees (as defined in the Partnership Agreement and inclusive of CoreTrust Purchasing Group). If the Partners of HealthTrust fail to consent to amend the Partnership Agreement, as described in this section, Participant shall have the right to immediately terminate this Agreement.

4.11 <u>Consulting Services</u>. Participant acknowledges that HealthTrust offers commercially available consulting programs, including the "SourceTrust," "ServiceTrust" and "SolutionsTrust" programs. As Participant is a partner of HealthTrust, and as the parties mutually desire to support the growth of these consulting programs, Participant agrees to consider engaging HealthTrust to provide additional consulting services to Participant as appropriate opportunities arise during the Term.

4.12 <u>Spend Analytics Tools</u>. HPG will provide its proprietary spend analysis tools including those for medical/surgical, pharmaceutical and orthopedic products at no charge to Participant for the length of the Term as set forth in the "Spend Analytics Services and Access Terms and Conditions" attached to this Agreement as Exhibit C. Additionally, Participant may suggest changes, need updates or other concerns regarding the spend analysis tools. HPG agrees to address such concerns through the HealthTrust Regional CEO assigned responsibility for Participant.

4.13 <u>Advisory Boards</u>. Participant shall have the right to have one (1) representative attend all HealthTrust Supply Chain Board, Advisory Boards, and Partner Advisory Committee meetings.

4.14 HPG agrees to work with Participant and other HPG Partners (as defined in the Partnership Agreement) to facilitate strategic dialog among the HPG Partners related to supply-chain issues and potential supply chain investment. Additionally, HPG through its CEO, CFO and supply chain leadership, agrees that it will conduct quarterly supply chain meetings with Participant to facilitate, discuss and review: (1) potential supply chain investments, (2) innovations and strategies related to supply chain and (3) best practices/key provider initiatives among the membership (e.g. centralized distribution models; remote pharmacy strategies).

4.15 <u>Performance</u>.

4.15.1 <u>Current Performance Issues</u>. Over the course of the ongoing relationship between HPG and Participant, HPG has been made aware of certain performance issues and opportunities for improvement that Participant desires

for HPG to address, including those noted below. HPG has been and will continue to engage in reasonable continuous improvement efforts and may add additional staff and other resources to address Participant's concerns.

- Data quality issues related to nightly data feeds, Catscan, and agreement launch packages

- Items dropped from data feed and Catscan due to extensions not being processed by HPG in a timely manner;

- Timeliness of contract items provided by the supplier on their price file being loaded and available in the data feed;

- Timeliness of price file increases/decreases being loaded and available in the data feed; and

- Distributor version of contract item being dropped or not loaded; and

- Quality and accuracy of the price file and timely correction.

4.15.2 <u>Future Performance Issues</u>. During the Term of this Agreement, HPG agrees to timely respond to any current performance issues and future issues should they arise. All notices of purported performance issues shall be sent to the HealthTrust Regional CEO assigned to Participant. Upon receipt of such purported performance issue notice, the Parties shall work in good faith to resolve the performance issue to Participant's reasonable satisfaction. If Participant is not satisfied with the proposed resolution, Participant may elevate the purported performance issue to the SVP, Sales and Marketing, by providing notice of the purported performance issue and an explanation of why HPG's proposed solution is unsatisfactory. In the event that Participant remains dissatisfied after such escalation or provides notice of a perceived systemic performance issue, HealthTrust, through its Chief Operating Officer, and Participant will confer in good faith to develop a commercially reasonable action plan to achieve Participant's reasonable satisfaction.

4.15.3 <u>Termination for Performance Issues</u>. In the event HPG performance issues discussed in Section 14.5.1 require more than 30 hours per calendar month for two consecutive calendar quarters of Participant staff time or cost Participant more than One Hundred Thousand Dollars ($100,000) in one quarter, in order to remedy, Participant shall have the right to terminate this Agreement upon thirty (30) days advance written notice; provided, however, that Participant may so terminate this Agreement in the event of a failure described above only if Participant shall have given HealthTrust written notice of the specifics of the data quality performance issue causing Participant to incur such time or cost, including any evidence of such data quality performance issue, and HealthTrust shall not have cured such issue within forty-five (45) days thereafter.

4.15.4 <u>Spend Analytics Enhancements</u>. The Parties acknowledge that HPG's current platforms provide certain spend analytics capabilities for Participant. The Parties further mutually desire to improve the user functionality and related aspects of these platforms and, accordingly, HPG agrees to collaborate with Participant to define and develop supply analytics enhancements within a mutually agreed and commercially reasonable implementation timeframe. HPG will seek

Participant's input into the ongoing development plan and strategy for these enhancements, to be reviewed with Participant on at least a quarterly basis. In the event HPG is unable to implement the mutually agreed development plan, Participant shall have the right to terminate this Agreement upon ninety (90) days advance written notice to HPG.

4.15.5 <u>Access to PPI Data</u>. HPG acknowledges its commitment, as permitted by this Agreement, to provide efficient access to de-identified data regarding PPI pricing maintained by HPG to Custom Resources for purposes of benchmarking and to evaluate sourcing opportunities, beginning no later than September 1, 2015.

4.15.6 Nothing in this Section shall be interpreted to limit the Parties' other rights or obligation under this Agreement including Participant's rights under Section 7.5 of this Agreement.

**5.** **Representations, Warranties and Covenants of Participant.**

Participant, for itself and for each of the Facilities that purchase under the Vendor Contracts, whether or not set forth on Exhibit A hereto, hereby represents and warrants to and covenants with HPG as follows:

5.1 All purchases under the Vendor Contracts by Participant and its Facilities for Products and Services shall be in the name of, and between, Participant or one or more of its Facilities, on the one hand, and the respective Vendor, on the other hand. HPG shall not be a party to any such purchases and shall not have any liability under any such agreement or with respect to any such purchases or any Products and Services furnished thereunder. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, (i) HPG DOES NOT MAKE, AND EXPRESSLY DISCLAIMS, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, AS TO ANY PRODUCTS AND SERVICES SOLD BY ANY VENDOR, AND (ii) PARTICIPANT HEREBY EXPRESSLY RELEASES HPG FROM ANY AND ALL LIABILITY AND CLAIMS RELATING TO THE PRODUCTS AND SERVICES, AND ANY BREACH OR ALLEGED BREACH OF WARRANTY IN CONNECTION WITH THE PRODUCTS AND SERVICES.

5.2 Participant and its Facilities shall indemnify and hold HPG, the partners in HPG, and their respective Affiliates, agents, officers, directors and employees (the "Indemnitees"), harmless, from and against any and all losses, liabilities, penalties, claims, damages, demands, costs and expenses (including, without limitation, reasonable attorneys' fees, witness fees, investigation expenses, costs of management time, any and all other out-of-pocket, any punitive or consequential damages, and any other expenses incident thereto) whatsoever that are assessed, imposed, awarded against or incurred after the date hereof by any of them, relating to acts or omissions of Participant which relate in any way to this Agreement, including, without limitation, any claims resulting from a failure to pay for any Products and Services purchased by Participant or any of its Facilities, any product liability claims associated with the Products and Services purchased by Participant or any of its Facilities, or any failure to comply with Participant's obligations under Paragraphs 6.2 and 6.4 herein. If any such

claim is made against Participant or any of its Facilities, Participant shall notify HPG in writing, and in reasonable detail, promptly (and in any event within fifteen (15) business days) after receipt by Participant or its Facility of written notice of such claim, and shall indemnify and hold the Indemnitees harmless for any Liabilities arising from any failure to promptly notify HPG. Likewise, if any such claim is made against any Indemnitee, HPG shall notify Participant in writing, and in reasonable detail, promptly (and in any event within fifteen (15) business days) after receipt by HPG of written notice of such claim. Participant shall use its reasonable efforts to obtain the dismissal of HPG from any action or proceeding relating thereto.

