# EXHIBIT B

Execution copy



**THIRD AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT**

**OF**

**HEALTHTRUST PURCHASING GROUP, L.P.**

THE LIMITED PARTNERSHIP INTERESTS DESCRIBED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND ARE OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH ACTS. NO SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THESE INTERESTS MAY BE MADE BY A LIMITED PARTNER UNLESS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT, OR UNLESS HEALTHTRUST PURCHASING GROUP, L.P. (THE "PARTNERSHIP") HAS BEEN FURNISHED WITH AN OPINION OF COUNSEL, WHICH OPINION OF COUNSEL SHALL BE SATISFACTORY TO THE PARTNERSHIP, TO THE EFFECT THAT SUCH SALE, TRANSFER, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION MAY BE LEGALLY EFFECTED WITHOUT SUCH REGISTRATION. ADDITIONAL RESTRICTIONS ON TRANSFER AND SALE ARE SET FORTH HEREIN.

Execution copy

## Table of Contents

ARTICLE I     DEFINITIONS ................................................................................................. 1
     Section 1.1     Definitions ............................................................................ 1

ARTICLE II     FORMATION ................................................................................................. 8
     Section 2.1     Formation and Name ............................................................ 8
     Section 2.2     Partners .................................................................................. 8
     Section 2.3     Term ...................................................................................... 8
     Section 2.4     Purpose .................................................................................. 9
     Section 2.5     Registered Agent and Office ............................................... 9
     Section 2.6     Principal Place of Business ................................................. 9
     Section 2.7     Qualification in Other Jurisdictions ................................... 9

ARTICLE III     MANAGEMENT OF PARTNERSHIP BUSINESS; POWERS OF
         GENERAL PARTNER ................................................................................. 9
     Section 3.1     Management of the Partnership ........................................... 9
     Section 3.2     Management Obligations of the General Partner ............... 10
     Section 3.3     Powers of the General Partner ............................................ 10
     Section 3.4     Right to Rely on the General Partner .................................. 11
     Section 3.5     Specific Limitations on the General Partner ...................... 12
     Section 3.6     Approval of Certain Actions by Tax-Exempt Partners ...... 13
     Section 3.7     Approval of the Management Services Agreement ............ 13
     Section 3.8     Limitation on Liability of the General Partner ................... 13
     Section 3.9     Indemnification of the General Partner ............................. 13
     Section 3.10     Reimbursement ..................................................................... 14

ARTICLE IV     RIGHTS AND STATUS OF LIMITED PARTNERS ................................. 14
     Section 4.1     Limited Partners Shall Not Manage or Control ................. 14
     Section 4.2     Limitation of Liability ......................................................... 14
     Section 4.3     Bankruptcy, Death, Etc. ...................................................... 15
     Section 4.4     Power of Attorney ................................................................ 15
     Section 4.5     Board of Advisors; Advisory Committees .......................... 15
     Section 4.6     Meetings of Partners ............................................................ 15

ARTICLE V     INDEPENDENT ACTIVITIES; SPECIAL COVENANTS ........................ 16
     Section 5.1     Independent Activities ......................................................... 16
     Section 5.2     Change in Control ................................................................ 17

ARTICLE VI     CAPITAL ACCOUNTS; PROFITS AND LOSSES;
         DISTRIBUTIONS; LOANS ......................................................................... 19
     Section 6.1     Capital Account ................................................................... 19
     Section 6.2     Additional Capital Contributions ....................................... 20
     Section 6.3     Allocation of Income and Costs ......................................... 20
     Section 6.4     Other Allocation Rules ........................................................ 23

| Section 6.5 | Tax Allocations: | 23 |
| Section 6.6 | Distributions | 24 |
| Section 6.7 | Loans | 24 |
| Section 6.8 | Related Parties | 24 |
| Section 6.9 | Adjustments to Interests | 25 |
| Section 6.10 | Adjustments to Interest Upon Termination of Interest of a Limited Partner | 25 |

ARTICLE VII     DISPOSITION OF INTERESTS AND ADDITIONAL PARTNERS..........26

| Section 7.1 | Transfers by Partners | 26 |
| Section 7.2 | Substituted Limited Partner | 26 |
| Section 7.3 | Certain Permitted Transferees | 27 |
| Section 7.4 | Admission of Additional Limited Partners | 27 |
| Section 7.5 | Invalid Transfer or Resignation | 28 |
| Section 7.6 | Distributions and Allocations in Respect of a Transferred Interest | 28 |
| Section 7.7 | Partnership's and General Partner's Right of First Refusal | 28 |
| Section 7.8 | Occurrence of Terminating Event or Adverse Terminating Event | 29 |
| Section 7.9 | Payment for Partner's Interest | 29 |
| Section 7.10 | Termination of Interest Upon Termination of Participation Agreement | 30 |
| Section 7.11 | Partnership Initial Public Offering | 30 |

ARTICLE VIII     DISSOLUTION AND WINDING UP ..........................................31

| Section 8.1 | Dissolution | 31 |
| Section 8.2 | Reconstitution | 31 |
| Section 8.3 | Interim Manager | 31 |
| Section 8.4 | Liquidation | 32 |
| Section 8.5 | Court Appointment of Liquidating Trustee | 33 |
| Section 8.6 | Final Statement | 33 |
| Section 8.7 | Claims of the Partners | 33 |

ARTICLE IX     MISCELLANEOUS ........................................................33

| Section 9.1 | Partner's Interest | 33 |
| Section 9.2 | Fiscal Year | 33 |
| Section 9.3 | Tax Matters Partner | 33 |
| Section 9.4 | Right to Make Section 754 Election | 34 |
| Section 9.5 | Notices | 34 |
| Section 9.6 | Amendment | 34 |
| Section 9.7 | Severability | 36 |
| Section 9.8 | Governing Law | 36 |
| Section 9.9 | Counterparts | 36 |
| Section 9.10 | Exhibits | 36 |
| Section 9.11 | Additional Documents | 36 |
| Section 9.12 | Headings | 36 |
| Section 9.13 | Replaces Second Amended and Restated Agreement | 36 |



execution

## THIRD AMENDED AND RESTATED
## LIMITED PARTNERSHIP AGREEMENT

### OF

### HEALTHTRUST PURCHASING GROUP, L.P.

This Third Amended and Restated Limited Partnership Agreement (this "Agreement") of HealthTrust Purchasing Group, L.P., a Delaware limited partnership (the "Partnership", "HealthTrust" or "HPG"), by and among HPG Enterprises, LLC (f/k/a CMS GP, LLC), a Delaware limited liability company (the "General Partner"), as General Partner; and HPG Solutions, LLC (f/k/a Management Services LP, LLC), a Delaware limited liability company ("HPG Solutions"); LifePoint Hospitals Holdings, Inc., a Delaware corporation ("LifePoint"); CHS/Community Health Systems, Inc., a Delaware corporation ("CHS"); Catholic Health Initiatives, a Colorado not-for-profit entity ("CHI"); Franciscan Alliance, Inc., an Indiana not-for-profit entity ("Franciscan"); Hospital Sisters Health System, an Illinois not-for-profit entity ("HSHS"); Trinity Health Corporation, an Indiana non-profit corporation ("Trinity"); and Tenet HealthSystem Medical, Inc, a Delaware corporation ("Tenet") as Limited Partners, and each other Person who after the date hereof becomes a Substituted Limited Partner or an Additional Limited Partner of the Partnership in accordance with the terms hereof. This Agreement shall be effective as of January 1, 2016 (the "Effective Date") as to all Partners except Tenet, and shall be effective as to Tenet as of February 1, 2016 (the "Tenet Effective Date").

### WITNESSETH:

WHEREAS, the Partnership was formed as a limited partnership on April 28, 1999 under and pursuant to the Delaware Act and that certain Amended and Restated Limited Partnership Agreement of the Partnership dated as of May 11, 1999; and

WHEREAS, the Partners and the Partnership desire to amend and restate in its entirety that certain Second Amended and Restated Limited Partnership Agreement of the Partnership that was effective as of April 18, 2007 as previously amended by amendments 1-15.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Partners hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    Definitions.  Unless the context otherwise requires, the terms defined in this Section 1.1 shall, for the purposes of this Agreement, have the meanings herein specified.

"Additional Limited Partner" means a Person who is admitted into the Partnership as a Limited Partner pursuant to the terms of Article VII below.

"Adverse Terminating Event" means, with respect to any Limited Partner, such Limited Partner has breached the terms and conditions of this Agreement, including without limitation, violating the transfer restrictions set forth in Article VII below, as determined in the reasonable discretion of the General Partner.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments: (i) increased for any amounts such Partner is unconditionally obligated to restore and the amount of such Partner's share of Partnership minimum gain (as set forth in Treasury Regulation § 1.704-2(d)) and Partner nonrecourse debt minimum gain (as set forth in Treasury Regulation § 1.704-2(i)(3)) after taking into account any changes during such year; and (ii) reduced by the items described in Treasury Regulation §§ 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Affiliate" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and with respect to a not-for-profit entity, the ability to direct or cause the direction of the board of directors.

"Agreement" means this Third Amended and Restated Limited Partnership Agreement as amended, modified, supplemented or restated from time to time.

"Annual Adjustment Date" has the meaning set forth in Section 6.9 below.

"Bankruptcy" means, as to any Partner, the Partner's taking or acquiescing to the taking of any action seeking relief under, or advantage of, any applicable debtor relief, liquidation, receivership, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, reorganization or similar law affecting the rights or remedies of creditors generally, as in effect from time to time. For the purpose of this definition, the term "acquiescing" shall include, without limitation, the failure to file within the time specified by law, an answer or opposition to any proceeding commenced against such Partner under any such law, and a failure to file, within thirty (30) days after its entry, a petition, answer or motion to vacate or to discharge any order, judgment or decree providing for any relief under any such law.

"Baseline Amount" of a Partner means the amount of Net GPO Fees that must be received by the Partnership in order for GPO Fees to be shared with such Partner. The Baseline Amounts of the Partners are $3,372,427 for CHS, $26,991,088 for Legacy Consorta Partners, $114,500,000.00 for Tenet, and $0 for each other Partner; provided that any Additional Limited Partner may be assigned a Baseline Amount as determined by the General Partner and such Additional Limited Partner. Only Healthcare Products GPO Fees shall be applied against the applicable Baseline Amount for Partners that receive distributions under Section 6.3(e)(i). Healthcare Products GPO Fees and Business Products GPO Fees shall be applied against the applicable Baseline Amount for Partners that receive distributions under Section 6.3(e)(ii).

"Business Products GPO" means any Group Purchasing Organization operated by HPG where most Participants are not Healthcare Providers and where its Vendor Contracts are for non-healthcare related products and services. CoreTrust shall be considered to be a Business Products GPO.

"Business Products GPO Fees" means the GPO Fees received by any Business Products GPO from Vendors pursuant to Vendor Contracts and related to the purchase of products and/or services by Participants in such Business Products GPOs, reduced by the portion of GPO Fees that are payable under any Group Purchasing Access Agreement or shared pursuant to an agreement between the Partnership and a Participant (or an Affiliate of a Participant).

"Capital Account" has the meaning set forth in Section 6.1 below.

"Capital Contribution" means, with respect to any Partner, the amount of cash and the initial fair market value of any property (other than money) contributed to the Partnership with respect to Interests in the Partnership held or purchased by such Partner, including any additional Capital Contributions.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section of the Code refers not only to such specific section but also to any corresponding provision of any federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"Competitive Activities" has the meaning set forth in Section 5.1(b) below.

"Competitive Business" has the meaning set forth in Section 5.1(b) below.

"Contributing Partner" has the meaning set forth in Section 6.2 below.

"CoreTrust" means CoreTrust Purchasing Group, a Business Products GPO formed and operated by the Partnership.

"Costs" means all or any expenses incurred by the Partnership for operating HPG Group Purchasing Organizations and HPG Ancillary Programs.

"Delaware Act" means the Delaware Revised Uniform Limited Partnership Act, Del. Code Ann. §17-101, et seq., as amended from time to time.

"Fair Market Value" of an Interest has the meaning set forth in Section 7.9(c) below.

"General Partner" means HPG Enterprises, LLC (f/k/a CMS GP, LLC), a Delaware limited liability company that is an indirect wholly owned subsidiary of HCA, or any replacement general partner of the Partnership, but excluding any Person who ceases to be a general partner of the Partnership pursuant to this Agreement.

"General Partner Interest" means the Interest held by the General Partner.

"Global Sourcing Fees" mean those fees received by the Partnership as a result of purchases by Participants of products sourced by the Partnership under its global sourcing program.

"GPO Fees" means cash receipts of the Partnership or any HPG Group Purchasing Organization received from Vendors pursuant to Vendor Contracts and related to the purchase of products and/or services by Participants. "GPO Fees" shall not include Rebates.