5.3     During the Term of this Agreement, except as contemplated and permitted under Sections 2.6 with respect to acquisitions in which Participant lacks a Controlling Ownership Interest, neither Participant nor any of its Facilities shall utilize, participate in or maintain membership in any other group purchasing organization, or other similar agreement or arrangement, for purchasing Products and Services available pursuant to the Program (except as to VitalSource). The parties intend that, except as to VitalSource, this Agreement shall be the exclusive arrangement that Participant and its Facilities utilize for the purchase through a group purchasing organization or similar entity of Products and Services available pursuant to the Program. Participant or any of its Facilities may maintain membership in state or local health care associations, provided they do not participate in any group purchasing services offered associations that are available from HPG. Participant or any of its Facilities may, in the absence of HPG maintaining a national or regional agreement in a particular product or service area, develop its own vendor agreements for use by Participant or any of its Facilities. However, if at a later date Products and Services available under the Program overlap those available under any vendor agreements with Participant or any Facilities, then Participant and Facilities shall transition to the applicable HPG Vendor Contracts at the first appropriate opportunity without improperly terminating or breaching any of its then existing legal obligations under its vendor agreements.

5.4     Participant and its Facilities shall purchase pursuant to the HPG Vendor Contracts, during each calendar quarter during the Term of this Agreement, at least eighty percent (80%) of each of the Products and Services available through Vendor Contracts, other than "optional source" award status Vendor Contracts and with respect to MWBE vendor agreements, under the Program used in the normal and customary operations of Participant and its Facilities, taken as a whole (the "Compliance Level"); *provided, however,* that if Participant or any of its Facilities purchase any Products and Services under a Vendor Contract that requires purchase of a higher percentage of the Products and Services available under such Vendor Contract used in the normal and customary operations of Participant or such Facilities, Participant and its Facilities shall comply with such higher requirement. Notwithstanding the foregoing, purchases of products or services other than under HealthTrust Vendor Contracts when necessary for patient care considerations that are not able to be met by Products and Services, shall not be included in the calculation for meeting the Compliance Level.

5.5     Nothing in this Agreement shall be construed to require or encourage Participant or any of its Facilities to improperly terminate or breach in any way any existing vendor agreement to which Participant or any of its Facilities is a party.

5.6     Participant agrees to cause each of the Facilities (i) to comply with all terms of this

Agreement as if a party hereto, (ii) to comply with all terms of the Vendor Contracts, including without limitation, Compliance Levels and (iii) to execute separate agreements or acknowledgements as reasonably requested by HPG or any particular Vendor evidencing such Facility's agreement to comply with the terms of the relevant Vendor Contract.

5.7    Participant agrees that all Products purchased by it or its Facilities under the Vendor Contracts will be for use in the provision of healthcare services in its Facilities, and not for resale or distribution to third parties other than in the course of the provision of healthcare services by such Facilities, except as to any distribution center that is an Affiliate of Participant, such distribution center shall have the right to purchase Products and Services and distribute such to Affiliates of Participant provided such distribution center and such Affiliates are all listed as Facilities under this Agreement. Participant acknowledges that such prohibition on resale and distribution extends to resale or distribution to physician practices other than those owned by, Controlled by, or managed by Participant and listed in Exhibit A. The parties acknowledge that to the extent any Vendor Contracts contain prohibition of purchases by physician practices, any Participant Facilities listed on Exhibit A as physician practices will not be able to purchase under those contracts. HPG and Participant will work in good faith to identify those Vendor Contracts under which Participant's physician practice Facilities would like to purchase and if the terms of any of such Vendor Contracts prohibit purchases by physician practices, HPG will attempt to negotiate terms under which Participant physician practices can make purchases.

5.8    Participant agrees, and shall cause each of its Facilities to agree, to the extent the confidentiality obligations of Section 9 are applicable to the information disclosed, to keep all communications between HPG and Participant or its Facilities confidential, not to discuss or disseminate such communications to other participants in the Program or to any third parties, and to comply with the confidentiality requirements of Section 9 thereof.

5.9    Participant warrants that all Facilities listed on Exhibit A hereto, or as later amended, qualify as Affiliates of Participant and furnish services to third parties for which payment may be made in whole or in part under Medicare or a state healthcare program.

5.10   Business Associate Agreements. Participant acknowledges and agrees that HealthTrust may provide on the HealthTrust Website, copies of BAAs as a convenience for all HealthTrust participants. HealthTrust does not accept any legal, financial or other obligation or responsibility relating to the BAAs or the posting of BAAs. Participant further acknowledges and agrees that it is solely responsible for determining if the BAAs meet its own legal and other obligations under HIPAA and any other laws and regulations. Participant further acknowledges that there may be certain Vendors which have not entered into a BAA with HealthTrust. HealthTrust does not accept any legal, financial, or other obligation relating to Participant's reliance on the absence of a BAA between a Vendor and HealthTrust as suggesting that a BAA is not required, and Participant is solely responsible for determining: (i) whether a BAA with a Vendor is required; and (ii) the content of any such BAA.

5.11   HealthTrust is Not a Business Associate. It is not the intent of this relationship to have PHI disclosed by Participant or any Facility to HealthTrust or to, in any way, make

HealthTrust a Business Associate to Participant or any Facility. If it becomes necessary for PHI to be disclosed to HealthTrust, including as may be necessary in connection with a scope of work or other project with a HealthTrust or HealthTrust-affiliated service line (e.g. ServiceTrust, SolutionsTrust, SourceTrust), the Parties shall use commercially reasonable efforts to negotiate and enter into a BAA to cover the applicable business arrangement. If as of the Effective Date a BAA exists between HealthTrust and Participant or any Facility, such BAA shall remain in effect subject to its terms, and not be superseded by this Agreement.

6. **GPO Fees, Rebates, and Global Sourcing Fees.**

6.1     Participant acknowledges (i) that HPG will receive payment of fees for administrative and other services provided by HPG from Vendors based on Products and Services purchased, licensed or leased by Participant and its Facilities ("GPO Fees") during the Term of this Agreement, (ii) that the percentage of the GPO Fees will generally be three percent (3%) or less from each Vendor if a GPO Fee is paid, but may in some cases be higher, and (iii) HPG will receive GPO Fees from some Vendors that are distributors of Products in amounts that are one percent (1%) or less but resulting in an aggregate GPO Fee from both the Vendor manufacturer and the Vendor distributor that may exceed three percent (3%) of the purchase price paid by a Facility, but which shall not exceed four percent (4%) of the purchase price paid by a Facility. With respect to the Vendor Contract between AT&T and HPG for long distance telephone services, HPG receives a GPO Fee of four and one half percent (4.5%). The HPG Vendor List on the HPG Website lists (i) HPG Vendor Contract list, (ii) the list of HPG Vendor Contracts where the Vendors have agreed to pay GPO Fees of three percent (3%) or less, (iii) the list of HPG Vendor Contracts with distributors listing the GPO Fee to be paid to HPG by each distributor, and (iv) the list of HPG Vendor Contracts where the Vendors have agreed to pay GPO Fees to HPG greater than three percent (3%), including the specific percentage of the GPO Fee or the maximum GPO Fee. HPG shall disclose to Participant on an annual basis, in writing, with respect to purchases of Products and Services by each Participant and by each of the Facilities, the names of the Vendors and the specific amount of GPO Fees received from each of such Vendors for Products and Services purchased by Participant and its Facilities. HPG shall disclose to the Secretary of the United States Department of Health and Human Services, upon request, the amount of GPO Fees received by HPG from each Vendor with respect to Products and Services which are purchased, licensed or leased by Participant and its Facilities. Participant agrees to disclose the applicable GPO Fee information provided by HPG regarding such GPO Fees to each of its Facilities. All GPO Fees received by HealthTrust as a result of purchases by Participant and its Facilities under the survival provisions of Section 3.3 shall be retained by HealthTrust.