"Group Purchasing Access Agreement" or "Access Agreement" means any agreement between the Partnership and an entity that is a Group Purchasing Organization or which has ownership of and/or controls companies who are prospects for becoming, or which become a member of any HPG Group Purchasing Organization, pursuant to which members of such Group Purchasing Organization or the owned/controlled companies can participate in any HPG Group Purchasing Organization.

"Group Purchasing Organization" means any organization organized for the purpose of aggregating purchasing activities in order to achieve economic benefits for its participants.

"HCA" means HCA Holdings, Inc., a Delaware corporation, and any successor in interest.

"HCA Affiliate" means any Affiliate of HCA (other than a natural Person).

"Healthcare Products GPO" means any HPG Group Purchasing Organization where Participants generally are Healthcare Providers, and Vendor Contracts for healthcare and other products and services are made available to such Participants.

"Healthcare Products GPO Fees" means the GPO Fees received by the Partnership pursuant to Vendor Contracts and related to the purchase of products and/or services by Participants in Healthcare Products GPOs, reduced by the portion of GPO Fees that are payable under any Group Purchasing Access Agreement or shared pursuant to an agreement between the Partnership and a Participant (or an Affiliate of a Participant).

"Healthcare Providers" means any entity providing healthcare to patients, including, but not limited to, hospitals, surgery centers, imaging centers, physician practices, long-term care facilities, assisted living facilities and skilled nursing facilities.

"HPG Ancillary Program(s)" means programs developed or provided by HPG that are outside of core healthcare group purchasing contracting services, and which are offered to Participants and others typically for a fee, including, but not limited to, spend analytics, supply chain consulting, vendor audits, custom contracting services, global sourcing initiative for importing products for Participants, as well as (i) any domestic Group Purchasing Organization for a defined, restricted line of products or services, or (ii) any Group Purchasing Organization in a country other than the United States, and which is designated as an HPG Ancillary Program by

the General Partner. Any such programs that fall within this definition of HPG Ancillary Programs shall not be considered as a HPG Group Purchasing Organization as defined in this Agreement.

"HPG Ancillary Program Costs" means those Costs incurred by HPG determined by the General Partner to be Costs allocated to HPG Ancillary Programs.

"HPG Ancillary Program Revenue" means cash receipts received by HPG determined by the General Partner to be revenue allocated to HPG Ancillary Programs, except for Global Sourcing Fees.

"HPG Group Purchasing Organization" means any Group Purchasing Organization operated by HPG, including any Healthcare Products GPO and any Business Products GPO.

"HPG Specialty Contracts" means those Vendor Contracts for products or services not historically offered by healthcare group purchasing organizations, which shall be the following categories: pharmacy benefits management arrangements, employee benefits plans, employee life insurance, employee long term disability insurance, energy (electricity and natural gas), and temporary labor. Categories to be considered as HPG Specialty Contracts may only be added or removed by a Majority-In-Interest of the Limited Partners.

"Indemnified Parties" has the meaning set forth in Section 3.9(a) below.

"Interest" means a Partner's percentage interest in the Partnership as stated in Exhibit A and Exhibit B, and as thereafter determined by the General Partner as provided in Section 6.9 or Section 6.10 hereof.

"Investment Partner(s)" means the General Partner, HPG Solutions, LifePoint, and CHS. The General Partner is under no obligation to offer or allow any Partner other than the General Partner, HPG Solutions, LifePoint, and CHS the right to become an Investment Partner.

"Investment Partner GPO Fees" means the GPO Fees received by the Partnership based on purchases by all Investment Partners and Affiliates of Investment Partners under Vendor Contracts, related to all HPG Group Purchasing Organizations.

"Legacy Consorta Member" means Persons that were previously members of Consorta, Inc. and which became Participants in 2007 and continue as Participants as of the Effective Date.

"Legacy Consorta Partners" means CHI, Franciscan, HSHS, and Trinity.

"Legacy Consorta Member Remaining GPO Fees" means the GPO Fees received by the Partnership based on the purchase of products and/or services under Vendor Contracts by Participants other than Legacy Consorta Partners that were formerly with the Group Purchasing Organization Consorta, Inc., less the amount of such fees that are paid to the Legacy Consorta Member pursuant to its Participation Agreement with respect to a Legacy Consorta Member's (or its Affiliates') respective purchases under Vendor Contracts.

"Legacy Consorta Partner GPO Fees" means the GPO Fees received by the Partnership based on the purchase of products and/or services under Vendor Contracts, related to all HPG Group Purchasing Organizations, by Legacy Consorta Partners.

"Liabilities" has the meaning set forth in Section 3.9(a) below.

"Limited Partner" means the Investment Limited Partners, the Legacy Consorta Limited Partners and the Non-Investment Limited Partners, each of whom is identified as a Limited Partner on Exhibit A attached hereto, and any Substituted Limited Partner or Additional Limited Partner, but excluding any Person who ceases to be a limited partner of the Partnership pursuant to the terms of this Agreement. Effective February 1, 2016, Tenet will be a Limited Partner with the Interest stated in Exhibit B.

"Limited Partnership Interest" means an Interest held by a Limited Partner.

"Liquidating Trustee" has the meaning set forth in Section 8.4 below.

"Majority-in-Interest of the Limited Partners" means the affirmative vote of the Limited Partners holding in excess of seventy-five percent (75%) of the Interests in the Partnership held by the Limited Partners.

"Management Services Agreement" means that certain Management Services Agreement, dated as of May 11, 1999, by and among the Partnership and HCA Management Services, LP (f/k/a CHCA Management Services, L.P.), as such Management Services Agreement may be amended from time to time upon approval of such amendment by a Majority-in-Interest of the Limited Partners and by the General Partner.

"Net GPO Fees" means the GPO Fees received by the Partnership based on purchases of products and/or services by all Participants, reduced by the portion of GPO Fees that are payable under any Group Purchasing Access Agreement or shared pursuant to an agreement between the Partnership and a Participant (or an Affiliate of a Participant). For avoidance of doubt, Net GPO Fees includes Non-Partner Healthcare Products GPO Fees, Non-Partner Business Products GPO Fees, Legacy Consorta Member Remaining GPO Fees, the portion of Legacy Consorta Partner GPO Fees not allocated directly to Legacy Consorta Partners, and the portion of Non-Investment Partner GPO Fees not allocated directly to Non-Investment Partners.

"Noncontributing Partner" has the meaning set forth in Section 6.2 below.

"Non-Investment Partner" means the entities listed on Exhibit B attached hereto and any entity resulting from the combination of two or more of the entities listed at such Exhibit B, and any entities resulting solely from the division of any entity listed at such Exhibit B. For avoidance of doubt, the term "Non-Investment Partner" shall not include any Legacy Consorta Partner.

"Non-Investment Partner GPO Fees" means the GPO Fees received by the Partnership based on the purchase of products and/or services under Vendor Contracts, related to all HPG Group Purchasing Organizations, by Non-Investment Partners.

"Non-Partner Business Products GPO Fees" means the Business Products GPO Fees received by the Partnership based on purchases by all Participants that are not Partners (or Affiliates of a Partner) under Vendor Contracts related to all Business Products GPOs.

"Non-Partner GPO Costs" means the portion of the Costs determined by multiplying (a) the Costs by (b) a fraction, the numerator of which is the total dollar amount of Net GPO Fees and the denominator of which is the total dollar amount of GPO Fees received by the Partnership. For purposes of this calculation, total GPO Fees shall not include (i) any portion of receipts of GPO Fees that are payable under any Group Purchasing Access Agreement or (ii) any portion of receipts of GPO Fees shared pursuant to an agreement between the Partnership and a Participant that is not a Partner (or an Affiliate of a Partner).

"Non-Partner Healthcare Products GPO Fees" means the Healthcare Products GPO Fees other than Partner GPO Fees.

"Participants" means members participating under any HPG Group Purchasing Organization by virtue of having entered into a Participation Agreement, including the entity that is named as a party to the Participation Agreement and any Affiliate thereof listed in the Participation Agreement as being able to participate in the group purchasing program.

"Participation Agreement" means the agreement between a Participant and the Partnership or an Affiliate of the Partnership enabling participation in any particular HPG Group Purchasing Organization.

"Partner" means (a) each Person identified on Exhibit A hereto as of the date hereof as a General Partner or Limited Partner who has executed this Agreement or a counterpart thereof; and (b) each Person who is hereinafter admitted as a Partner in accordance with the terms of this Agreement and the Delaware Act.

"Partner GPO Fees" means the Healthcare Products GPO Fees received by the Partnership based on purchases by all Partners and Affiliates of any Partner.

"Partner GPO Costs" means the portion of Costs that are not Non-Partner GPO Costs.

"Partnership" means HealthTrust Purchasing Group, L.P., a limited partnership formed under the Delaware Act and governed by this Agreement.

"Person" means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"Rebates" means any rebates received by the Partnership that are attributable to purchases made by Participants.

"Substituted Limited Partner" means any Person admitted to the Partnership as a Limited Partner pursuant to Section 7.2 below.

"Tax Exempt Partners" means any Partner that is a tax exempt organization as described in Section 501(c)(3) of the Code, including, but not limited to, CHI, Franciscan, HSHS, and Trinity.

"Terminating Event" means, with respect to any Partner, the Partner is in Bankruptcy.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Vendor Contract" means a written agreement between the Partnership or any Affiliate of the Partnership (or assigned to the Partnership or any Affiliate of the Partnership) and a third party supplier of products and/or services whereby such vendor agrees to sell such products and/or services to Participants of one or more HPG Group Purchasing Organizations in accordance with the terms of such agreement.

## ARTICLE II
## FORMATION

Section 2.1    Formation and Name.    The Partnership was formed pursuant to the Delaware Act upon the filing of the Certificate of Limited Partnership in the office of the Secretary of State of Delaware on April 28, 1999. The rights and liabilities of all Partners currently existing or hereafter admitted shall be as provided under the Delaware Act, except as herein otherwise expressly provided. The General Partner shall execute and file, as appropriate, in accordance with the provisions of the Delaware Act such amendments to the Certificate of Limited Partnership and such other documents as are or become necessary or advisable, as determined by the General Partner.

The name of the Partnership shall be HealthTrust Purchasing Group, L.P. or such other name as the General Partner may designate upon written notice to the Partners, with such variations thereof as may be necessary to comply with the laws of other states within which the Partnership may do business.

Section 2.2    Partners.  The names and business addresses of the Partners are as set forth on Exhibit A hereto.   The General Partner shall from time to time amend Exhibit A in accordance with the provisions of Section 7.4(c) hereof.

Section 2.3    Term.  The Partnership commenced on the date that its Certificate of Limited Partnership was filed with the Secretary of State of Delaware and shall continue to exist until the date on which the Partnership is dissolved pursuant to Article VIII below and thereafter, to the extent provided for by applicable law, until wound up and terminated pursuant to Article VIII below.

Section 2.4    Purpose.  The purpose of the Partnership is to own, manage, develop and operate one or more Group Purchasing Organizations relating to purchasing goods, supplies, materials, products, pharmaceuticals, equipment and services used by Healthcare Providers and non-Healthcare Providers as the General Partner deems reasonably necessary, appropriate or advisable from time to time, and to engage in such other businesses and activities and to do any and all other acts and things that the General Partner deems reasonably necessary, appropriate or advisable from time to time in furtherance of the purposes of the Partnership as set forth in this Section 2.4 (subject to the provisions of Section 3.5 and Section 3.7 below).

It is the intent of the Partners to structure and operate any Healthcare Products GPO with participants that are Healthcare Providers in compliance with the Medicare and Medicaid anti-kickback statute, set forth at 42 U.S.C. §1320a-7b(b).  The Partners intend to structure the activities of the Partnership related to any Healthcare Products GPO to comply with the requirements of the "safe harbor" regulations regarding payments to group purchasing organizations set forth in 42 C.F.R. §1001.952(j) and the Partners believe that they have structured the Partnership accordingly.

Section 2.5    Registered Agent and Office.  The Partnership's registered agent and office in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.  At any time, the General Partner may change the Partnership's registered agent.

Section 2.6    Principal Place of Business.  The principal place of business of the Partnership shall be at 155 Franklin Road, Suite 400, Brentwood, Tennessee 37027.  At any time, the General Partner may change the location of the Partnership's principal place of business.

Section 2.7    Qualification in Other Jurisdictions.  The General Partner shall cause the Partnership to be qualified, formed or registered under assumed or fictitious names or foreign limited partnership statutes or similar laws in any jurisdiction in which the Partnership transacts business if such qualification, formation or registration is required or desirable in order to protect the limited liability of the Limited Partners or to permit the Partnership lawfully to transact business; provided, however, that no Partner shall be required to submit to personal liability as a result of such action.  The General Partner (or its designated agent) is authorized to execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary or desirable in respect of the foregoing.