6.2     HPG agrees to pay to Participant any funds received from Vendors designated as Vendor rebates based on purchases of Products and Services by Participant and its Facilities during the term of this Agreement. Participant acknowledges that any such rebates received from HPG in respect to purchases made under the Vendor Contracts will be allocated among all Facilities participating in the Program in amounts proportionate to the dollar amount of Products and Services giving rise to such rebate purchased by each Facility participating in the Program and as otherwise required by law and/or regulation. The amount of any rebate distributed to Participant shall be treated as a discount to Participant's cost for the applicable Products and Services. The

Participant is responsible for allocating any such rebate so received, as well as any rebate received directly from any Vendor, among its Facilities and for providing all required information regarding such rebate amounts and allocations to its Facilities as required by law and/or regulation. It is the intent of the parties hereto to establish a business relationship that complies with the Medicare and Medicaid anti-kickback statutes set forth at 42 U.S.C. §1320a-7b(b). In certain instances, invoices from Vendors may not accurately reflect the net cost of Products and Services to the Participant and/or Facility. Where a discount or other reduction in price is applicable, the parties also intend to comply with the requirements of 42 U.S.C. §1320a-7b(b)(3)(A) and the "safe harbor" regulations regarding discounts or other reductions in price set forth in 42 C.F.R. §1001.952(h). In this regard, the parties hereto acknowledge that Participant will satisfy, and ensure that its Facilities satisfy, any and all legal and regulatory requirements imposed on buyers. Thus, Participant will accurately report, under any state or federal program that provides cost or charge based reimbursement for the Products and Services covered by this Agreement, the net cost actually paid by the Participant and/or Facility, pursuant to such Vendor Contracts. HPG shall make payments of such Rebates due hereunder, together with supporting documentation, directly to Participant for Participant and all Facilities, not less frequently than monthly, with payment due for all Rebates processed by the fifteenth (15th) day of each month, as soon as possible thereafter, but in no case later than thirty (30) calendar days following the end of the month in which such Rebate is processed, assuming all required documentation for proper allocation is received from the Vendor.

6.3    HPG maintains on the HPG Website, HPG Vendor Lists, which are hereby incorporated as part of this Agreement. The parties hereby expressly agree that updated HPG Vendor Lists shall be deemed to be an amendment to this Agreement for the purpose of incorporating such list to be included in this Agreement. Participant agrees to periodically (at least annually) check the HPG Website to obtain a copy of the updated HPG Vendor Lists.

6.4    Participant acknowledges that any portion of GPO Fees or other payments made by HPG to Participant pursuant to this Agreement shall be considered a discount. Participant agrees to allocate the GPO Fees received between each of its Facilities based on their respective purchases under HPG Vendor Contracts. Participant further represents that it intends to comply with the requirements of 42 U.S.C. section 1320a-7b(b)(3)(A) and the "safe harbor" regulations regarding discounts or other reductions in price set forth at 42 C.F.R. section 1001.952(h). In this regard, Participant will satisfy, and ensure that its Facilities satisfy, any and all legal and regulatory requirements imposed on buyers. Thus, Participant and its Facilities will accurately report, under any state or federal program that provides cost or charge based reimbursement for the Products and Services covered by this Agreement, the net cost actually paid by the Participant and/or Facility, pursuant to HPG Vendor Contracts.

6.5    Global Products and Global Sourcing Fee. Participant acknowledges that HealthTrust is engaged in a program to achieve savings on products ("Global Products") by sourcing them internationally through a coordinated arrangement with a third party (or third parties). Due to the investment of HealthTrust in this program, as well as the services and clinical expertise that HealthTrust will dedicate to sourcing products globally, pricing for Global Products made available to Participants and Facilities for purchase may also include a fee payable to HealthTrust (a "Global Sourcing Fee"). While the

Global Sourcing Fee is not calculated based on a specific formula related to sourcing costs, the amount of the Global Sourcing Fee will range from zero percent (0%) up to a maximum of five percent (5%) of the sourcing costs. As used in this section, "sourcing costs" includes costs for purchasing Global Products from the manufacturer and transportation and logistics costs for delivery to the distribution warehouse.

7. **Termination.**

7.1     HPG may terminate this Agreement on ninety (90) days' notice to Participant if (i) Participant and its Facilities, taken as a whole, fail to maintain the Compliance Level in respect to any of the Products and Services for the two consecutive Calendar Quarters immediately preceding the Calendar Quarter in which notice of termination is provided under this section, (ii) Participant or any of its Facilities fails to comply with the material terms and conditions of a substantial number of the Vendor Contracts, or (iii) Participant or any of its Facilities otherwise breaches any provision of this Agreement, *provided, however*, that HPG may so terminate this Agreement in the event of a breach described above only if HPG shall have given Participant written notice of the specifics of the breach, including any evidence of non-compliance supporting HPG's assertion of breach, and Participant shall not have cured such breach or caused such breach to be cured within forty-five (45) days thereafter.

7.2     HPG shall also have the right to terminate this Agreement in its entirety upon ninety (90) days prior notice  (i) upon the transfer, directly or indirectly, by sale, merger or otherwise, of substantially all of the assets of Participant or its ultimate parent or any permitted assignee to an independent third party (upon assignment to such assignee); (ii) in the event that more than forty-nine percent (49%) of Participant's capital stock or equity ownership, or the capital stock or equity ownership of its ultimate parent, or any such permitted assignee is transferred to an independent third party entity; (iii) upon Participant filing for protection under any bankruptcy laws or being the subject of any involuntary bankruptcy proceeding; or (iv) upon Participant and all Facilities failing to make any purchases under any HPG Vendor Contracts over any sixty (60) day period. HPG shall also have the right to terminate this Agreement in its entirety with thirty (30) days prior notice upon Participant becoming a member of another Group Purchasing Organization other than VitalSource.  If Participant ceases to do business as a going concern at the address (addresses) listed in Exhibit A to this Agreement, HPG shall have the right to terminate this Agreement effective fifteen (15) days after sending notice of termination to Participant.

7.3     Participant shall have the right to terminate this Agreement in its entirety upon ninety (90) days prior notice to HPG if: (1) the general partner of HPG changes to a non-HCA Affiliate; and (2) upon HPG filing for protection under any bankruptcy laws or being the subject of any involuntary bankruptcy proceeding.