### ARTICLE III
### MANAGEMENT OF PARTNERSHIP BUSINESS;
### POWERS OF GENERAL PARTNER

Section 3.1    Management of the Partnership.  The management of the Partnership's business shall be vested in the General Partner.  Except as otherwise set forth in this Agreement, the General Partner exclusively shall manage and control the business and affairs of the Partnership, shall make all decisions affecting the business and affairs of the Partnership and shall take all such actions as the General Partner deems necessary or appropriate to accomplish the purpose of the Partnership as set forth herein.  The General Partner shall be the sole Person

with the power to bind the Partnership, except and to the extent that such power is expressly delegated to any other Person by such General Partner.

Section 3.2    Management Obligations of the General Partner.    The General Partner shall devote such time to the Partnership as may be necessary to manage and supervise the Partnership's business and affairs, but nothing in this Agreement shall preclude the General Partner, at the expense of the Partnership, from employing any HCA Affiliate or a third party to provide management or other services to the Partnership, always subject, however, to the control of the General Partner and, if applicable, subject to approval in accordance with Section 3.7.

Section 3.3    Powers of the General Partner.

(a)    Except as otherwise set forth in Sections 3.5 and 3.7 of this Agreement, the General Partner shall have the right, power and authority, in the management of the business and affairs of the Partnership, to do or cause to be done any and all acts and things, at the expense of the Partnership, deemed by such General Partner to be necessary or appropriate to effectuate the business, purposes and objectives of the Partnership.    Without limiting the generality of the foregoing, the General Partner shall have the power and authority to:

(i)    borrow money from any source, including, without limitation, from the General Partner, HCA or an HCA Affiliate and, if security is required therefor, to mortgage or subject to any other security device any portion of the Partnership's property, to obtain replacements of any mortgage or other security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate or extend any mortgage or other indebtedness or security device, all of the foregoing on such terms and in such amounts as the General Partner deems, in its reasonable discretion, to be in the best interest of the Partnership;

(ii)    acquire and enter into any contract of insurance which the General Partner deems reasonably necessary and proper for the protection of the Partnership, for the conservation of the Partnership's assets, or for any other purpose beneficial to the Partnership;

(iii)    employ, or enter into contractual relationships with, from time to time on behalf of the Partnership, individuals (including employees of the General Partner, HCA, or any HCA Affiliate) on such terms and for such compensation as the General Partner shall deem appropriate, and enter into agreements for the transfer of Interests to such Persons as provided in Article VII below;

(iv)    make decisions as to accounting principles and elections, whether for book or tax purposes (and such decisions may be different for each purpose);

(v)    set up or modify record keeping, billing and accounts payable accounting systems;

(vi)    alienate, mortgage, pledge or otherwise encumber, sell, exchange, lease or purchase real and/or personal property;

   (vii) open checking and savings accounts, in banks or similar financial institutions, in the name of the Partnership, and deposit cash in and withdraw cash from such accounts, provided that any such deposits are made in federally insured banks or financial institutions;

   (viii) adjust, arbitrate, compromise, sue or defend, abandon, or otherwise deal with and settle any and all claims in favor of or against the Partnership, as the General Partner shall, in its sole discretion, deem proper;

   (ix) execute, make, perform, amend, extend, or modify, and carry out on behalf of and in the name of the Partnership all types of contracts, leases, agreements, instruments, notes, certificates, titles or other documents of any kind or nature as are deemed reasonably necessary and desirable by the General Partner;

   (x) ensure that each year the Partnership undergoes an audit of its financial statements by an external accounting firm; and

   (xi) perform all duties and powers and do all things for and on behalf of the Partnership in all matters necessary or desirable to or for the furtherance of the purpose of the Partnership.

   The expression of any power or authority in this Agreement shall not in any way limit or exclude any other power or authority which is not specifically or expressly set forth in this Agreement.

   (b) The Partnership shall not have any officers except such officers as are appointed by the General Partner, in which event such officers shall have such power and authority as the General Partner delegates in writing.

   (c) The Limited Partners grant the General Partner a limited power of attorney for entering into an amendment to the Partnership Agreement solely to amend Exhibit A to the Partnership Agreement to reflect the adjustments to the Partners' Interests as determined by the General Partner in accordance with the terms of Section 6.9 hereof.

  Section 3.4 Right to Rely on the General Partner. No Person or governmental body dealing with the Partnership shall be required to inquire into, or to obtain any other documentation as to, the authority of the General Partner to take any action permitted under Section 3.3 above. Furthermore, any Person dealing with the Partnership may rely upon a certificate signed by the General Partner as to the following:

   (a) the identity of the General Partner or any Limited Partner;

   (b) the existence or nonexistence of any fact or facts that constitute a condition precedent to acts by the General Partner or which are in any other manner relevant to the affairs of the Partnership;

Case 3:21-cv-00460 Document 1-2 Filed 06/10/21 Page 15 of 49 PageID #: 67

(c)     the Persons who are authorized to execute and deliver any instrument or document on behalf of the Partnership; or

(d)     any act or failure to act by the Partnership on any other matter whatsoever involving the Partnership or any Partner.

Section 3.5     Specific Limitations on the General Partner.

Notwithstanding anything to the contrary in this Agreement or the Delaware Act, without the prior written approval of a Majority-in-Interest of the Limited Partners and by the General Partner to the specific act in question, the General Partner shall have no right, power or authority:

(a)     to do any act in contravention of this Agreement;

(b)     to change or reorganize the Partnership into any other legal form, each of which is considered outside the ordinary course of the Partnership's business, or file any election to change the entity classification of the Partnership to something other than a partnership for U.S. federal tax purposes;

(c)     to knowingly perform any act that would subject any Limited Partner to liability as a general partner in any jurisdiction;

(d)     to amend this Agreement (except as provided in Section 9.6 below);

(e)     to change the nature of the business of the Partnership;

(f)     to sell all or substantially all of the assets of the Partnership or merge or consolidate the Partnership;

(g)     to dissolve the Partnership (pursuant to Section 8.1);

(h)     to create any other HPG Group Purchasing Organization; or

(i)     to approve any transaction between the Partnership and any Partner including the making of loans by the Partnership to a Partner, any management or service agreements or other agreements between the Partnership and a Partner, or any affiliate of any Partner unless the terms of such transaction are determined by the General Partner to be generally no less favorable to the Partnership than the terms that would be made available to the Partnership in an arm's length transaction with an independent third party (and, with respect to loans, only if the Partnership has sufficient cash to satisfy the payment obligations to the Partners as set forth herein).

The limitations in this Section 3.5 shall not be applicable to any Liquidating Trustee acting pursuant to Article VIII below.

Section 3.6    Approval of Certain Actions by Tax-Exempt Partners.

Notwithstanding anything to the contrary in this Agreement or the Delaware Act, the General Partner and the Partnership shall use commercially reasonable efforts not to take any action that would jeopardize the tax-exempt status of any Tax Exempt Partner, or that would cause any Tax Exempt Partner to become liable for excise taxes pursuant to IRC Section 4911, 4955 or 4965.

Section 3.7    Approval of the Management Services Agreement.  By executing this Agreement, the Partners hereby approve the execution and delivery by the General Partner, on behalf of the Partnership, of the Management Services Agreement.  Amendments to the Management Services Agreement shall require approval by a Majority-in-Interest of the Limited Partners and by the General Partner.

Section 3.8    Limitation on Liability of the General Partner.  The General Partner shall discharge its duties as a Partner in good faith, in a manner it reasonably believes to be in the best interest of the Partnership, and with such care as an ordinarily prudent person in a like position would exercise under similar circumstances.  The General Partner shall not be liable for any action or failure to take any action, if it performed the duties of its office in compliance with the foregoing and the Delaware Act.  In discharging its duties, the General Partner is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by one or more officers or employees of the Partnership whom the General Partner reasonably believes to be reliable and competent in the matters presented; legal counsel, public accountants or other Persons as to matters the General Partner reasonably believes are within the Person's professional or expert competence; or a committee of the Partners of which it is not a member, if the General Partner reasonably believes the committee merits confidence; provided, however, that the General Partner is not acting in good faith if it has knowledge concerning the matter in question that makes such reliance unwarranted.

Section 3.9    Indemnification of the General Partner.

(a)    Except to the extent such indemnification may be prohibited by law, the Partnership, its receiver, or its trustee shall indemnify and hold the General Partner and its affiliates, and their respective agents, officers, directors and employees (the "Indemnified Parties"), harmless against any and all losses, liabilities, penalties, claims, damages, demands, costs and expenses (including, without limitation, reasonable attorneys' fees, investigation expenses, any and all other out-of-pocket expenses and any punitive or consequential damages) (collectively, "Liabilities") whatsoever that are assessed, imposed, awarded against or incurred after the date hereof by any of them by reason of any act performed or omitted to be performed by any of them in connection with the Partnership's business.

(b)    In the event any Partner shall bring a legal action against the General Partner, including a Partnership derivative suit, the Partnership, its receiver, or its trustee shall indemnify and hold the General Partner harmless against any and all Liabilities whatsoever that are assessed, imposed, awarded against or incurred after the date hereof by the General Partner in respect of such action.

(c)     The Partnership, its receiver, or its trustee shall indemnify and hold the General Partner harmless against any and all Liabilities suffered by the General Partner in the event that it, for the benefit of the Partnership, makes any deposit, acquires any option, makes any payment, or assumes any obligation in connection with any property proposed to be acquired by the Partnership.

(d)     Indemnification required by this Section 3.9 shall be made by periodic payment of the amount thereof during the course of the investigation or defense, as and when bills are received or Liability is incurred; provided, however, that no payment shall be made to any Indemnified Party in advance of a final disposition of the proceeding unless (i) such Indemnified Party furnishes the Partnership with written affirmation of its good faith belief that it has met the standard of conduct described in the Delaware Act, and a written, unlimited general undertaking, executed personally or on its behalf, to repay the advance if it is ultimately determined that it is not entitled to indemnification; and (ii) a determination is made in accordance with the Delaware Act that the facts then known to the Partnership would not preclude indemnification under this Section 3.9.  If, at any time, the Partnership has insufficient funds to provide such indemnification, it shall provide such indemnification if and as the Partnership generates sufficient funds, and prior to any distribution to the Partners.

Notwithstanding the foregoing provisions of this Section 3.9, no Indemnified Party shall be indemnified by the Partnership for any Liability for actions or omissions by such Indemnified Party if it is determined by a judgment of a court that is binding, final and not subject to review on appeal, that such Liability was the result of actions or omissions that constitute intentional misconduct or gross negligence on the part of such Indemnified Party.

Section 3.10   Reimbursement.  The General Partner shall be entitled to be reimbursed for any and all reasonable costs and expenses incurred by it in connection with managing and operating the Partnership and its properties and business.  Such reimbursement shall be paid by the Partnership, upon the written application of the General Partner, as soon as funds are available therefor.

## ARTICLE IV
## RIGHTS AND STATUS OF LIMITED PARTNERS

Section 4.1   Limited Partners Shall Not Manage or Control.  The Limited Partners have the rights and the status of limited partners under the Delaware Act.  Except to the extent expressly otherwise provided in this Agreement, the Limited Partners shall not take part in the management or control of the Partnership business, or sign for or bind the Partnership, such powers being vested exclusively in the General Partner.

Section 4.2   Limitation of Liability.  No Limited Partner shall have any personal liability whatsoever, solely by reason of its status as a Limited Partner of the Partnership, whether to the Partnership, the General Partner or any creditor of the Partnership, for the debts of the Partnership or any of its losses beyond the amount of the Limited Partner's obligation to contribute its Capital Contribution to the Partnership.

Section 4.3    Bankruptcy, Death, Etc.  Neither the Bankruptcy, death, disability nor declaration of incompetence or incapacity of a Limited Partner shall dissolve the Partnership, but the rights of a Limited Partner to share in the profits and losses of the Partnership and to receive distributions of Partnership funds shall, on the happening of such an event, devolve upon the Limited Partner's estate, legal representative or successor in interest, as the case may be, subject to this Agreement, and the Partnership shall continue as a limited partnership under the Delaware Act.  The Limited Partner's estate, representative or successor in interest shall be entitled to receive distributions and allocations with respect to such Limited Partner's Interest in the Partnership and shall be liable for all of the obligations of the Limited Partner.  However, the Limited Partner's estate, representative or successor in interest shall have no right to any information or accounting of the affairs of the Partnership, shall not be entitled to inspect the books or records of the Partnership, and shall not be entitled to any of the rights of a general partner or limited partner (other than the right to receive distributions and allocations as described in the foregoing sentence) under the Delaware Act or this Agreement unless such estate, representative or successor in interest is admitted to the Partnership as a Substituted Limited Partner pursuant to Section 7.2 below.