7.4     HPG shall also have the right to terminate this Agreement with respect to any particular Facility, and Participant shall have the right to terminate this Agreement with respect to its  Facility in which it does not have a Controlling Ownership Interest, upon ninety (90) days prior notice to the other Party (i) upon the transfer, directly or indirectly, by sale, merger or otherwise, of substantially all of the assets of the Facility to an independent third party; (ii) in the event that more than forty-nine percent (49%) of the Facility's capital stock or equity ownership is transferred to an independent third party entity; (iii)

upon Facility filing for protection under any bankruptcy laws or being the subject of any involuntary bankruptcy proceeding; (iv) upon Facility failing to make any purchases under any HPG Vendor Contracts over any sixty (60) day period; (v) if Facility is managed by Participant, upon termination of Participant's agreement with Facility to manage its material management function; or (vi) if a Facility fails to maintain the Compliance Level in respect to any of the Products and Services for any two consecutive Calendar Quarters. HPG shall also have the right to terminate this Agreement with respect to any Facility with thirty (30) days prior notice upon the Facility becoming a member of another Group Purchasing Organization other than VitalSource. If a Facility ceases to do business as a going concern at the address (addresses) listed in Exhibit A to this Agreement, HPG shall have the right to terminate this Agreement with respect to such Facility effective fifteen (15) days after sending notice of termination to Participant and the Facility. If Participant exercises its right above to terminate this Agreement with respect to a Facility in which it does not have a Controlling Ownership Interest, such Participant termination shall not prejudice or restrict such Facility's opportunity to enter into a separate participation agreement with HPG.

7.5     Participant shall have the right to terminate this Agreement on thirty (30) days prior written notice in the event HPG fails to perform its material obligations under this Agreement, and fails to cure such breach within sixty (60) days following receipt of notice specifically describing such breach. The parties acknowledge that mere occasional errors on the part of HPG in providing information to Participant with respect to Vendor Contracts shall not be considered a breach of HPG's material obligations hereunder. HPG's obligation with respect to such errors shall be to provide corrected information to Participant as soon as is commercially reasonable under the circumstances.

7.6     If HPG enters into or has an agreement with any current or future member (except for Investment Partners, as defined in the Partnership Agreement) containing more favorable terms in their totality including, but not limited to, the combination of equity, GPO Fee share, and proportionate resource commitments, than those granted to Participant hereunder, then Participant shall provide a written request to HPG to negotiate in good faith on a potential amendment to this Agreement. If the Parties, acting in good faith, are unable to agree on such an amendment to this Agreement within thirty (30) days of HPG's receipt of Participant's written notice, Participant shall have the right to terminate this Agreement on thirty (30) days prior written notice.

7.7     If HPG enters into or has an agreement with any current or future member containing more favorable requirements relative to negotiating and executing Custom Agreements (or other separate Participant-specific agreements) with HealthTrust Vendors than those granted to Participant hereunder, or if HPG enforces requirements relative to Custom Agreements (or other separate Participant-specific agreements) with HealthTrust Vendors more strictly against Participant than against any current or future member, then Participant shall provide a written notice specifying the purported more favorable requirements and HPG shall (a) provide additional information to Participant demonstrating it has not been disadvantaged relative to the other member, or (b) if more favorable requirements are in place, shall negotiate in good faith on a potential amendment to this Agreement. If more favorable requirements are in place and the Parties, acting in good faith, are unable to agree on such an amendment to this

Agreement within thirty (30) days of HPG's receipt of Participant's written notice, Participant shall have the right to terminate this Agreement on thirty (30) days prior written notice.

7.8 Upon termination of this Agreement, HPG shall have no further obligations hereunder, including, without limitation, no obligation to maintain, update or advise Participant or its Facilities concerning any Products or Services provided hereunder, except (i) as necessary to support any continuing contracts under Section 3.3, (ii) to pay to Participant its allocable portion of any rebates and GPO Fees earned prior to termination and (iii) to provide the applicable reporting for rebates and GPO Fees with respect to Participant purchases from Vendors made prior to termination or for any Custom Agreements that remain in effect after the date of intended termination. Participant shall remain obligated to pay for all purchases by it and the Facilities made under Vendor Agreements prior to termination.

7.9 The termination of this Agreement pursuant to this Section 7 shall not affect the validity and effect of purchases made by Participant under Vendor Contracts prior to termination, Participant's obligation to pay Vendors in respect of such purchases, or any obligation of Participant under any specific agreement with a Vendor.

8. **Access to Books and Records.**

Until the expiration of four (4) years after the Term of this Agreement (including any renewal term), HPG shall make available to Participant, the Secretary of the United States Department of Health and Human Services, the United States Comptroller General, and their duly authorized representatives, in accordance with 42 C.F.R. §420.300 et seq., this Agreement and all books, documents, and records necessary to certify the nature and extent of the costs of the services provided by HPG hereunder. If HPG carries out any of its duties hereunder through a subcontract worth $10,000 or more over a twelve-month period with a related organization, the subcontract also shall contain an access clause to permit such access by the Secretary, the Comptroller General, and their duly authorized representatives to the related organization's books, documents and records. The parties agree that any attorney-client, accountant-client or any other legal privilege shall not be deemed waived by virtue of the provisions of this Section 8.

9. **Confidentiality.**

9.1 Except as permitted in Paragraph 9.4 or as otherwise expressly provided in this Agreement, the terms and exhibits of this Agreement, all information, documents and instruments (including, without limitation, all information regarding the pricing, rebates, discounts, shipping terms and other terms and conditions of the Vendor Contracts, as well as information relating to quantities of Products and Services purchased by Participant and/or its Facilities) delivered or otherwise provided by HPG to Participant or its Facilities, or any of their agents, directors, officers or employees, , or by Participant and/or its Facilities to HPG or any of its agents, directors, officers or employees, is confidential (hereinafter, "Confidential Information"). The parties agree that, subject to any more restrictive confidentiality provisions contained in any Vendor Contract, they shall maintain all Confidential Information in strict confidence, shall use such Confidential Information only as is required in connection with their obligations under this Agreement and the provision of healthcare services by Participant and/or its

Facilities, and may disclose such Confidential Information only on a "need to know" basis to their duly authorized officers, directors, representatives, consultants, accountants, attorneys and agents and to the duly authorized officers, directors, representatives and agents of their Affiliates, subject to the confidentiality and limitations on use provisions contained in this Agreement and any Vendor Contract. The parties shall communicate to each such person the confidentiality obligations of this Agreement, shall cause those persons to hold such Confidential Information in strict confidence as if parties hereto, and shall require the above described non-employees to sign written confidentiality agreements with non-disclosure requirements at least as strict as those stated herein, prior to receipt of any Confidential Information. Notwithstanding anything herein to the contrary, Participant shall not provide any Confidential Information to any entity that functions as a group purchasing organization or is an Affiliate of such an entity, without the prior written consent HealthTrust which shall not be unreasonably withheld. Participant further agrees that any confidentiality agreement with a third party for materials management support or related consulting services, shall contain provisions that prohibit (a) any use of Confidential Information in a database for use other than directly for Participant, unless otherwise expressly approved by HPG, and (b) any other use of Confidential Information for the purpose of performing services for other clients. HPG may use and disclose Confidential Information of Participant (i) in conjunction with the performance of its group purchasing organization functions, (ii) if the information is not associated specifically with Participant and is combined with information from other participants of HPG, or (iii) as is required by law or regulation. Each of HPG and Participant further acknowledges that the remedy at law for any breach or threatened breach of this Paragraph 9.1 will be inadequate and, accordingly, that it and its Affiliates shall, in addition to all other available remedies (including, without limitation, seeking such damages as it or any of its Affiliates can show it has sustained by reason of such breach), be entitled to seek injunctive relief.

9.2 Notwithstanding Paragraph 9.1 above, in the event that any Facility is a governmental unit and is required by law to disclose certain Confidential Information to the public, Participant shall not be liable pursuant to Paragraph 9(a) above, *provided,* that such Facility (i) furnishes only that portion of the information which such Facility is required by law to disclose; (ii) informs HPG of the required disclosure and the legal basis on which such disclosure is required to be made prior to making such disclosure, and (iii) affords HPG the opportunity to intervene for the purpose of seeking an appropriate protective order or otherwise protecting HPG's interest in the information to be disclosed.