Section 4.4    Power of Attorney.  Each Limited Partner hereby appoints the General Partner as his agent and attorney-in-fact to prepare, execute, acknowledge and file in its place and on its behalf (a) all Certificates of Limited Partnership or amended Certificates of Limited Partnership as may be required by applicable law or this Agreement, (b) all other instruments that may be required or permitted by law to be filed on behalf of the Partnership and that are not inconsistent with this Agreement, and (c) the elections, and all forms and documents required in connection therewith, referred to in Sections 9.3 and 9.4 hereof.

Section 4.5    Board of Advisors; Advisory Committees.  The General Partner shall establish a Board of Advisors to consult with and advise the General Partner with respect to any and all matters deemed appropriate by the General Partner; provided, however, that the recommendations made by such Board of Advisors shall not be binding upon the General Partner or the Partnership, and such Board of Advisors shall not take part in the management or control of the Partnership business, or sign for or bind the Partnership, such powers being vested exclusively in the General Partner.  The number and identity of the members of the Board of Advisors shall be determined from time to time in the sole discretion of the General Partner; provided, however, the General Partner shall use reasonable efforts to select such members in a manner consistent with the General Partner's past practice of appointing subject matter experts, including subject matter experts from each of the Partners, to the Board of Advisors and the Advisory Committees.

Section 4.6    Meetings of Partners.

(a)    Meetings of Partners may be called by the General Partner, and shall be promptly called upon the written request of Partners representing a Majority-in-Interest of the Limited Partners stating the purpose or purposes of the proposed meeting to the General Partner, for informational purposes or for any purpose permitted by this Agreement.  The General Partner shall give all Partners a notice of the purpose or purposes of any proposed meeting not less than five (5) days before the meeting unless such notice is waived by a Majority-in-Interest of the

Limited Partners and by the General Partner. Meetings shall be held at a time and place within or without the State of Delaware as determined by the General Partner.

(b)    The Partners may, at their election, participate in any regular or special meeting by means of telephone conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other. A Partner's participation in a meeting pursuant to the preceding sentence shall constitute presence in person at such meeting for all purposes of this Agreement, and such presence shall constitute a waiver of notice of the meeting with respect to such Partner.

(c)    Each Partner may authorize any Person to act on such Partner's behalf by proxy on all matters as to which a Partner is entitled to participate, whether by waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Partner authorizing such proxy or such Partner's attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months after the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Partner executing it.

(d)    Each meeting of Partners shall be conducted by the General Partner or by a Person appointed by the General Partner. The meeting shall be conducted pursuant to such reasonable rules as may be adopted by the General Partner or the Person appointed by the General Partner for the conduct of the meeting.

(e)    Notwithstanding anything to the contrary in this Agreement, any action that may be taken at a meeting of the Partners may be taken without a meeting if a consent in writing setting forth the action so taken is approved unanimously by all of the Partners, or by a Majority-in-Interest, as applicable, which consent may be executed in multiple counterparts. In the event any action is taken pursuant to this Section 4.6(e), it shall not be necessary to comply with any notice or timing requirements set forth in Section 4.6(a) above.

## ARTICLE V
## INDEPENDENT ACTIVITIES; SPECIAL COVENANTS

Section 5.1    Independent Activities.

(a)    Subject to the limitations set forth in Section 5.1(b) below, the General Partner and its Affiliates may engage in or possess interests in other business ventures of every nature and description, independently, and with others, whether such activities are competitive with the Partnership or otherwise, without having or incurring any obligation to offer any interest in such activities to the Partnership. Subject to the limitations set forth in Section 5.1(b) below, neither this Agreement nor any activity undertaken hereunder shall prevent the General Partner or any of its Affiliates from engaging in such other activities or require the General Partner or any of its Affiliates to permit the Partnership to participate in such activities. Furthermore, as a material part of the consideration for the General Partner executing this Agreement and admitting the other Limited Partners to the Partnership, the Limited Partners herein waive, relinquish and renounce any right or claim of participation in any such activities.

Page **16** of **38**

(b)     Notwithstanding the foregoing, neither the General Partner nor any of its Affiliates may possess any ownership interest in any other business venture that (i) owns, manages, develops or operates a national Group Purchasing Organization or similar arrangement that serves hospitals, surgery centers, long-term care facilities, assisted living facilities and skilled nursing facilities ("Competitive Businesses") and (ii) is competitive with the Partnership ("Competitive Activities"); provided, however, that Competitive Activities shall not include the owning, managing, developing or operating of (v) any Group Purchasing Organization or similar arrangement which operates within a specific geographic market or markets that is or are not national in scope, (w) any international healthcare or hospital related businesses or matters (including, without limitation, any Group Purchasing Organization or similar arrangement), (x) any Group Purchasing Organization or similar arrangement for activities which are not Competitive Businesses, such as Group Purchasing Organizations for equipment, supplies or other materials and services used in physician practices, (y) any Group Purchasing Organization or similar arrangement for the purchase of pharmaceuticals (whether or not distributed in hospitals) or an array of products the usage of which in hospitals is relatively minor, or (z) any Group Purchasing Organization or similar arrangement that is owned, managed or operated by a Person that is acquired by the General Partner or any of its Affiliates after the date hereof, provided that the operations of such Group Purchasing Organization do not comprise more than twenty percent (20%) of the consolidated revenues of such Person. In the event of an actual or threatened breach by the General Partner or its Affiliates of this Section 5.1(b), the non-breaching party shall be entitled to an injunction in any appropriate court, restraining the actual or threatened breach by such other party. If a court shall hold that the duration and/or scope (geographic or otherwise) of the agreement contained in this Section 5.1(b) is unreasonable, then, to the extent permitted by law, the court may prescribe a duration and/or scope (geographic or otherwise) that is reasonable and judicially enforceable. The parties agree to accept such determination, subject to their rights of appeal, which the parties hereto agree may be substituted in place of any and every offensive part of this Section 5.1(b), and as so modified, this Section 5.1(b) of this Agreement shall be as fully enforceable as if set forth herein by the parties in such modified form. Nothing herein stated shall be construed as prohibiting any party hereto from pursuing any other remedies available for such breach or threatened breach, including the recovery of damages.

Section 5.2     Change in Control.

(a)     In the event that the General Partner or the Partnership undergoes a Change in Control (as defined in Subsection 5.2(b)), and, in the event HCA or the HCA parent entity undergoes a Change in Control at a time when HCA or the HCA parent entity is an Affiliate of the General Partner, the General Partner shall give the Limited Partners written notice of the Change in Control (the "Change in Control Notice") as soon as practicable, but in no event later than thirty (30) days after the event constituting the Change in Control has occurred. The General Partner's failure to give the Change in Control Notice shall not affect the rights of the Tax Exempt Partners granted herein. Each Tax Exempt Partner (i) shall have thirty (30) days following its receipt of a Change in Control Notice (or its discovery of a Change in Control if a Change in Control Notice is not sent or its discovery of an Adverse Change in Control) to provide written notice to the General Partner that such Change in Control is

considered to be an Adverse Change in Control (as defined in Subsection 5.2 (b)), and in such event provide demonstrable evidence substantiating such conclusion, and (ii) upon its provision of the foregoing notice and evidence, a Tax Exempt Partner shall have the right to terminate its Interest in the Partnership and its Participation Agreement effective on a date not later than one hundred eighty (180) days following the date of its Adverse Change in Control notice ("Interest Termination Date"). The rights of the Tax Exempt Partners in this Section 5.2 shall be independent of each other, meaning, each Tax Exempt Partner may separately exercise the rights granted in this Subsection (a) independent of the other, and except as otherwise provided in this Agreement, the rights provided in this Subsection (a) for the Tax Exempt Partners are the sole remedies for any Adverse Change in Control.

(b)     For purposes of this Agreement, a "Change in Control" means (i) the consolidation or merger of the General Partner, the Partnership, HCA or the HCA parent entity, as applicable, into or with any other Person or Persons (other than a merger to reincorporate such entity in a different jurisdiction, or a consolidation or merger in which the holders of the outstanding voting stock of the General Partner, the Partnership, HCA or the HCA parent entity, as applicable, immediately prior to such consolidation or merger cease together with such parties' Affiliates to hold a majority of the voting stock of the surviving Person following such consolidation or merger) or (ii) the sale, transfer or other disposition by the General Partner, the Partnership, HCA or the HCA parent entity, as applicable, of all or substantially all of its assets to any Person or Persons (other than a Person which is an Affiliate).  For purposes of this Agreement, an "Adverse Change in Control" means a Change in Control in which the surviving Person is an entity that engages in any business activity related to the provision of on-demand abortions, or is engaged in a business which any Tax Exempt Partner or any Affiliates thereof reasonably considers, as shown in either written publications or is publicly known prior to such Change in Control, to be morally reprehensible or would unreasonably subject the Bishop or Catholic Church in any Diocese in which any Tax Exempt Partner or Affiliates thereof reside to the potential for scandal, as that term is applied and interpreted by canon law of the Catholic Church.

(c)     In the event that the General Partner or the Partnership takes any action that a Tax Exempt Partner  reasonably believes (based on the advice of outside tax counsel) may adversely impact the Tax Exempt Partner's tax-exempt status, that Tax Exempt Partner shall have thirty (30) days following the first to occur of its discovery or notice of such action to provide written notice to the General Partner to such effect ("Tax Exempt Status Notice"), which notice shall include financial, legal and other relevant evidence substantiating such belief.  The General Partner and/or the Partnership shall have thirty (30) days following its receipt of a Tax Exempt Status Notice from a Tax Exempt Partner to take appropriate action to eliminate said action or to mitigate the effect of said action such that the Tax Exempt Partner no longer reasonably believes the action by the General Partner or the Partnership would result in the loss of such Tax Exempt Partner's tax exempt status (a "Remedial Action").  If any Tax Exempt Partner has provided a Tax-Exempt Status Notice and reasonably believes Remedial Action cannot be accomplished, such Tax Exempt Partner shall have the right to terminate its Interest and Participation Agreement if it provides notice thereof within sixty (60) days following its Tax Exempt Status Notice, and if it does so, its Interest and its Participation Agreement shall

terminate on a date stated by such Tax Exempt Partner that is not later than one hundred eighty (180) days following its Tax Exempt Status Notice ("Tax Exempt Partner Termination Date"). Notwithstanding the foregoing, if, in the sole judgment of a Tax Exempt Partner that provided or is providing a Tax Exempt Status Notice (based on the advice of outside tax counsel), the Tax Exempt Partner reasonably believes that such action by the General Partner or the Partnership is of the type or nature where Remedial Action cannot be accomplished within a thirty (30) day period, then such Tax Exempt Partner shall have the right to terminate its Interest and its Participation Agreement in accordance with an accelerated time period provided notice of such intent is given to the Partnership concurrently with or within fifteen (15) days following such Tax Exempt Partner's Tax Exempt Status Notice. In this event the accelerated time period shall be designated by the Tax Exempt Partner but shall not be longer than one hundred eighty (180) days following the date of its Tax Exempt Status Notice. The rights and remedies of each of the Tax Exempt Partners in this Section 5.2(c) shall be independent of each other and except as hereinafter provided shall be limited solely to terminating such Tax Exempt Partner's Interest in the Partnership and its Participation Agreement on the Tax Exempt Partner Termination Date; provided, however, that if the Tax Exempt Status Notice is based on the General Partner (with respect to its actions regarding the Partnership) or the Partnership (i) engaging in a "listed transaction" (within the meaning of Section 1.6011-4(b)(2) of the Regulations) or other transaction that lacks economic substance (within the meaning of Section 7701(o) of the Code), (ii) engaging in illegal insider transactions, or (iii) engaging in political activity in support of or against any particular candidate for public office (it being understood that the foregoing is not applicable to political activities conducted through healthcare and group purchasing trade associations related to the business of the Partnership and its members) ("Inappropriate Actions"), a Tax Exempt Partner shall have in addition to the termination rights set forth above the additional right to seek damages as its sole additional remedy directly caused as a result of the Inappropriate Actions, it being understood that in any such event the maximum aggregate liability of the Partnership and the General Partner to any Tax Exempt Partner shall not exceed $250,000.00.

(d)     In the event any Tax Exempt Partner terminates its Interest in the Partnership under Subsection 5.2(a) above, the Partnership shall pay such Tax Exempt Partner, as applicable, within thirty (30) days following its Interest Termination Date, the amount of its Capital Account as of the Interest Termination Date plus the following amount:

| CHI | $885,630.00 |
| Franciscan | $294,518.32 |
| HSHS | $253,264.87 |
| Trinity | $1,566,586.81 |

ARTICLE VI
CAPITAL ACCOUNTS; PROFITS AND LOSSES; DISTRIBUTIONS; LOANS

Section 6.1     Capital Account.  An individual capital account (a "Capital Account") shall be established and maintained for each Partner.  The Capital Account of each Partner shall

be maintained in accordance with the provisions of Section 704(b) of the Code and the Treasury Regulations (including Treasury Regulations 1.704-1(b)(2)(iv) thereunder).