9.3 To the extent that a party hereto, any Affiliate of a party hereto, any Facility or, to the knowledge of such party, any current or former employee of any such party or entity is requested (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any information required to be kept confidential pursuant to Paragraph 9.1 above, such party agrees to take all necessary action to maintain, or cause to be maintained (and to cause any such Affiliate or Facility, or in respect of a current or former employee, to use its reasonable efforts to cause such employee to maintain) the confidentiality of such information and to provide prompt notice to the other party, so that such other party may seek an appropriate protective order or waive compliance with Paragraph 9.1 above. If, in the absence of a protective order or the receipt of a waiver hereunder, the person who has

received such a request is, nonetheless, in the reasonable written opinion of counsel, legally required to disclose such information, such person may disclose such information, and no party shall be liable pursuant to Paragraph 9.1 above, *provided*, that such person (i) furnishes only that portion of the information which it is advised by counsel to disclose and (ii) exercises its reasonable efforts to obtain assurance that confidential treatment will be accorded to the disclosed portion of the information. Notwithstanding the foregoing, each party shall be permitted to disclose Confidential Information in any proceeding in which it is in an adversarial position to the other party.

9.4     Notwithstanding the foregoing, no party hereto shall be prohibited from using or permitting the use of and no party shall be required to hold in confidence any information to the extent that (i) such information has been or is publicly known or in the public domain through no fault of such party, or (ii) such information is lawfully acquired by such party from sources other than a party hereto, any Facility or Affiliate of such party, or any of their respective agents, directors, officers or employees, and the acquisition of such information is without restriction of further disclosure and, to the knowledge of the acquiring party, is not in breach of any confidentiality obligation to which the party providing such information is subject.

## 10.     **Attorneys' Fees.**

If either party commences legal action related to any claim or controversy between the parties for any matter arising out of this Agreement, the non-prevailing party shall pay all costs and reasonable attorneys' fees incurred by the prevailing party in connection therewith.

## 11.     **Force Majeure.**

Neither party shall be liable to the other party for any delay or failure to perform its obligations hereunder if such delay or failure results from causes beyond its reasonable control. Such causes may include, without limitation, acts of God, fires or other catastrophes, telecommunications failures, equipment failures, power failures, labor disputes, strikes, delays in transportation, riots, war, governmental regulations, non-performance by suppliers and Vendors, or problems experienced by HPG as a result of its own, HCA, Inc. or any other third party's computer software or hardware failures (an "Event of Force Majeure"). Each party shall give the other party prompt notice of any Event of Force Majeure that may cause delay or non-performance of its obligations hereunder.

## 12.     **Notices.**

All notices or other communications required or permitted under this Agreement shall be in writing, effective upon receipt and sent by registered or certified mail, postage prepaid, or by reputable express delivery service with proof of delivery, or delivered personally. Notices shall be addressed to each party as set forth below or as otherwise designed by a party:

Address for Notice:
HealthTrust Purchasing Group, L.P.
155 Franklin Road, Suite 400
Brentwood, Tennessee 37027
Fax No. (615) 344-3166
Attn: Vice-President, Sales and Marketing

With a copy to:

    Chief Legal Officer
    HealthTrust Purchasing Group, L.P.
    155 Franklin Road, Suite 400
    Brentwood, Tennessee 37027
    Fax No. (615) 344-3166

Participant:

    Catholic Health Initiatives
    198 Inverness Drive West
    Englewood, CO 80112
    Phone No.: 303-298-9100
    Fax No.: 303-298-9690
    Attn: SVP, Supply Chain
    Attn: General Counsel

Any party may change the person and address to which notices or other communications are to be sent to it by giving written notice of any such change in the manner provided herein.

## 13. Entire Agreement; Amendment.

13.1    This Agreement, together with the exhibits thereto, as such exhibits may be modified or supplemented from time to time pursuant to the terms of this Agreement, sets forth the entire agreement and understanding of the parties hereto in respect of the transactions contemplated hereby, and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof. No party hereto has relied upon any oral or written statement, representation, warranty, covenant, condition,

understanding or agreement made by any other party or any representative, agent or employee thereof, except for those expressly set forth in this Agreement or in the exhibits hereto.

13.2    This Agreement may be amended, modified, superseded or supplemented only by a written instrument expressly stating an intent to amend, modify, supersede, or supplement this Agreement, executed and delivered by each of the parties hereto.

## 14. Assignment.

Neither Participant nor any Facility may assign this Agreement, or any of its rights or duties set forth herein, without the prior written consent of HPG; *provided, however,* that each of the Facilities, upon execution and delivery of the GPO Affiliation Certificate, may participate in the Program in accordance with the terms hereof. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and permitted assigns; *provided, however,* that no assignment in violation of the provisions of this Agreement, shall vest any rights in any purported assignee. HPG may assign with consent from Participant, HPG's rights and obligations under this Agreement to a successor entity of HPG as part of a reorganization of HPG which results in HPG being organized in a different legal entity or corporate form, whether through conversion or merger.

15. **No Third-Party Beneficiaries.**

This Agreement is solely for the benefit of the parties hereto, and should not be construed to confer upon any other person any remedy, claim, liability, right of reimbursement, claim of action or other right.

16. **Severability.**

This Agreement shall be construed to be in accordance with any and all applicable federal and state laws and regulations. In the event there is a change in such laws and regulation, whether by statute, regulation, agency or judicial decision that has any material effect on the legality of any provision of this Agreement ("Affected Provision"), then the Affected Provision shall be deemed ineffective to the extent of such change in law or holding without invalidating the remaining provisions hereof or affecting the validity or enforceability of such Affected Provision in any other jurisdiction, subject to renegotiation in good faith by the parties at the written request of either party (the party making such request is hereinafter referred to as the "Requesting Party"). If the parties are unable to renegotiate the Affected Provision to bring it into compliance with the applicable law or regulation within forty-five (45) days of the date on which the Requesting Party provides notice of the change, the Affected Provision will be terminated and be of no further force and effect. In such event, the remainder of the Agreement shall remain in full force and effect.

17. **Governing Law.**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Tennessee without regard to the conflict of laws and principles thereof.

18. **Consent to Jurisdiction.**

Participant and HPG each hereby expressly (a) submits and consents in advance to the jurisdiction of any Tennessee State Court sitting in Nashville, Tennessee or the United States District Court for the Middle District of Tennessee with respect to any legal proceedings arising out of or relating to this Agreement; (b) waives any objection which it may have based upon lack of personal jurisdiction, improper venue or *forum non conveniens*; (c) agrees that all claims with respect to such legal proceedings may be heard and determined in any Tennessee State Court sitting in Nashville, Tennessee or the United States District Court for the Middle District of Tennessee; (d) agrees not to commence any legal proceeding relating to this Agreement other than in a Tennessee State Court sitting in Nashville, Tennessee or the United States District Court for the Middle District of Tennessee, and (e) agrees that a final judgment in any such legal proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

19. **Waiver of Jury Trial.**

PARTICIPANT AND HPG EACH HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT WHICH SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS

AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND, (d) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTON 19.

20.    **Rights Cumulative; Waiver.**

All rights and remedies conferred under this Agreement or by any other instrument or law shall be cumulative and may be exercised singularly or concurrently. The failure by either party to enforce any term shall not be deemed to be a waiver of future enforcement of that or any other term of this Agreement.