Section 6.2   Additional Capital Contributions.   If the General Partner determines that additional Capital Contributions are required, the General Partner shall have the right to request that each Partner make an additional Capital Contribution (pro rata to each Partner's Interest) to the Partnership in excess of its initial Capital Contribution.   If the General Partner makes such a request, no Partner shall be required to make such additional Capital Contribution, provided that if any Partner elects not to make the additional Capital Contribution (a "Noncontributing Partner"), the other Partners (the "Contributing Partners") shall have the right to contribute to the Partnership the amount of cash that the Noncontributing Partner or Noncontributing Partners failed to contribute.   The Partners shall have thirty days from the General Partner's request in which to elect to make or not to make such additional Capital Contributions.

Section 6.3   Allocation of Income and Costs.   The Partnership's income and Costs shall be allocated monthly to each Partner as follows:

(a)   **Investment Partner GPO Fees** shall be allocated to each Investment Partner based on the Investment Partner GPO Fees received by the Partnership with respect to such Investment Partner's (or its Affiliates') respective purchases under Vendor Contracts, as required by the Participation Agreement with each Investment Partner. The Partnership receives the Investment Partner GPO Fees allocated to the Investment Partners in its capacity as a receiving agent for each Investment Partner and, accordingly, the Investment Partner GPO Fees allocated to each Investment Partner shall be treated as income of the respective Investment Partner and not income of the Partnership.

(b)   **Legacy Consorta Partner GPO Fees** received by the Partnership with respect to a Legacy Consorta Partner's (or its Affiliates') respective purchases under Vendor Contracts shall first be allocated to the applicable Legacy Consorta Partner based on the percentage of such Legacy Consorta Partner's GPO Fees set forth in its respective Participation Agreement; next, a portion of the balance remaining shall be allocated to each Non-Investment Partner based upon its respective percentage Interest in the Partnership; and the remainder thereof shall be allocated to the Investment Partners based on the relative percentages of their respective Interests in the Partnership. The Partnership receives the portion of the Legacy Consorta Partner GPO Fees allocated to the Legacy Consorta Partners in its capacity as a receiving agent for each Legacy Consorta Partner and, accordingly, the Legacy Consorta Partner GPO Fees allocated to the Legacy Consorta Partners shall be treated as income of the respective Legacy Consorta Partner and not income of the Partnership. For avoidance of doubt, the remainder of the Legacy Consorta Partner GPO Fees shall be treated as income of the Partnership and not income of the Legacy Consorta Partners.

(c)   **Legacy Consorta Member Remaining GPO Fees** shall be allocated first to each Non-Investment Partner based upon its respective percentage Interest in the Partnership, and the remainder thereof shall be allocated to the Investment Partners based on the relative percentages of their respective Interests in the Partnership.

(d) **Non-Investment Partner GPO Fees** received by the Partnership with respect to a Non-Investment Partner's (or its Affiliates') respective purchases under Vendor Contracts shall first be allocated to the applicable Non-Investment Partner based on the percentage of such Non-Investment Partner's GPO Fees set forth in such Non-Investment Partner's Participation Agreement; next, a portion of the balance remaining shall be allocated to each Legacy Consorta Partner and any other Non-Investment Partner based upon its respective percentage Interest in the Partnership; and the remainder thereof shall be allocated to the Investment Partners based on the relative percentages of their respective Interests in the Partnership. The Partnership receives the portion of the Non-Investment Partner GPO Fees allocated to the Non-Investment Partners in its capacity as a receiving agent for each Non-Investment Partner and, accordingly, the Non-Investment Partner GPO Fees allocated to the Non-Investment Partners shall be treated as income of the respective Non-Investment Partner and not income of the Partnership. For avoidance of doubt, the remainder of the Non-Investment Partner GPO Fees shall be treated as income of the Partnership and not income of the Non-Investment Partners.

(e) **Non-Partner Healthcare Products GPO Fees and Non-Partner Business Products GPO Fees** received by the Partnership shall be allocated as follows:

(i) Subject to meeting its applicable Baseline Amount, Non-Partner Healthcare Products GPO Fees shall be allocated to each Legacy Consorta Partner and Non-Investment Partner based on the percentage of its respective Interest in the Partnership and the remainder thereof shall be allocated to the Investment Partners based on the relative percentages of their respective Interests in the Partnership. Until the Baseline Amount with respect to a particular Partner has been achieved, the Non-Partner Healthcare Products GPO Fees shall be allocated among the Partners otherwise entitled to such allocations and whose Baseline Amounts have been exceeded, in proportion to those Partners' relative percentage Interests in the Partnership.

(ii) Subject to meeting its applicable Baseline Amount, Non-Partner Business Products GPO Fees shall be allocated to CHI, Trinity, and each Non-Investment Partner based on the percentage of its respective Interest in the Partnership and the remainder thereof shall be allocated to the Investment Partners based on the relative percentages of their respective Interests in the Partnership. Until the Baseline Amount with respect to a particular Partner has been achieved, the Non-Partner Business Products GPO Fees shall be allocated among the Partners otherwise entitled to such allocations and whose Baseline Amounts have been exceeded, in proportion to those Partners' relative percentage Interests in the Partnership.

(f) Notwithstanding the foregoing provisions regarding Non-Partner Healthcare Products GPO Fees and Non-Partner Business Products GPO Fees, the Partnership reserves the right to not allocate any portion of Non-Partner Healthcare Products GPO Fees and Non-Partner Business Products GPO Fees related to particular HPG Specialty Contract(s) to Partners not materially participating (determined by reference to a Partner's "Materiality Threshold") in such HPG Specialty Contract for a particular category. Any Non-Partner Healthcare Products GPO Fees and Non-Partner Business Products GPO Fees subject to this subsection shall be reallocated among the Investment Partners otherwise receiving an allocation

of Non-Partner Healthcare Products GPO Fees and Non-Partner Business Products GPO Fees related to an HPG Specialty Contract in proportion to their respective relative Interests. The General Partner shall make adjustments of distributions pursuant to Section 6.6 to reflect adjustments pursuant to this Section 6.3(f). "Materiality Threshold" as used in this Section 6.3(f) shall be defined to require a Partner to be participating under a designated HPG Specialty Contract at a level of at least fifty percent (50%) of the maximum level such Partner could participate under such HPG Specialty Contract for all Facilities listed under its Participation Agreement. The Materiality Threshold shall be measured annually at the end of the calendar year. The Partnership reserves the right to reduce the future Non-Partner Healthcare Products GPO Fees and Non-Partner Business Products GPO Fees to be shared with any Partner that does not meet its Materiality Threshold. In such event, the allocations of profits to a Partner would be reduced up to a maximum equaling the amount of Non-Partner Healthcare Products GPO Fees and Non-Partner Business Products GPO Fees otherwise allocable to such Partner with respect to HPG Specialty Contracts with that Partner for the previous year in which the Partner fell below the Materiality Threshold.

(g) **Rebates** that the Partnership receives from Vendors shall be allocated by the Partnership to the Participants earning the Rebates through purchases under the Vendor Contracts, as required by the Participation Agreements. Such rebates shall be treated as earned by the Participants and not earned by the Partnership.

(h) **Partner GPO Costs** shall be allocated to each Investment Partner based on the percentage of each Investment Partner's monthly supplies expense as compared to all Investment Partner's monthly supplies expense. Such costs shall be treated as costs incurred by the Partners to whom these costs are properly allocable and not costs of the Partnership.

(i) **Non-Partner GPO Costs** shall be allocated to each Investment Partner in proportion to the relative amounts of Net GPO Fees allocated to such Partner pursuant to Section 6.3(e). All such Non-Partner GPO Costs shall be treated as costs incurred by the Partnership.

(j) **Retained Non-Investment Partner GPO Fees**. In the event the portion of a GPO Fee that would be allocable to a Non-Investment Partner under Section 6.3(d) is retained by a Vendor and applied to reduce the cost of any Vendor product or service purchased by such Non-Investment Partner, the remaining portion of such GPO Fees received by the Partnership shall be allocated first to the Legacy Consorta Partners and any other Non-Investment Partner based on their specific percentage Interests in the Partnership and next to the Investment Partners based on their relative Interests in the Partnership.

(k) **Legacy Consorta Partner GPO Fees and Legacy Consorta Member GPO Fees**. In the event the portion of a GPO Fee that would be allocable to a Legacy Consorta Partner or Legacy Consorta Member under Sections 6.3(b) and 6.3(c) is retained by a Vendor and applied to reduce the cost of any Vendor product or service purchased by such Legacy Consorta Partner or Legacy Consorta Member, the remaining portion of such GPO Fees received by the Partnership shall be allocated first to the Non-Investment Partners based on their specific percentage Interests in the Partnership and next to the Investment Partners based on their relative Interests in the Partnership.

(l) **HPG Ancillary Program Revenue and HPG Ancillary Program Costs.** Except as provided in Section 6.3(m), HPG Ancillary Program Revenues shall be allocable as Other Distributed Cash as set forth in Section 6.3(n) and HPG Ancillary Program Costs shall be included in Costs, and allocated as set forth in Sections 6.3(h) and 6.3(i).

(m) **Global Sourcing Fees from Investment Partner** purchases shall be allocated to the respective Investment Partner making the purchases upon which the Global Sourcing Fee was earned. All other Global Sourcing Fees shall be allocated as HPG Ancillary Programs as stated in Section 6.3(l).

(n) **Other Distributable Cash.** All other receipts of the Partnership remaining following reductions for funds allocated pursuant to Subsections 6.3(a) through (m) hereof, including any Global Sourcing Fee other than that payable to an Investment Partner in accordance with Section 6.3(m), shall be distributed to each Investment Partner based on its respective relative Interests in the Partnership, subject to Reserves. "Reserves" shall mean the amount of cash held in reserve for reasonably anticipated cash expenses of the Partnership.

Section 6.4    Other Allocation Rules.

(a) For purposes of determining the profits, losses, or any other items allocable to any period, profits, losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partner using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b) The Partners are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Partnership income and loss for income tax purposes, except as may otherwise be required by law.

Section 6.5    Tax Allocations.

(a) In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial "book value" as reflected in the contributing partner's Capital Account ("Book Value").

(b) In the event the Book Value of any Partnership asset is adjusted pursuant to the Treasury Regulations, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder, provided, however, that the General Partner shall adopt the traditional method described in Treasury Regulation § 1.704-3(b) for making such allocations unless all the Partners have provided written consent to utilize a different method under Code Section 704(c).

Page **23** of **38**

(c)     Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 6.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of profits, losses, other items, or distributions pursuant to any provision of this Agreement.

(d)     Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among the Partners in the same proportions as they share profits or losses, as the case may be, for the relevant taxable period.

(e)     Qualified Income Offset.  In the event any Partner unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation § 1.704.1(b)(2)(ii)(d)(4), (5) or (6), which causes or increases such Partner's Adjusted Capital Account Deficit, items of Partnership income and gain (consisting of a pro rata portion of each item of Partnership income, including gross income, and gain for such year) will be specially allocated to such Partner in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation under this Section 6.5(e) will be made if and only to the extent such Partner would have an Adjusted Capital Account Deficit after all other allocations under Article VI of the Agreement have been made.

Section 6.6     Distributions.  Distributions shall be made to the Partners at the times and in the aggregate amounts determined by the General Partner, but no less often than monthly and with payment due for all GPO Fees processed by the fifteenth (15th) day of each month, as soon as possible thereafter, but in no case later than thirty (30) calendar days following the end of the month in which such payment is processed.  Such distributions shall be allocated among the Partners in accordance with the methodology set forth in Section 6.3 hereof.

Section 6.7     Loans.  The General Partner or any Limited Partner, with the consent of the General Partner, may lend money to the Partnership.  If the General Partner or, with the written consent of the General Partner, any Limited Partner makes any loan to the Partnership, the amount of such loan shall not be treated as a contribution to the capital of the Partnership but shall be a debt due from the Partnership.  Any Partner's loan to the Partnership shall be repayable out of the Partnership's cash and shall bear interest at prevailing market rates.  Neither any Partner nor any Affiliate of any Partner shall be obligated to lend money to the Partnership.

Section 6.8     Related Parties.

(a)     General Partner and each Limited Partner may be subject to the requirements of 42 CFR § 413.17 (cost to a related organization) with respect to any allocations of profits, losses, Costs and GPO Fees made by the Partnership.  If those requirements are applicable to any Partner, such Partner may be required to submit cost reports to Centers for Medicare and Medicaid Services that appropriately reflect the costs for services, facilities or supplies furnished by related organizations, which may include the Partnership.  Pursuant to 42 CFR § 413.17, such costs must not exceed the price of comparable services, facilities, or supplies

Page **24** of **38**

that could be purchased elsewhere, unless the exception to the rule at 42 CFR § 413.17(d) is satisfied.