21.    **Headings.**

The section headings contained in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

22.    **Counterparts; Methods of Execution.**

This Agreement and any amendments may be executed by the Parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement. Execution and delivery of this Agreement and any amendments by the Parties shall be legally valid and effective through: (i) executing and delivering the paper copy of the document; (ii) transmitting the executed paper copy of the document by facsimile transmission, or electronic mail in "portable document format" (".pdf") or other electronically scanned format; or (iii) creating, generating, sending, receiving or storing by electronic means this Agreement and any amendments, the execution of which is accomplished through use of an electronic process associated with this Agreement, and executed or adopted by a Party with the intent to execute this Agreement (i.e., "electronic signature" through a process such as DocuSign®).

23.    **Audit Rights.**

HPG shall have the right, at its expense, to review and audit the books, records, and documents (whether in hardcopy, electronic or other form) of Participant and the Facilities directly related to the purchase of Products and Services by Participants to verify compliance with their obligations under this Agreement, the volumes of purchases of Products and Services under committed Vendor Contracts, and to obtain any data and information required for HPG to fulfill its responsibilities as a group purchasing organization for healthcare providers. Participant shall have the right, at its expense, to review and audit the books, records, and documents (whether in hardcopy, electronic or other form) of HPG to verify proper loading of Vendor Contract information and proper payments to Participant under this Agreement. The audit shall be conducted only after reasonable notice and during normal business hours, and may be conducted by the auditing Party's employees or agents, or by a third party auditor. To the extent they exist in electronic form, to provide electronic copies of books, records and documents requested for purposes of such audit. This right of audit may be exercised no more

than one (1) time per year by either Party. Each Party agrees to cooperate with the other Party to provide the above-stated materials, and to provide any reasonable assistance necessary for to carry out any audit permitted herein, at no cost to the other Party.

24. **Data.**

HealthTrust shall be the exclusive owner of the compilation of pricing data related to Products and Services. All purchasing transaction data (other than pricing data related to Products and Services) resulting from purchase of Products and Services by Participant and Facilities shall be owned by Participant. Participant agrees to transmit its available procurement data to HealthTrust through a data feed in a format and frequency specified by HealthTrust. Participant hereby authorizes HealthTrust to have access to Participant's (and Facilities') purchasing transaction data, whether through Vendors, distributors, or any business-to-business e-commerce companies through which orders for Products and Services, as well as for products and services not purchased through HealthTrust Vendor Contracts, are placed by Participant and its Facilities. Participant further authorizes HealthTrust to use purchasing transaction data from Participant and Facilities for statistical analysis, GPO functions and other similar purposes, to provide such data to other members and third parties provided such data is de-identified and no portion of the data contains any patient identification information or information that can be specifically traced to Participant, in which case such purchasing transaction data shall not be Confidential Information.

25. **Drug Enforcement Administration Registration Numbers.**

Participant hereby consents to HPG providing Drug Enforcement Administration registration numbers ("DEA" numbers) for itself and all Facilities, to HPG Vendors, including authorized HPG distributors; and to HPG receiving such DEA numbers from HPG Vendors, authorized HPG distributors, and any other appropriate sources.

26. **Names and Logos.**

Participant authorizes HealthTrust to use Participant's names and logos, as provided by Participant to HealthTrust, on HealthTrust's proprietary website and other HealthTrust publications listing Participant among other entities that are members of HealthTrust.

27. **CHI Standards of Conduct.**

Both Parties recognize that it is essential to the core values of Participant that both Parties at all times conduct themselves in compliance with the highest standards of business ethics and integrity and applicable legal requirements. HPG acknowledges that it has electronically accessed, obtained or otherwise received a copy of the *CHI Standards of Conduct* that are set forth *in Our Values & Ethics at Work Reference Guide* ("Reference Guide"), which is available at the following website:

http://www.catholichealthinit.org/corporate-responsibility

Both Parties agree to act in a manner consistent with such *Standards of Conduct*, to the extent the same are applicable to the Parties in the performance of the Agreement.

28. **Ethical and Religious Directives.**

HPG agrees that, throughout the term of the Agreement, HPG, any individual employed by HPG who provides services pursuant to the Agreement, will provide such services in accordance with *the Ethical and Religious Directives for Catholic Health Care Services,* as promulgated by the United States Conference of Catholic Bishops, as amended from time to time, and as interpreted by the local bishop (the "Directives"), if such services are applicable to the Directives. As of the date of the Agreement, the Directives are available at the following website: http://www.usccb.org/.

To the extent Participant reasonably believes that HPG is providing services in violation of the Directive, Participant shall notify HPG of the perceived violation and both parties will work in a commercially reasonable manner to resolve the issue. HPG's compliance with applicable directives shall be considered a material obligation of the Agreement.

29. **Invalidity/Excluded Provider Assurances.**

In an effort to comply with the requirements of Section 1128(b) of the Social Security Act, and the regulations promulgated thereafter, Purchaser and Vendor mutually certify and warrant as follows:

29.1 that the goods or services being furnished and the charges for same, are in compliance with the requirements of Medicare, Medicaid, and state law.

29.2 that each Party, including their Facilities, are not currently excluded, debarred, or otherwise ineligible to participate in Federal healthcare programs as defined in 42 USC § 1320a-7b(f) or any state healthcare program (the "Healthcare Programs") and to neither Party's knowledge, are not under investigation or otherwise aware of any circumstances which may result in that Party or any of its respective Facilities from being excluded from participation in the Healthcare Programs. These representations and warranties shall be ongoing during the Term, and each Party shall immediately notify the other of any change in the status of the representations and warranties set forth in this section.

29.3 that each Party agrees that it shall indemnify and hold harmless the other Party against all actions, claims, demands, and liabilities, and against all loss, damage, costs, and expenses, including reasonable attorneys' fees, arising directly out of its violation of this section, or due to the exclusion of a Party or any individual providing services to a Party from a federally funded health care program, including Medicare or Medicaid.

29.4 that each will not now, or at any time in the future, knowingly employ or otherwise knowingly do business with firms, individuals, or entities under suspension or exclusion from Medicare or Medicaid.

29.5 that each will cooperate by furnishing information about past, present, or future transactions, to whatever extent may be necessary, in order to establish compliance with Medicare and Medicaid requirements by Purchaser and HPG.

30. **Responsibility for Own Acts.**

Subject to Section 5.2, each Party shall be responsible for its own acts and omissions and shall be liable for payment of that portion of any and all claims, liabilities, injuries, suits, demands, and expenses of all kinds that may result or arise out of any alleged malfeasance or neglect caused by said Party, its employees, agents, or subcontractors, in the performance or omission of any act or responsibility of said Party under the Agreement. In the event that a claim is made against both Parties, it is the intent of both Parties to cooperate in the defense of said claim and to cause their insurers to do likewise. Both Parties shall, however, retain the right to take any and all actions they believe necessary to protect their own interests.

31. **Good Faith and Fair Dealing.**

Both parties shall deal with each other publicly and privately in an atmosphere of mutual respect and support, and each party shall maintain good public and patient relations and efficiently handle complaints and inquiries with respect to the services provided under the Agreement.

32. **Independent Contractors.**

The parties are independent contractors. Except as otherwise provided for in this Agreement, neither is authorized or permitted to act as an agent of the other. Nothing in the Agreement shall in any way alter control of the management, assets, and affairs of either party. Neither party, by virtue of the Agreement, assumes any liability for any debts or obligations of a financial or legal nature incurred by the other party.