(b)     The Partners acknowledge that while the allocation of Partnership income and costs set forth in the Partnership Agreement as amended is similar to and consistent with allocation and recognition under the Medicare Related Parties Rules, there will be a difference between the costs actually allocated to each Partner and the allowable expenses that can be included in a Medicare Cost Report filed by each Partner or their Affiliates.

Section 6.9    <u>Adjustments to Interests</u>.

(a)     Annually on July 1st of each year (the "Annual Adjustment Date"), the General Partner, pursuant to its powers under Subsection 3.3(c), shall amend the Partnership Agreement to reflect in <u>Exhibit A</u> revised Interests for each Investment Partner to be adjusted in accordance with the provisions of this Section 6.9. Each Investment Partner's revised Interest shall be in effect for the twelve (12) month period following the Annual Adjustment Date of such year, unless adjusted as provided in this Agreement. The Interests set forth below for each Legacy Consorta Partner shall be effective on January 1, 2016 and shall remain fixed, unless adjusted or terminated as provided in Section 7.10 or otherwise in accordance with the terms of this Agreement:

| CHI | 5.166% |
|-----------|--------|
| Franciscan | 1.128% |
| HSHS | 0.970% |
| Trinity | 6.000% |

The Interest for Tenet shall be five percent (5%) effective on February 1, 2016, unless adjusted or terminated as provided in Section 7.10 or otherwise in accordance with the terms of this Agreement.

(b)     As of the Annual Adjustment Date, each Investment Partner's Interest shall equal a percentage determined by dividing (a) the amount of each Investment Partner's GPO Fees received by the Partnership in respect of each Investment Partner during the preceding twelve (12) months ending on June 30 of such year by (b) the total amount of Investment Partner GPO Fees for such period; and multiplying the resulting quotient by the difference of 100% less the then aggregate Interest of the Non-Investment Partners and the Legacy Consorta Partners.

Section 6.10    <u>Adjustments to Interest upon Termination of Interest of a Limited Partner</u>. In the event the Interest of a Limited Partner is terminated as provided in Section 7.10, each Investment Partner shall receive their respective prorata portion of the Interest of the departing Partner based on the relative percentage Interests of the Investment Partners, in addition to their current Interest.

## ARTICLE VII
## DISPOSITION OF INTERESTS AND ADDITIONAL PARTNERS

Section 7.1    Transfers by Partners.  Except as otherwise set forth in this Article VII, a Limited Partner may not sell, assign, transfer, pledge or hypothecate all or any part of its Interest without the prior written consent of the General Partner, which consent may be withheld with or without reasonable cause, in the sole discretion of the General Partner.  Notwithstanding the foregoing, if a Limited Partner is acquired by another Limited Partner, then at the request of the acquiring Limited Partner the General Partner shall: (i) consent to the assignment of the Interest held by the acquired Limited Partner on the effective date of the closing of such acquisition (the "Acquisition Closing Date"), and (ii) amend Exhibit A to include the Interest of the acquired Limited Partner in the Interest of the acquiring Limited Partner, effective as of the Acquisition Closing Date.  If a Limited Partner receives the prior consent of the General Partner, it may sell its Interest in the Partnership if the following conditions are satisfied:

(a)     the sale, transfer or assignment, when aggregated with any prior sales, transfers or assignments of Interests, does not result in a sale or exchange within a twelve (12) month period of fifty percent (50%) or more of the total interests in the Partnership's capital and profits within the meaning of Code Section 708(b) (provided that the General Partner may, in its sole discretion, waive such condition);

(b)     the Limited Partner and its transferee execute, acknowledge and deliver to the General Partner such instruments of transfer and assignment with respect to such transaction as are in form and substance reasonably satisfactory to the General Partner;

(c)     unless waived in writing by the General Partner, the Limited Partner delivers to the General Partner an opinion of counsel satisfactory to the General Partner, covering such securities and tax laws and other aspects of the proposed transfer as the General Partner may require;

(d)     the Limited Partner has furnished to the transferee a written statement showing the name and taxpayer identification number of the Partnership in such form and together with such other information as may be required under Section 6050K of the Code and the Treasury Regulations thereunder; and

(e)     the Limited Partner pays the Partnership a transfer fee in an amount determined by the General Partner, which shall be an amount sufficient to pay all reasonable expenses of the Partnership (including any and all reasonable expenses of the General Partner) in connection with such transaction.

Any Limited Partner who thereafter sells, assigns or otherwise transfers all or any portion of its Interest promptly shall notify the General Partner of such transfer and shall furnish to the General Partner the name and address of the transferee and such other information as may be required under Section 6050K of the Code and the Treasury Regulations thereunder.

Section 7.2    Substituted Limited Partner.  Any transferee obtaining the Interest of a Limited Partner in accordance with Section 7.1 above shall be deemed a Substituted Limited Partner for purposes of this Agreement without any further action or approval.  No Person taking or acquiring, by whatever means, the Interest of any Limited Partner, except as provided in Section 7.1 above, shall be admitted as a Substituted Limited Partner without the consent of the General Partner and unless such Person:

(a)    elects to become a Substituted Limited Partner by delivering notice of such election to the Partnership;

(b)    executes, acknowledges and delivers to the Partnership such other instruments as the General Partner may deem reasonably necessary or advisable to effect the admission of such Person as a Substituted Limited Partner, including, without limitation, the written acceptance and adoption by such Person of the provisions of this Agreement; and

(c)    pays the Partnership a transfer fee in an amount determined by the General Partner, which shall be an amount sufficient to pay all reasonable expenses of the Partnership (including any and all reasonable expenses of the General Partner) in connection with the admission of such Person as a Substituted Limited Partner.

Section 7.3    Certain Permitted Transferees.  Notwithstanding any of the provisions of this Agreement to the contrary, the General Partner may transfer, convey, sell or assign any of the Interest held by such General Partner to any HCA Affiliate without the consent of or notice to any other Partner and any Limited Partner may transfer, convey, sell or assign any of the Interest held by such Limited Partner to the General Partner.

Section 7.4    Admission of Additional Limited Partners.

(a)    The General Partner is authorized to issue Interests to any Person and to admit such Person to the Partnership as an Additional Limited Partner, provided that any such issuance of Interests shall comply with applicable securities laws.  The General Partner shall have reasonable discretion in determining the consideration to be paid to the Partnership in respect of such Interests, which shall be based on then current value (which must be fully paid in cash or property at the time of subscription), and the terms and conditions with respect to the Partnership for admitting Additional Limited Partners.  The General Partner will not permit any Person to become an Additional Limited Partner unless such Person agrees to be bound by the terms of this Agreement.  The General Partner shall do all things necessary to comply with the Delaware Act and is authorized to do all things it deems to be necessary or advisable in connection with admitting any Additional Limited Partner, including, but not limited to, complying with any federal or state statute, or any rule, regulation or guideline issued by any federal, state or other governmental agency.

(b)    The General Partner shall not admit any Person as a Limited Partner if such admission would have the effect of causing the Partnership to be re-classified for federal income tax purposes as an association (taxable as a corporation under the Code), or would violate any Medicare or other health care law, rule or regulation, or would not meet applicable

exemptions from securities registration and securities disclosure provided under federal and state securities laws.

(c)     The General Partner shall amend Exhibit A attached to this Agreement from time to time to reflect the admission of any successor General Partner, Substituted Limited Partners or Additional Limited Partners, or the reduction or termination of any Partner's Interest.

Section 7.5     Invalid Transfer or Resignation.  No transfer of an Interest that is in violation of this Article VII shall be valid or effective, and the Partnership shall not recognize any improper transfer for the purposes of making allocations, payments of profits, return of capital contributions or other distributions with respect to such Interest, or part thereof.  The Partnership may enforce the provisions of this Article VII either directly or indirectly or through its agents by entering an appropriate stop transfer order on its books or otherwise refusing to register or transfer or permit the registration or transfer on its books of any proposed transfer not in accordance with this Article VII.  Except in connection with a transfer or assignment of all of its then remaining Interest in accordance with Section 7.1 above, a Partner may not resign from the Partnership prior to the dissolution and winding up of the Partnership.  A resigning Partner shall not be entitled to receive any distribution and shall not otherwise be entitled to receive the fair value of its Interest except as otherwise provided for in this Agreement or in the Partner's Participation Agreement.

Section 7.6     Distributions and Allocations in Respect of a Transferred Interest.  If any Partner sells, assigns or transfers all or any part of its Interest during any accounting period in compliance with the provisions of this Article VII, Partnership income, gain, deductions and losses attributable to such Interest for the respective period shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during the appropriate accounting period in accordance with Code Section 706(d), using the daily proration method.  All Partnership distributions before the effective date of such transfer shall be made to the transferor, and all such Partnership distributions on and after the effective date of such transfer shall be made to the transferee.  Solely for purposes of making Partnership tax allocations and distributions, the Partnership shall recognize a transfer on the day following the date of transfer.  Neither the Partnership nor the General Partner shall incur any liability for making Partnership allocations and distributions in accordance with the provisions of this Section 7.6.

Section 7.7     Partnership's and General Partner's Right of First Refusal.  Subject to the restrictions on transfer set forth in this Article VII, if any Partner receives or obtains an offer from a third party to acquire in any manner all or any part of its Interest, which offer the Partner has accepted in writing subject to this Article VII, the Partner promptly shall notify the General Partner in writing of the offer received, including the name of the offeror, the amount of the Interest offered to be purchased, the proposed purchase price and the other terms and conditions of the offer.  The Partnership shall have the option for a period of sixty (60) days from the day the General Partner receives notice of such offer to purchase such Partner's Interest on the same terms and conditions contained in the offer.  The Partnership may exercise its option by notifying the Partner proposing to sell prior to the end of such sixty (60) day period of its election to exercise such option and shall thereafter purchase such Partner's Interest within such sixty (60)

day period. If the Partnership does not exercise its option, the General Partner shall have the option to purchase such Partner's Interest on the same terms and conditions within the same sixty (60) day period. If the Partnership and the General Partner fail to exercise or both indicate in writing that they will not exercise such option within the period provided, or if either the Partnership or the General Partner elects to exercise the option but fails to effect the purchase within the prescribed period, the Partner, in accordance with and subject to the provisions of this Article VII (including the provisions of Section 7.1 above requiring the consent of the General Partner) may convey or dispose of the part of the Partner's Interest that was the subject of the offer, but only at the price, on the terms and conditions, and to the party specified in the offer notice to the General Partner. If terms and conditions more favorable to the proposed purchaser than, or in any material manner different from, those specified in the offer notice to the General Partner should be agreed to by the Partner, the Partnership and the General Partner shall again have the option to purchase the selling Partner's Interest, in accordance with the more favorable or different purchase terms and this Section 7.7. Neither the General Partner nor the Partnership shall be liable or accountable to any Partner which attempts to transfer its Interest for any loss, damage, expense, cost, or liability resulting from the Partnership's or General Partner's exercise or failure to exercise the purchase option under this Section 7.7 within the sixty (60) day period described herein, or from the Partnership's or General Partner's failure to notify the Partner within such sixty (60) day period of the Partnership's or the General Partner's intention not to exercise the purchase option.

Section 7.8    Occurrence of Terminating Event or Adverse Terminating Event.

(a)    In the event a Terminating Event shall occur with respect to any Partner, such Partner or the Partner's successor or other legal representative, including a trustee in a Bankruptcy, shall give written notice thereof to the Partnership within thirty (30) days of the occurrence of such event. Upon the receipt of such notice, the Partnership shall have the right, but not the obligation, for the sixty (60) days following the date of receipt of such notice to purchase such Partner's Interest. If the Partnership has not received written notice of a Terminating Event with respect to any Partner as required under this Section 7.8(a), the Partnership shall have the right to purchase such Partner's Interest for sixty (60) days after the Partnership has actual knowledge of the occurrence of such event and gives written notice thereof to the Partner. Notwithstanding anything to the contrary in this Agreement, the failure of a Partner to notify the Partnership of the occurrence of a Terminating Event as required under this Section 7.8(a) shall not constitute the occurrence of an Adverse Terminating Event.

(b)    In the event the General Partner determines that an Adverse Terminating Event has occurred with respect to any Partner, the Partnership shall give written notice thereof to such Partner and, for a period of sixty (60) days thereafter, the Partnership shall have the right, but not the obligation, to purchase such Partner's Interest.

(c)    In the event the Partnership does not elect to exercise its right to purchase such Partner's Interest pursuant to subsections (a) or (b) above, then the General Partner shall have the right, but not the obligation, to purchase such Partner's Interest, within the time periods indicated in, and pursuant to the same terms provided in, this Section 7.8, for purchases of such Partner's Interest by the Partnership.