33. **Non-Discrimination.**

The Parties shall not discriminate in the provision of services under this Agreement based on race, color, national origin, ancestry, religion, sex, marital status, disability, sexual orientation, age, or any other legally prohibited basis.

34. **Compliance with All Laws, Regulations, and Standards.**

34.1  Compliance. The parties intend and in good faith believe that the Agreement complies with the provisions of the Taxpayer Bill of Rights 2, the Internal Revenue Code, specifically including the provisions regarding private benefit and private inurement that apply to Purchaser as a 501(c)(3) corporation.

34.2  Violation of Tax-Exempt Status. If, in the opinion of Participant's outside tax counsel, any provision of this Agreement could jeopardize the federal tax-exempt status of Participant, or the tax-exempt status of the bonds of the Participant, or could result in prohibition of any referral or payment to Participant, then such provision of this Agreement shall be subject to renegotiation in good faith by the Parties at the written request of Participant changed as necessary so that, in the good faith opinion of Parties, such federal tax-exempt status is no longer threatened or such prohibition would no longer result, as the case may be. In such event, the remainder of the Agreement shall remain in full force and effect.

34.3  Equal Employment Opportunity. Participant an Equal Employment Opportunity and Affirmative Action employer. As such, 41 CFR 60-1.4(a), 41 CFR 60-300.5, 41 CFR

60-741.5 as well as 29 CFR Part 471, Appendix A to Subpart A are herein incorporated by reference. By acceptance of this contract, HPG represents and warrants that unless exempted under the terms of these applicable laws, it will comply with the forgoing statutes, rules and regulations and all amendments thereto. To the extent applicable, Participant and HPG shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability. For avoidance of doubt, as of the Effective Date, HealthTrust does not consider itself a covered prime contractor or subcontractor subject to the foregoing statutes, rules and regulations. If HealthTrust's status should change at any time, it will implement policies and procedures in compliance with all legal requirements.

34.4    Prohibition on Child Labor and Human Trafficking. Each Party warrants and represents that it shall comply with all federal and state labor and employment laws, and executive orders and specifically those regarding child labor, procuring commercial sex, using forced labor and human trafficking, as applicable. This includes but is not limited to the Trafficking Victims Protection Reauthorization Act of 2013, Executive Order – *Strengthening Protections Against Trafficking in Persons in Federal Contracts*, Federal Acquisition Regulations (FAR), the provisions of the International Labor Organization's ("ILO") Minimum Age Convention (No. 138), 1973, and any other laws or regulations that prohibit any form of human trafficking, commercial sex, forced labor, child labor or other exploitation of children in the manufacturing, delivery or provision of products/devices, items or services and as each may be amended from time to time.

*Signatures Follow on Next Page*

**IN WITNESS WHEREOF,** each party hereto has duly executed, or has caused this Agreement to be duly executed, as of the date first above written.

HealthTrust Purchasing Group, L.P.
by HPG Enterprises, LLC, its general partner

Catholic Health Initiatives

HealthTrust Signee: *Edward Jones*

Participant Signee:

HealthTrust Signee Name: *Edward T. Jones*

Participant Signee Name:  Dean Swindle

HealthTrust Signee Title: *President + CEO*

Participant Signee Title:  President of
Enterprise Business Lines and CFO

HealthTrust Signature Date: *9/4/15*

Participant Signature Date:  9/2/2015

Participant Federal Tax ID No: <u>98-12061-0000</u>

## LIST OF EXHIBITS

Exhibit A      List of Participant Hospitals and Other Healthcare Facilities and Services

Exhibit B      GPO Affiliation Certificate

Exhibit C      Spend Analytics Services and Access Terms and Conditions

**Exhibit A**

**LIST OF HOSPITALS AND OTHER
HEALTHCARE FACILITIES AND SERVICES**

As of the Effective Date, the roster of Participant's Facilities maintained by HealthTrust as compiled and updated from time to time pursuant to Participant's prior Participation Agreement dated April 18, 2007, as amended, is hereby incorporated in its entirety by reference. Facilities may be added to this list after the Effective Date by the means described in this Agreement, including Participant's providing to HealthTrust the Facility information required below.

| Facility Name | |
|---|---|
| Address: | |
| City, ST, Zip: | |
| Relationship to Participant: | ☐ Owned ☐ Managed ☐ Joint Venture ☐ Partnership ☐ Other |
| Class of Trade: | |
| Description (Facility Type): | |

## EXHIBIT B

### GPO Affiliation Certificate

    The Participant listed at the end of this GPO Affiliation Certificate ("GPOAC") and those Facilities on the attached list (if any is attached) hereby confirm that they have designated HealthTrust Purchasing Group, L.P. ("HealthTrust") as their sole GPO affiliation pursuant to a written Participation Agreement with _____ dated as of _____. Participant and those Facilities listed on the attached shall be eligible to participate in the Program upon HealthTrust providing notice to Vendor and Participant of Participant's "Eligibility Date". Eligibility Date shall mean the date Participant and Facilities will be able to start purchasing products and services under the Program. Vendors having contracts with HealthTrust are hereby instructed and authorized to remove the Participant and Facilities from any other GPO affiliations for purchasing products from such Vendors. HealthTrust is hereby authorized to provide copies of this GPOAC to its Vendors and HealthTrust Vendors shall be entitled to rely on the contents of this GPOAC. The parties agree that changes to Participant's and any Facility's DEA number, contact information, address correction and other such information that do not change the terms and conditions of the Participation Agreement may be completed in the HealthTrust databases without requiring any amendment to the Participation Agreement.

    Participant, on behalf of each Facility on the attached list also confirms that an authorized representative of the Facility has received a copy of the referenced Participation Agreement. All terms used but not otherwise defined herein have the meanings stated in the Participation Agreement. This GPOAC confirms agreement by each Facility that, in consideration of being granted access to the Program and HealthTrust Vendor Contracts available under the Program, the Facility will comply with, and be bound by, all of the terms and conditions of the Participation Agreement as if a party thereto. This GPOAC further confirms agreement that, with regard to purchases made by any Participant/Facility under HealthTrust Vendor Contracts, each will purchase products from Vendor only for its "**own use**" in the provision of healthcare services. Each Participant/Facility will comply with all terms and conditions of such Vendor Contracts, including without limitation payment terms, compliance levels, and arbitration or other dispute resolution provisions. Participant and each Facility recognize that failure to comply with these obligations could result in termination of the Participation Agreement.

    This GPOAC, the Participation Agreement and any amendments to such documents (each, a "Document"), may be executed by the Parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement. Execution and delivery of this Agreement and any amendments by the Parties shall be legally valid and effective through (i) executing and delivering the paper copy of the document, (ii) transmitting the executed paper copy of the document by facsimile transmission, or electronic mail in "portable document format" (".pdf") or other electronically scanned format, or (iii) creating, generating, sending, receiving or storing by electronic means this Agreement and any amendments, the execution of which is accomplished through use of an electronic process associated with this Agreement, and executed or adopted by a Party with the intent to execute this Agreement (i.e., "electronic signature" through a process such as DocuSign®).

    Participant, on behalf of itself and each Facility, acknowledges that with respect to its purchases from Vendors, (a) HealthTrust is acting as a group purchasing organization for which it will receive fees from Vendors and (b) Participant and Facilities may receive rebates from Vendors either directly or through HealthTrust. With respect to such rebates, Participant and Facilities intend to comply with the requirements of the applicable law and safe harbor regulations.

## Participant/Facility Legal Entity Name      *GPOID:

A list containing the name of the Facilities with specific identification information is attached hereto and incorporated herein.