Page **29** of **38**

Section 7.9     Payment for Partner's Interest.

(a)     If any Partner's Interest is purchased because of the occurrence of a Terminating Event, the amount the Partnership will pay for such Interest shall be equal to the Fair Market Value of such Interest.

(b)     If the Partnership purchases any Partner's Interest as a result of an Adverse Terminating Event, the amount to be paid by the Partnership to such Partner shall be equal to the balance of the Partner's Capital Account as of the date of the Adverse Terminating Event.

(c)     For purposes of this Section 7.9, the "Fair Market Value" of a Partner's Interest shall be an amount determined to be the "fair market value" of such Partner's Interest by an independent appraiser having an established reputation and experience with group purchasing or similar organizations, who shall have been selected in the sole discretion of the General Partner.

(d)     If the Partnership purchases any Partner's Interest pursuant to this Section 7.9, the Partnership shall pay any such amounts owed therefor to such Partner or its successor in a lump sum or, at the discretion of the General Partner, in up to sixty (60) equal monthly payments with interest at the "prime" or base rate as established from time to time by The Chase Manhattan Bank on the unpaid principal balance. If the General Partner exercises its discretion to pay for an Interest in monthly installments, the first such installment will be paid to the Partner or its successor in interest on the first day of the month after thirty (30) days have expired since the Partner's Interest has been purchased. Each subsequent installment shall be paid on the first day of each successive month until the full amount owed to the Partner or its successor in interest has been paid. The Partnership's obligation to pay the Partner in monthly installments under this Section 7.9 will be evidenced by a non-recourse promissory note executed by the General Partner on behalf of the Partnership.

Section 7.10     Termination of Interest Upon Termination of Participation Agreement.  A Partner's Interest in the Partnership shall be automatically terminated upon the occurrence of a termination of the Participation Agreement of such Partner (or such Partner's Affiliates). Effective as of such termination date, the General Partner shall reduce the terminated Partner's Interests to zero percent (0%) and such Interest shall be allocated to each of the Investment Partners in a manner consistent with Section 6.10. The General Partner shall adopt an amended Exhibit A to reflect such adjustments.  Partnership income, gain, deductions, losses and distributions prior to the date of termination, regardless of when received, and attributable to such terminated Partner's Interest shall be allocated to such Partner in accordance with Article VI hereof.  A Partner whose Interest is terminated pursuant to this Section 7.10 shall be released from any and all obligations of the Partnership except for (a) those obligations or liabilities of such Partner arising out of a breach of this Agreement by such Partner and (b) those obligations or liabilities of such Partner based on events occurring, arising or maturing prior to such Partner's termination.

Section 7.11 <u>Partnership Initial Public Offering</u>. Upon approval of the General Partner and a Majority-in-Interest of the Limited Partners, and pursuant to a registration rights agreement also so approved (the "Registration Rights Agreement"), all or part of the Interests of the Partners shall be offered for sale in a firm commitment underwritten initial public offering (an "Initial Public Offering") in a manner so approved by the Partners and in accordance with the terms of the Registration Rights Agreement. For purposes of clarification, an Initial Public Offering shall not be deemed a Change in Control pursuant to Section 5.2. In such event, each of the Partners shall participate in the Initial Public Offering to the extent of their respective Interests. By way of illustration, if a Limited Partner has an Interest in the amount of 10%, and the General Partner and the Majority-in-Interest of the Limited Partners approve an Initial Public Offering of 40% of the total Interests in the Partnership, then such 10% Limited Partner shall offer 40% of its 10% Interest, or a 4.0% Interest in the Initial Public Offering. In the event the General Partner and a Majority-in-Interest of the Limited Partners approve an Initial Public Offering, all Partners shall have a period of thirty (30) days from the date of such approval to notify the General Partner that it does not intend to participate in the Initial Public Offering and desires to terminate its Interest in the Partnership, in which case the Partnership will be obligated to pay such Partner for its Interest in accordance with Section 7.9(b) immediately prior to the consummation of the Initial Public Offering.

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

Section 8.1 <u>Dissolution</u>. The Partnership shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (a) the approval by a Majority-in-Interest of the Limited Partners of the dissolution of the Partnership, (b) the resignation, expulsion, bankruptcy or dissolution of the General Partner or the occurrence of any other event which would legally disqualify the General Partner from acting as the General Partner in the Partnership; (c) the General Partner in its reasonable discretion determines that a rule, ordinance, regulation, statute or government pronouncement has been enacted that makes any material aspect of this Agreement or the activities conducted by the Partnership unlawful or eliminates or substantially reduces, either directly or indirectly, the benefits that would accrue to the Partners (including the General Partner) with respect to continuing the Partnership's business operations; (d) the dissolution of the Partnership by judicial decree; (e) there remains only one Partner in the Partnership; or (f) December 31, 2050. Nothing contained in this Section 8.1 is intended to grant to any Partner the right to dissolve the Partnership at will (by retirement, resignation, withdrawal or otherwise), or to exonerate any Partner from liability to the Partnership and the remaining Partners if it dissolves the Partnership at will. Any dissolution at will of the Partnership, including dissolution caused under Section 8.1(b) above, shall be in contravention of this Agreement for purposes of the Delaware Act. Dissolution of the Partnership under Section 8.1(d) above shall not constitute a dissolution at will.

Section 8.2 <u>Reconstitution</u>. If the Partnership is dissolved as a result of an event described in Section 8.1(b) above, the Partnership may be reconstituted and its business continued if, within ninety (90) days after the date of dissolution, all of the Limited Partners affirmatively elect to reconstitute the Partnership, agree on the identity of the new General Partner or Partners, and execute an instrument confirming such facts. If the Partnership is

reconstituted, an amendment to this Agreement shall be executed and an amended Certificate of Limited Partnership filed of record.

Section 8.3    Interim Manager.  If the Partnership is dissolved as a result of an event described in Section 8.1(b) above and the General Partner is unable to continue acting as the General Partner of the Partnership, those Partners who constitute a Majority-in-Interest of the Limited Partners may appoint an interim manager of the Partnership, who shall have and may exercise only the rights, powers and duties of a general partner necessary to preserve the Partnership assets, until (a) a new General Partner is elected under Section 8.2 above, if the Partnership is reconstituted; or (b) a Liquidating Trustee is appointed under Section 8.4 below, if the Partnership is not reconstituted.  The interim manager shall not be liable as a general partner to the Limited Partners and shall, while acting in the capacity of interim manager on behalf of the Partnership, be entitled to the same indemnification rights as are set forth in Section 3.9 above. The interim manager appointed as provided herein shall be entitled to receive such reasonable compensation for its services as may be agreed upon by such interim manager and those Partners who appointed the interim manager.

Section 8.4    Liquidation.

(a)    If the Partnership is dissolved and is not reconstituted, the General Partner, as liquidating trustee (the "Liquidating Trustee"), shall commence to wind up the Partnership's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the satisfaction of liabilities to creditors.  In the event that the General Partner is unable to perform in its capacity as Liquidating Trustee due to its bankruptcy, dissolution or any other termination of the General Partner as an entity, the Liquidating Trustee shall be a Person approved by Partners who own at least two-thirds of the Interests of the Partners (excluding Interests owned by the General Partner).

(b)    The Liquidating Trustee shall give all notices to creditors of the Partnership and shall make all publications required by the Delaware Act.  In the course of winding up and terminating the business and affairs of the Partnership, except as otherwise set forth in this Section 8.4(b), the assets of the Partnership (other than cash and any contracts or agreements for purchasing goods, supplies, materials, dietary products, pharmaceuticals, equipment and services used by hospitals) shall be sold, its liabilities and obligations to creditors, including any Partners who made loans to the Partnership as provided in Section 6.7 hereof, and all expenses incurred in its liquidation shall be paid, and all resulting items of Partnership income, gain, loss or deduction shall be credited or charged to the Capital Accounts of the Partners in accordance with Article VI above.  All Partnership property not sold upon liquidation of the Partnership shall be distributed in kind to the Partners.  Thereafter, the Liquidating Trustee shall establish any reserve (including reserves for expenses associated with the conduct of examinations for years which have not been finally audited by the Internal Revenue Service) which the Liquidating Trustee deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership.  Such reserve may be paid over by the Liquidating Trustee to any financial institution acceptable to the Liquidating Trustee, as escrow agent to be held for disbursement in payment of any of the aforementioned liabilities and, at the expiration of such period as shall be deemed advisable by the Liquidating Trustee, for distribution of the

balance to the Partners in the same proportions as the amount so reserved would otherwise have been distributed to the Partners pursuant to this Agreement. Finally, the balance of any funds and any other assets then remaining shall be distributed among all Partners having positive Capital Account balances (as determined after giving effect to all adjustments attributable to allocations of items of profit and loss realized by the Partnership during the fiscal year in question (including items of profit and loss realized on the liquidation) and all adjustments attributable to contributions and distributions of money and property effected prior to such distribution) *pro rata* in accordance with such positive Capital Account balances.

Section 8.5 Court Appointment of Liquidating Trustee. If, within ninety (90) days following the date of dissolution provided in Section 8.1 above, a Liquidating Trustee has not been appointed in the manner provided therein, any interested party shall have the right to make application to any United States Federal District Judge for the United States Federal Court, Middle District of Tennessee for appointment of a Liquidating Trustee, and the Judge shall be fully authorized and empowered to appoint and designate a Liquidating Trustee who shall have all the powers, duties, rights and authority of the Liquidating Trustee herein provided.

Section 8.6 Final Statement. Within a reasonable time following the completion of the liquidation, the Liquidating Trustee shall supply to each of the Partners a statement which shall set forth the assets and the liabilities of the Partnership as of the date of completion of the liquidation, and shall execute and file such certificates or documents as may be necessary to evidence the dissolution and termination of the Partnership.

Section 8.7 Claims of the Partners. Partners and former Partners shall look solely to the assets of the Partnership for the return of the capital contributions made by such Partners to the Partnership, and if the assets of the Partnership remaining after payment of or due provision for all debts, liabilities and obligations of the Partnership are insufficient to return such capital contributions, the Partners and former Partners shall have no recourse against the Partnership or any other Partner.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1 Partner's Interest. A Partner's Interest shall for all purposes be personal property. A Partner has no interest in specific Partnership property.

Section 9.2 Fiscal Year. The fiscal year of the Partnership shall end on December 31 of each year, or on such other date as shall be determined by the General Partner.

Section 9.3 Tax Matters Partner.

(a) The General Partner is hereby designated as "Tax Matters Partner" of the Partnership for purposes of Section 623l(a)(7) of the Code and shall have the power to manage and control, on behalf of the Partnership, any administrative proceeding at the Partnership level with the Internal Revenue Service relating to the determination of any item of Partnership income, gain, loss, deduction or credit for federal income tax purposes.

Page **33** of **38**

     (b)    The Tax Matters Partner shall, within ten (10) days of the receipt of any notice from the Internal Revenue Service in any administrative proceeding at the Partnership level relating to the determination of any Partnership item of income, gain, loss, deduction or credit, mail a copy of such notice to each Partner.

     (c)    Consistent with the requirements of Section 3.5(b) and Section 6.5(b), the Tax Matters Partner shall make all tax elections and other decisions relating to the preparation and filing of all Partnership tax returns.

     (d)    The Tax Matters Partner shall cause the Partnership to be audited annually by an independent accounting and audit firm of national reputation, the results of which shall be delivered to the Partners upon receipt by the Partnership.

    Section 9.4    <u>Right to Make Section 754 Election</u>. The Tax Matters Partner, in its sole discretion, may make or revoke, on behalf of the Partnership, an election in accordance with Section 754 of the Code, so as to adjust the basis of Partnership property in the case of a distribution of property within the meaning of Section 734 of the Code, and in the case of a transfer of an Interest within the meaning of Section 743 of the Code. Each Partner shall, upon request of the Tax Matters Partner, supply the information necessary to give effect to such an election. The Partnership shall have such basis adjustments as required under Section 734 of the Code, if any, and Section 743 of the Code in the absence of an election under Section 754 of the Code.

    Section 9.5    <u>Notices</u>. All notices or other communications required or permitted under this Agreement shall be in writing and sufficient if sent by registered or certified mail, postage prepaid, addressed as provided below, or delivered personally, by private courier or fax, and followed by such mailing:

     (a)    If given to the Partnership, at the Partnership's mailing address set forth below:

       HealthTrust Purchasing Group, L.P.
       155 Franklin Road, Suite 400
       Brentwood, Tennessee 37027
       Telecopy:
       877-470-8956
       Attention: Chief Legal Officer

with a copy to each Partner as set forth in paragraph (b) below. The Partnership may change the person and address to which notices or other communications are to be sent to it by giving written notice of any such change to each Partner in the manner provided herein.