## GPO Affiliation Certificate Facility List

| | |
|---|---|
| Non-Pharmacy Eligibility Date: | |
| Pharmacy Eligibility Date: | |
| Facility Name | |
| Address: | |
| City, ST, Zip: | |
| Relationship to Participant: | ☐ Owned ☐ Managed ☐ Joint Venture ☐ Partnership ☐ Other |
| Class of Trade: | |
| Description (Facility Type): | |
| *GPOID: | |

### Exhibit C

### Spend Analytics Services and Access Terms and Conditions

The following terms and conditions shall apply to the Spend Analytics Services provided under the Agreement. The capitalized terms not defined in Section 1 in the main terms and conditions of the Agreement, in context or in Section 1 of this Exhibit C shall have the meaning specified in the text box below ("**Text Box**").

| Number of Authorized Users: | Thirty (30) (subject to Section 2.3 below) |
|---|---|
| Purpose: | Establish the terms and conditions pursuant to which Participant may obtain a license to use a spend analytics system to perform cost analyses. |

In consideration of the mutual commitments set out below for the spend analytics services ("Spend Analytics Services"), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**1      Definitions.**

1.0      "AP Tool" is defined as the AP Tool software products made available for access under the terms of this Agreement for the purposes of performing accounts payable spend analyses regarding medical/surgical and orthopedic products.

1.1      "Authorized User" is defined as any person having access to and using the Rx Tool or AP Tool on Participant's behalf.

1.2      "Content" is defined as all HealthTrust or Participant materials, data, files, reports, pricing, market intelligence and information collected, received, transmitted, interpreted or created by or through the Rx Tool and/or AP Tool, including, but not limited to, HealthTrust or Participant designs, trademarks, logos, text, images, graphics, clips, and other material.

1.3      "Dedicated Servers" is defined as the servers purchased by HealthTrust and housed and operated by HealthTrust, and related technology and products required for creating a dedicated environment for Participants to access the AP Tool and/or Rx Tool.

1.4      "Direct Spend" is defined as expenditures for products and services used directly for products or services that are sold by Participant.

1.5      "Direct Spend Analytics Services" is defined as spend analytics services to be performed by HealthTrust on Direct Spend data from Participant.

1.6      "Documentation" is defined as written manuals and other materials provided by HealthTrust to Participant in connection with Participant's use of the AP Tool and/or Rx Tool, including, but not limited to, standard manuals, data models, flow charts and other materials regarding the use of Rx Tool or AP Tool and generally supplied by HealthTrust to its customers, in electronic format, as well as complete or partial copies of the foregoing.

1.7      "Indirect Spend" is defined as the amount spent for products and services used by Participant in operating its business, but which are not included in products or services sold by Participant.

1.8     "Rx Tool" is defined as the Rx Tool software products made available for access under the terms of this Agreement for the purposes of performing pharmacy spend analyses.

1.9     "Spend Reports" shall be defined as spend analytics reports generated as a result of inputting Participant data and using the AP Tool and/or Rx Tool.

1.10    "Spend Tools" is defined as the AP Tool and/or Rx Tool selected in the Text Box to which HealthTrust is granting access to the Participant in accordance with the terms of this Agreement.

2       **Rx Tool and AP Tool Terms and Conditions**.

2.0     Access.  HealthTrust grants to Participant a limited, non-exclusive, non-transferable right via a standard Internet web browser: (i) to have its Authorized Users access and use the Spend Tools for the purpose of performing spend analyses in the manner and to the extent provided for by the Documentation; (ii) to use the Documentation solely for the purposes of supporting Participant's use of the Spend Tools; and (iii) to generate reports, all for Participant's own internal use only, in accordance with the terms of this Agreement and as provided in the Documentation.  All rights not expressly granted to Participant shall be reserved to HealthTrust.

2.1     Prohibitions.  Participant shall not directly or indirectly: (i) download, use or otherwise copy all or any portion of the Spend Tools Content or Documentation except as allowed in this Agreement or Documentation; (ii) cause or permit the reverse engineering, modification, disassembly or decompiling of the Spend Tools or any portion thereof; (iii) modify or change the Spend Tools except to configure the Spend Tools by means of any user-enabled features of the Spend Tools; (iv) create any derivative work of the Spend Tools or Documentation; (v) sublicense, rent, loan, lease, transfer, grant access to or otherwise distribute the Spend Tools, any reports generated by use of the Spend Tools, or any portion thereof to any other person or entity, except as permitted in this Agreement or Documentation; or (vi) use the Spend Tools or Documentation to provide services to any third-party person or entity.

2.2     Use.  When Participant accesses the Spend Tools, it is contemplated that the Spend Tools will provide the ability to perform spend analysis and generate various Spend Reports. Participant also expressly authorizes HealthTrust to have access to all Participant data entered into the Spend Tools and all resultant Spend Reports only for internal group purchasing purposes by HealthTrust, including analysis of compliance with HealthTrust vendor contracts and assisting Participant in determining cost savings opportunities under HealthTrust vendor contracts, with the understanding that the Participant data, Spend Reports and all other information HealthTrust provides to Participant in connection with or arising out of the Spend Tools shall be considered to be Confidential Information owned by Participant.

2.3     Authorized Users.  As of the Effective Date, Participant is permitted the number of Authorized Users indicated in the Text Box above.  In the event Participant requests additional Authorized Users due to the addition of new Facilities after the Effective Date, HealthTrust shall increase the number of Authorized Users in an amount proportionate to the additional Facilities at no charge to Participant.  Participant shall provide HealthTrust with the names and titles of any requested Authorized Users.

2.4     Covered Facilities.  All Facilities of Participant are authorized to receive the Spend Analytics Services.

Case 3:21-cv-00460   Document 1-1   Filed 06/10/21   Page 38 of 39 PageID #: 51

3  **Termination of Spend Analytics Services.**

3.0  <u>Termination for Cause</u>.  Either Party shall have the right to terminate the Spend Analytics Services in the event of any breach by the other Party of any material term hereof which is not cured within thirty (30) days from the date written notice of such breach is sent to the other Party.

4  **Limitation of Liability; Indemnification.**

4.0  <u>HealthTrust</u>.  HEALTHTRUST SHALL HAVE NO LIABILITY UNDER THIS AGREEMENT WITH RESPECT TO THE SPEND TOOLS OR SERVICES OR THE PERFORMANCE OF HEALTHTRUST UNDER THIS AGREEMENT.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING: (i) HEALTHTRUST DOES NOT MAKE AND EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, AS TO THE Rx TOOL, THE AP TOOL AND ANY RELATED SERVICES; AND (ii) PARTICIPANT HEREBY EXPRESSLY RELEASES HEALTHTRUST FROM ANY AND ALL LIABILITY AND CLAIMS RELATING TO THE Rx TOOL, THE SPEND TOOL AND RELATED SERVICES, AND ANY BREACH OR ALLEGED BREACH OF ANY WARRANTY IN CONNECTION WITH THE Rx TOOL, THE SPEND TOOL AND RELATED SERVICES.

4.1  <u>Indemnification</u>.  Participant agrees to and does hereby defend, indemnify and hold harmless HealthTrust and its Affiliates, successors, assigns, directors, officers, agents, and employees from and against any and all damages arising out of or resulting from any claim, lawsuit, investigation, proceeding, regulatory action, or other cause of action, including attorney's fees, arising out of or in connection with Participant's use of the AP Tool and/or the Rx Tool other than as authorized under this Agreement, or any misuse or abuse of the Spend Tools.