     (b)    If given to any Partner, at the address set forth on the books and records of the Partnership. Any Partner may change the person and address to which notices or other communications are to be sent to it by giving written notice of any such change to the Partnership and to the other Partners in the manner provided herein.

Page **34** of **38**

(c)     All such notices shall be deemed to have been given when received.

Section 9.6     Amendment.  Except as otherwise expressly provided in this Section 9.6, amendments or modifications may be made to this Agreement only by setting forth such amendments or modifications in a document approved by the General Partner and a Majority-in-Interest of the Limited Partners.  The General Partner may, without the consent or approval of any Limited Partner, amend any provision of this Agreement and execute, swear to, acknowledge, deliver, file and record whatever documents may be required in connection therewith to reflect:

(a)     a change in the location of the principal place of business of the Partnership not inconsistent with the provisions of Section 2.6 above, or a change in the registered office or the registered agent of the Partnership not inconsistent with the provisions of Section 2.5 above;

(b)     admission of a Partner into the Partnership or termination of any Partner's Interest in accordance with this Agreement;

(c)     a change (i) that is of an inconsequential nature and does not adversely affect any Partner in any material respect; (ii) that is reasonably necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state agency or contained in any federal or state statute, compliance with any of which the General Partner deems to be in the best interest of the Partnership and the Partners; or (iii) that is required or contemplated by this Agreement;

(d)     a change to any provision in this Agreement required to be so changed by the Staff of the Securities and Exchange Commission or other federal agency or by a State Securities Commissioner or similar official, which change is deemed by such commission, agency or official to be for the benefit or protection of the Partners; and

(e)     the annual adjustment to the Interests of the Partners set forth in Section 6.9 hereof.

Except as otherwise expressly provided herein, no amendment or modification of this Agreement may be made, which (i) affects the respective rights or obligations of any Partner so as to affect such Partner materially and adversely in a manner different from the other Partners (including, but not limited to, any amendment that disproportionately affects the Interest of any Partner or its interests in the capital, profits or losses of, or distributions or allocations with respect to such Partner), or (ii) has the effect of causing the Partnership not to comply with its obligations to such Partner under any Group Purchasing Access Agreement or Participation Agreement between such Partner and the Partnership, unless the same has been set forth in an amendment to this Agreement duly executed by the General Partner and a Majority-in-Interest of the Limited Partners that includes such Partner.  In addition, any amendments or modifications to the following sections shall not be effective unless set forth in an amendment to this Agreement duly executed by the Tax Exempt Partners: that portion of the definition of "Affiliate" related to not-for-profit entities; Section 3.3(a)(x); the percentage of Interests required to approve actions by

the General Partner, and deletion of any one of the list of actions, under Section 3.5; Section 3.6; Section 3.7; any provision of Section 5.2; Sections 6.3(b), (c), (d), or (g); Sections 6.9 (a) or (b); Section 6.10; Sections 7.9(a) or (b); Section 7.10; Section 7.11; Section 9.3(d); or this final paragraph of Section 9.6. For purposes of clarification, any amendment or modification to any of the above-referenced sections that only affects the Investment Partners shall not require the Tax Exempt Partner's approval.

Section 9.7    Severability.    In the event that any provision hereof is prohibited or unenforceable in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 9.8    Governing Law.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

Section 9.9    Counterparts.    This Agreement may be executed in any number of separate counterparts, each of which shall be deemed to be an original, but which together shall constitute one and the same instrument.  Execution and delivery of this Agreement and any amendments by the Partners shall be effective through: (i) executing and delivering the paper copy of the document; (ii) transmitting the executed paper copy of the document by facsimile transmission, or electronic mail in "portable document format" (".pdf") or other electronically scanned format; or (iii) "electronic signature" through a process such as DocuSign®.

Section 9.10    Exhibits.    Each exhibit to this Agreement is incorporated herein for all purposes.

Section 9.11    Additional Documents.    Each Partner, upon the request of the General Partner, agrees to perform all further acts and execute, acknowledge and deliver any documents that may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

Section 9.12    Headings.    The section headings contained in this Agreement are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

Section 9.13    Replaces Second Amended and Restated Agreement.    This Agreement hereby amends, restates, supersedes and replaces the Second Amended and Restated Agreement in all respects and shall be the sole instrument governing the operation of the Partnership.

*[Remainder of page intentionally left blank.  The following page is the signature page.]*

DocuSign Envelope ID: 8DD95421-81D3-42A3-A3F0-C5CD1DEEA8D1

IN WITNESS WHEREOF, each party hereto has duly executed this Agreement, or has caused this Agreement to be duly executed, as of the Effective Date, provided, that Tenet has duly executed this Agreement as of the Tenet Effective Date.

**HPG ENTERPRISES, LLC**

By: _____

Name: _Edward Jones_____

Title: _Vice-President_____

**HPG SOLUTIONS, LLC**

By: _____

Name: _Edward Jones_____

Title: _Vice-President_____

**CATHOLIC HEALTH INITIATIVES**

By: _____
    E842E345C69F453...
Name: Dean Swindle

Title: Evp & CFO

**HOSPITAL SISTERS HEALTH SYSTEM**

By: _____

Name: _____

Title: _____

**CHS/COMMUNITY HEALTH SYSTEMS, INC.**

By: _____

Name: _____

Title: _____

**LIFEPOINT HOSPITALS HOLDINGS, INC.**

By: _____

Name: _____

Title: _____

**FRANCISCAN ALLIANCE, INC.**

By: _____

Name: _____

Title: _____

**TRINITY HEALTH CORPORATION**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, each party hereto has duly executed this Agreement, or has caused this Agreement to be duly executed, as of the Effective Date, provided, that Tenet has duly executed this Agreement as of the Tenet Effective Date.

**HPG ENTERPRISES, LLC**

By: _____

Name: _____

Title: _____

**CHS/COMMUNITY HEALTH SYSTEMS, INC.**

By: _____

Name: _____

Title: _____

**HPG SOLUTIONS, LLC**

By: _____

Name: _____

Title: _____

**LIFEPOINT HOSPITALS HOLDINGS, INC.**

By: _____

Name: _____

Title: _____

**CATHOLIC HEALTH INITIATIVES**

By: _____

Name: _____

Title: _____

**FRANCISCAN ALLIANCE, INC.**

By: _____

Name: _____

Title: _____

**HOSPITAL SISTERS HEALTH SYSTEM**

By: _Mary Starmann-Harris_

Name: _Mary Starmann-Harrison_

Title: _President and CEO_

**TRINITY HEALTH CORPORATION**

By: _____

Name: _____

Title: _____

Page **37** of **38**

IN WITNESS WHEREOF, each party hereto has duly executed this Agreement, or has caused this Agreement to be duly executed, as of the Effective Date, provided, that Tenet has duly executed this Agreement as of the Tenet Effective Date.

**HPG ENTERPRISES, LLC**

By: _____

Name: _____

Title: _____

**CHS/COMMUNITY HEALTH SYSTEMS, INC.**

By: _____

Name: _____ Martin G. Schweinhart _____

Title: _____ Executive Vice President Administration _____

**HPG SOLUTIONS, LLC**

By: _____

Name: _____

Title: _____

**LIFEPOINT HOSPITALS HOLDINGS, INC.**

By: _____

Name: _____

Title: _____

**CATHOLIC HEALTH INITIATIVES**

By: _____

Name: _____

Title: _____

**FRANCISCAN ALLIANCE, INC.**

By: _____

Name: _____

Title: _____

**HOSPITAL SISTERS HEALTH SYSTEM**

By: _____

Name: _____

Title: _____

**TRINITY HEALTH CORPORATION**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, each party hereto has duly executed this Agreement, or has caused this Agreement to be duly executed, as of the Effective Date, provided, that Tenet has duly executed this Agreement as of the Tenet Effective Date.

**HPG ENTERPRISES, LLC**

By: _____

Name: _____

Title: _____

**CHS/COMMUNITY HEALTH SYSTEMS, INC.**

By: _____

Name: _____

Title: _____

**HPG SOLUTIONS, LLC**

By: _____

Name: _____

Title: _____

**LIFEPOINT HOSPITALS HOLDINGS, INC**

By: _David M. D_____

Name: _David M. Dill_____

Title: _President & COO_____

**CATHOLIC HEALTH INITIATIVES**

By: _____

Name: _____

Title: _____

**FRANCISCAN ALLIANCE, INC.**

By: _____

Name: _____

Title: _____

**HOSPITAL SISTERS HEALTH SYSTEM**

By: _____

Name: _____

Title: _____

**TRINITY HEALTH CORPORATION**

By: _____

Name: _____

Title: _____

Page **37** of **38**

IN WITNESS WHEREOF, each party hereto has duly executed this Agreement, or has caused this Agreement to be duly executed, as of the Effective Date, provided, that Tenet has duly executed this Agreement as of the Tenet Effective Date.

**HPG ENTERPRISES, LLC**

By: _____

Name: _____

Title: _____

**CHS/COMMUNITY HEALTH SYSTEMS, INC.**

By: _____

Name: _____

Title: _____

**HPG SOLUTIONS, LLC**

By: _____

Name: _____

Title: _____

**LIFEPOINT HOSPITALS HOLDINGS, INC.**

By: _____

Name: _____

Title: _____

**CATHOLIC HEALTH INITIATIVES**

By: _____

Name: _____

Title: _____

**FRANCISCAN ALLIANCE, INC.**

By: _Kevin D. Leah_

Name: _KEVIN D. LEAHY_

Title: _President/CEO_

**HOSPITAL SISTERS HEALTH SYSTEM**

By: _____

Name: _____

Title: _____

**TRINITY HEALTH CORPORATION**

By: _____

Name: _____

Title: _____

HPG002-0000001

DocuSign Envelope ID: 0D2B9B4C-2421-4B0C-A348-2CA390466E2E

IN WITNESS WHEREOF, each party hereto has duly executed this Agreement, or has caused this Agreement to be duly executed, as of the Effective Date, provided, that Tenet has duly executed this Agreement as of the Tenet Effective Date.

**HPG ENTERPRISES, LLC**

By: _____

Name: _____

Title: _____

**CHS/COMMUNITY HEALTH SYSTEMS, INC.**

By: _____

Name: _____

Title: _____

**HPG SOLUTIONS, LLC**

By: _____

Name: _____

Title: _____

**LIFEPOINT HOSPITALS HOLDINGS, INC.**

By: _____

Name: _____

Title: _____

**CATHOLIC HEALTH INITIATIVES**

By: _____

Name: _____

Title: _____

**FRANCISCAN ALLIANCE, INC.**

By: _____

Name: _____

Title: _____

**HOSPITAL SISTERS HEALTH SYSTEM**

By: _____

Name: _____

Title: _____

**TRINITY HEALTH CORPORATION**

By: _Lou Fierens_
—31B22C54F21A4A9...

Name: Lou Fierens

Title: 9/14/2015

HealthTrust Third Amended and Restated Partnership Agreement

TENET HEALTHSYSTEM MEDICAL, INC.

By: _____

Name: Daniel Cancelmi

Title: Senior Vice President

**EXHIBIT A**
to
**THIRD AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

PARTNERSHIP INTERESTS

| Partner Name | Effective January 1, 2016 | Effective February 1, 2016 |
|---|---|---|
| **General Partner:** | | |
| HPG Enterprises, LLC<br>One Park Plaza<br>Nashville, TN 37203 | 1.0% | 1.0% |
| **Limited Partners:** | | |
| HPG Solutions, LLC<br>One Park Plaza<br>Nashville, TN 37203 | 53.962% | 51.397% |
| LifePoint Hospitals Holdings, Inc.<br>103 Powell Court, Suite 200<br>Brentwood, TN 37027 | 5.793% | 5.523% |
| CHS/Community Health Systems, Inc.<br>4000 Meridian Boulevard<br>Franklin, TN 37067 | 24.981% | 23.816% |
| Catholic Health Initiatives<br>198 Inverness Drive West<br>Englewood, CO 80112 | 5.166% | 5.166% |
| Hospital Sisters Health System<br>4936 LaVerna Road<br>Springfield, IL 62707-9456 | 0.970% | 0.970% |
| Franciscan Alliance, Inc.<br>1515 Dragoon Trail<br>Mishawaka, ID 46544 | 1.128% | 1.128% |
| Trinity Health Corporation<br>20555 Victor Parkway<br>Livonia, MI 48152-7018 | 7.008% | 6.000% |
| Tenet HealthSystem Medical, Inc.<br>1445 Ross Avenue, Suite 1400<br>Dallas, TX 75202 | 0.0% | 5.000% |

Exhibit A

**EXHIBIT B**
to
**THIRD AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

### Non-Investment Partners

| Name | Limited Partnership Interest |
|------|------------------------------|
| Tenet HealthSystem Medical, Inc. | 5.0% (Commencing February 1, 2016) |

Exhibit B