# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **COMMONSPIRIT HEALTH, a Colorado corporation,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:21-cv-00460** |
| **HEALTHTRUST PURCHASING GROUP, L.P., a Delaware limited partnership; and HPG ENTERPRISES, LLC, a Tennessee limited liability company,** | ) ) ) ) ) ) | **Judge Aleta A. Trauger** |
| **Defendants.** | ) ) | |

## MEMORANDUM

Before the court is plaintiff/counterdefendant CommonSpirit Health's Motion to Dismiss the counterclaims asserted by defendants/counterclaimants HealthTrust Purchasing Group, L.P. and HPG Enterprises, LLC (collectively referred to herein, in the singular, as "HeathTrust," unless necessary to distinguish between them). (Doc. No. 51.) For the reasons set forth herein, the motion will be denied.

## I. STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim

is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.,* 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)).

## II. FACTS AND PROCEDURAL HISTORY

Plaintiff CommonSpirit Health ("CommonSpirit") filed suit against HealthTrust in June 2021, asserting claims for breach of a Participation Agreement, breach of a Partnership Agreement, breach of fiduciary duty, and conversion and seeking damages as well as declaratory and injunctive

relief. (Doc. No. 1.) HealthTrust, in response, filed an Answer denying liability and Counterclaims asserting that CommonSpirit had misappropriated its trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Count I), and the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701 *et seq.* (Count II), and had breached the confidentiality and exclusivity provisions of the parties' Participation Agreement. (Doc. No. 35.) HealthTrust, too, seeks damages as well as a declaratory judgment that the plaintiff's prior material breach of the Participation Agreement justified HealthTrust's termination of that Agreement.

HealthTrust is a group purchasing organization ("GPO"). (Doc. No. 35 ¶ 1.) A GPO "functions as an entity to leverage the purchasing power of a group of healthcare providers to obtain discounts from vendors and negotiate the prices for drugs, devices, and other medical products and services based on the collective buying power of the GPO members." (Doc. No. 1 ¶ 7; Doc. No. 35, Answer ¶ 7.) CommonSpirit's predecessor, Catholic Health Initiatives ("CHI") was a member of the HealthTrust GPO beginning in 2007 and was party to the Participation Agreement with HealthTrust that took effect on January 1, 2016 and was set to expire on January 1, 2021. (Doc. No. 35 ¶¶ 17, 19; Doc. No. 35-1.) CHI was also a limited partner in HealthTrust Purchasing Group, L.P. ("HPG"), with its equity interest in HPG contingent upon CHI's continued membership in the GPO under the Participation Agreement. (Doc. No. 35 ¶¶ 15, 18.)

The Participation Agreement, attached as an exhibit to both the Complaint and the Counterclaims, includes a GPO exclusivity provision, pursuant to which CHI agreed that HealthTrust would be the only GPO from which its facilities would purchase products and services and that it would purchase at least 80% of its products and services from HealthTrust. (Doc. No. 1-1, Participation Agreement §§ 2.3, 5.3, 5.4.) The Participation Agreement also includes

confidentiality obligations, requiring CHI to maintain in strict confidence, among other things, the "pricing, rebates, discounts, shipping terms and other terms and condition[s] of the Vendor Contracts" and prohibiting CHI from providing such pricing information to "any entity that functions" as a GPO. (Participation Agreement § 9.1.)

In February 2019, CHI became the sole corporate member of another health system, Dignity Health ("Dignity") and began operating under the name CommonSpirit Health. (Doc. No. 35 ¶ 24.) Dignity had long been a member and equity shareholder of a different GPO, Premier, Inc. ("Premier"), a competitor of HealthTrust. (*Id.* ¶ 25.)

In May 2019, CHI, now known as CommonSpirit, allegedly demanded that HealthTrust waive the exclusivity provision of the Participation Agreement and allow it effectively to maintain membership agreements simultaneously with HealthTrust and Premier. It also demanded that HealthTrust agree to amend the Participation Agreement to grant CommonSpirit the right to terminate the Participation Agreement without cause and prior to its expiration at the end of 2020. (*Id.* ¶ 29.) HealthTrust refused and informed CommonSpirit that, if it wished to terminate the Participation Agreement prematurely, it would have to pay HealthTrust a "buy out" for the remainder of the term and forfeit its equity in HPG. (*Id.* ¶ 30.)

In June 2019, CommonSpirit invited HealthTrust and others, including Premier, to submit proposals to become CommonSpirit's new GPO provider as of January 1, 2021, when the Participation Agreement with HealthTrust expired. HealthTrust participated in this process, again reminding CommonSpirit that its contractual obligations continued through the end of 2020 and again rebuffing its request to amend the Participation Agreement to allow CommonSpirit to unilaterally terminate the Agreement prematurely without cause. (*Id.* ¶¶ 31–33.) In or around

January 2020, CommonSpirit announced that it had selected Premier to be its sole and exclusive GPO.

In January and February 2020, HealthTrust and CommonSpirit engaged in dialogue concerning CommonSpirit's transition to Premier as its GPO, in which CommonSpirit acknowledged that it would "lose its equity" in HPG but also "purported to commit to completing its contractual obligations to HealthTrust." (Doc. No. 35 ¶ 39; *see also* Doc. No. 35-7, Jan. 28, 2020 Letter from D. DeLay, CommonSpirit Senior Vice President, to E. Jones, HealthTrust CEO ("DeLay Letter").)[1] According to HealthTrust, despite CommonSpirit's stated intent to comply with its contractual obligations through the end of 2020, CommonSpirit's actions demonstrated that it did not actually intend to do so. (Doc. No. 35 ¶ 40.) HealthTrust further contends that the DeLay Letter constituted an express repudiation of the Participation Agreement. (*Id.* ¶¶ 77–78.)

HealthTrust also points to the January 28, 2020 press release issued by Premier announcing that CommonSpirit "will be fully converting to Premier's group purchasing organization," without stating a date on which such conversion would be effective. (*Id.* ¶ 36; *see also* Doc. No. 35-3, Press Release.) According to HealthTrust, CommonSpirit then announced to its vendors sometime in February 2020 in an undated letter addressed to "Supplier" (the "Supplier Letter") that it had "elect[ed] to utilize Premier, Inc. as its sole national GPO effective January 1, 2020." (Doc. No. 35-4, at 1.) The Supplier Letter stated that the "anticipated go live date of all Premier contract activities is April 1, 2020" and that "Premier and CommonSpirit Health will be working together to finalize contracts covering all our spend [sic] in the next few weeks." (*Id.*; *see also* Doc. No. 35 ¶ 37.)

---

[1] All of the documents referenced herein are attached as exhibits to HealthTrust's Counterclaims.

HealthTrust alleges that CommonSpirit "proceeded to further breach its obligations" under the Participation Agreement by:

> directly and through Premier representatives, demanding that vendor suppliers work with Premier to adopt prices at least as favorable as those negotiated under HealthTrust's vendor contracts. This outreach included an email, on information and belief induced by CommonSpirit, from a Premier employee (copying a CommonSpirit employee), requiring that vendors submit a spreadsheet directly comparing their HealthTrust prices versus Premier prices and directing vendors that, "[i]f pricing [with Premier] is not the same or better than previous pricing [with HealthTrust], then coordinated negotiation will occur between the supplier, CommonSpirit, and Premier."

(Doc. No. 35 ¶ 41 (quoting Doc. No. 35-5, Feb. 28, 2020 email from K. Tompkins of Premier, copied to S. Pederson with CHI, allegedly directed to vendors ("February 28 email")); *see also* Doc. No. 35-6, Vendor Spreadsheet).) HealthTrust states in a footnote that the Vendor Spreadsheet attached to the February 28 email includes a column titled "CHI price" and that the price CHI was paying "was, of course, reflective of HealthTrust's vendor contract pricing, which was confidential." (Doc. No. 35, at 10 n.1.)

HealthTrust alleges that these "unlawful actions" interfered with its own commercial relationships with its vendors, with whom it had entered into confidentiality agreements restricting the disclosure of "prices for products and services thereunder to third parties." (*Id.* ¶ 42.) It claims that CommonSpirit "requested and sought to induce these vendors" to violate their own confidentiality agreements with HealthTrust, thus damaging HealthTrust's "commercial position with regard to the vendor relationships that form the backbone of HealthTrust's business model." (*Id.*) HealthTrust alleges "upon information and belief" that CommonSpirit shared HealthTrust's prices with Premier, in breach of CommonSpirit's confidentiality obligations under the Participation Agreement. (*Id.* ¶ 43.)

HealthTrust states that, upon learning that CommonSpirit was engaged in the misappropriation of HealthTrust's confidential pricing information, HealthTrust mitigated its

damages by terminating CommonSpirit's access to HealthTrust's members-only web portal containing its pricing information. (*Id.* ¶ 44.) It then formally notified CommonSpirit on March 13, 2020 that the Participation Agreement would terminate effective March 31, 2020, at which time CommonSpirit would also forfeit its equity interest in HPG. (*Id.* ¶ 45.)

Rather than answering the Counterclaims, CommonSpirit filed its Motion to Dismiss under Rule 12(b)(6), along with a supporting Memorandum of Law, seeking the dismissal of all five claims for relief set forth in HealthTrust's Counterclaims. (Doc. Nos. 51, 51-1.) HealthTrust filed a Response in Opposition to the motion (Doc. No. 56), and CommonSpirit filed a Reply (Doc. No. 58).

## III.     DISCUSSION

### A.     Count I: Federal Trade Secret Claim

The DTSA provides a private cause of action for the misappropriation of trade secrets. *B&P Littleford, LLC v. Prescott Mach., LLC*, No. 20-1449, 2021 WL 3732313, at *5 (6th Cir. Aug. 24, 2021); 18 U.S.C. § 1836(b)(1). The statute provides two alternative meanings for the term "misappropriation": (1) acquisition of a trade secret by a person who knows it was acquired by improper means; or (2) disclosure of a trade secret without consent under certain circumstances. 18 U.S.C. § 1839(5)(A) & (B). More specifically, the "disclosure" prohibition defines "misappropriation," as relevant here, as the:

> (B) disclosure or use of a trade secret of another without express or implied consent by a person who–
>
> > (i) used improper means to acquire knowledge of the trade secret; [or]
> >
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was–
> >
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

18 U.S.C. § 1839(5)(B)(i)–(ii).

CommonSpirit argues that subsection (B)(i) of the definition clearly does not apply, because HealthTrust does not dispute that CommonSpirit was in "lawful possession of vendor prices being charged to CommonSpirit." (Doc. No. 51-1, at 6.) It construes the misappropriation claim as premised upon HealthTrust's allegations that CommonSpirit "encouraged" (or "instructed" or "demanded") vendors to "share" vendor pricing with third party Premier (*see* Doc. No. 35 ¶¶ 59, 70, 41) and argues that this allegation fails to state a claim, because HealthTrust does not explain how, as a matter of law, "'encouraging' a third party vendor who is in rightful possession of its own prices" to disclose that information to another third party (Premier) "would in any way constitute misappropriation of a trade secret" by CommonSpirit. (Doc. No. 51-1, at 6.)

HealthTrust responds by asserting that CommonSpirit misstates the law, insofar as it omits reference to the provision of the statute that includes within the definition of "misappropriation" the "use of improper means to acquire knowledge of a trade secret 'derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.'" (Doc. No. 56, at 3 (quoting 18 U.S.C. § 1839(5)(B)(ii)(III)).) It notes that the statute further defines "improper means" to include "breach or inducement of a breach of a duty to maintain secrecy." (*Id.* at 3–4.) And it maintains that it has properly alleged that "CommonSpirit misappropriated HealthTrust's trade secret by inducing vendors to disclose the confidential HealthTrust prices to its competitor GPO, Premier." (*Id.* at 4.)

In other words, HealthTrust's position does not appear to be, simply, that CommonSpirit disclosed to Premier HealthTrust's trade secret pricing data in CommonSpirit's possession, actionable under the definition of misappropriation contained in § 1839(5)(B)(ii)(II). Instead, HealthTrust appears to be claiming that CommonSpirit used HealthTrust's trade secret information by improperly inducing individual vendors to breach their own confidentiality provisions with HealthTrust by disclosing HealthTrust's confidential pricing information either directly to Premier, or indirectly to Premier through CommonSpirit, with knowledge that the individual vendors had contractual obligations to maintain the secrecy of that information based on their confidentiality agreements with HealthTrust. At this juncture in the proceedings, the court finds that this version of misappropriation is supported by the language of § 1839(5)(B)(i), (B)(ii)(I), and/or (B)(ii)(III).[2] In particular, although HealthTrust is focused on the disclosure of its confidential vendor pricing to Premier, its allegations give rise to a reasonable inference that the information was also disclosed to CommonSpirit in the course of its dealings with the vendors and that CommonSpirit used that information in its dealings with Premier.

CommonSpirit also argues that the facts alleged in the Counterclaims do not support misappropriation because HealthTrust does not allege facts that would show how CommonSpirit induced HealthTrust's vendors to disclose trade secret information or that CommonSpirit actually disclosed or used trade secret information itself. More specifically, it objects that HealthTrust has not identified what exactly was disclosed, by whom, or to whom. CommonSpirit further argues that the exhibits on which HealthTrust relies to support its claim "contradict HealthTrust's

---

[2] CommonSpirit also argues that the facts alleged in the Counterclaims do not support misappropriation because the allegations—that it "encouraged" and "instructed" and "demanded" vendors to share their vendor pricing with Premier (see Doc. No. 35 ¶¶ 59, 70, 41)—contradict each other. The court is not persuaded that "encourage," "instruct," and "demand" actually contradict each other. Rather, they are differing methods of inducement.

conclusion" that unlawful disclosures occurred. (*Id.*) In that regard, CommonSpirit characterizes Exhibit 4 (Doc. No. 35-4), the undated Supplier Letter, as "providing instructions for the 'fire drill' GPO transition necessitated solely by HealthTrust's sudden termination of the Participation Agreement effective March 31, 2020." (Doc. No. 51-1, at 7.) It characterizes Exhibit 5, the February 28 email (Doc. No. 35-5), as a "self-addressed email sent by a Premier employee" to himself, "copied only to one other person—a CommonSpirit employee." (Doc. No. 51-1, at 8.) As such, CommonSpirit argues, there is no evidence this email was sent to vendors, as HealthTrust alleges. CommonSpirit claims that the email, instead, "merely maps out the steps necessary for Premier to take in transitioning the GPO duties in the least disruptive manner." (*Id.*) And, CommonSpirit argues, HealthTrust has not shown that any vendors actually provided pricing in response to it. CommonSpirit claims that the spreadsheet at Exhibit 6 (Doc. No. 35-6) is essentially a blank chart attached to Exhibit 5 that does not even contain a column titled, "CHI price," contrary to HealthTrust's assertion, and does not demonstrate that CommonSpirit demanded information from anyone. (*Id.*)

In response, HealthTrust asserts that the court must view the facts and construe the allegations in the Counterclaims (including the exhibits attached to it) in the light most favorable to HealthTrust and that, construed together, the allegations and exhibits adequately allege trade secret misappropriation. Specifically, it articulates its claim as based on CommonSpirit's "involve[ment] in disclosing [HealthTrust's] trade secret information to Premier without HealthTrust's implied or express consent," with knowledge that the vendors it induced to disclose their pricing arrangements with HealthTrust to Premier were parties to confidentiality agreements with HealthTrust protecting HealthTrust's confidential pricing information. (Doc. No. 56, at 5–6.)

It also explains its exhibits. In response to CommonSpirit's assertion that the February 28 email "does not show that it was sent to vendors as HealthTrust alleges," HealthTrust points out that the email itself states: "Premier sends this e-mail *to suppliers* with price template." (*See* Doc. No. 35-5, at 1.) The court further notes that the email salutation is addressed to "All," and its first sentence states: "If you are in receipt of this email then you were a primary contact at the CommonSpirit supplier engagement meetings this week." (*Id.*) The court finds that it is plausible to infer from the language of the February 28 email that Premier blind-copied it to CommonSpirit's suppliers. (HealthTrust parenthetically states that it received a copy of the email from a supplier. (Doc. No. 56, at 7.))

Regarding Exhibit 6, HealthTrust concedes that the column header it quoted as indicating "CHI price" actually just states "Price," but, it asserts, the context makes it clear that this was the price CHI was paying at the time. Insofar as CommonSpirit takes issue with the template's being blank, HealthTrust explains that,

> [a]t the time when the template was sent, CHI paid the price that HealthTrust had negotiated. (CC at ¶ 10, n.1.) . . . .The template is blank because, as described in the email from CommonSpirit to which it was attached, CommonSpirit was requesting that vendors fill out the spreadsheet by, among other things, providing the prices that CHI had with HealthTrust.

(Doc. No. 56, at 7.)

HealthTrust does not address CommonSpirit's argument regarding the Supplier Letter, but the court notes that the dates in the letter call into question CommonSpirit's claim that it was prompted by HealthTrust's unilateral termination of the Participation Agreement—in particular, the reference to CommonSpirit's having selected Premier as its "sole national GPO effective January 1, 2020." (Doc. No. 35-4, at 1.)

Viewing the facts alleged in the pleading and the attached exhibits in the light most favorable to HealthTrust, the court finds that the Counterclaims plausibly allege trade secret

misappropriation in violation of 18 U.S.C. § 1839(5)(B)(i), (B)(ii)(I), and/or (B)(ii)(III). HealthTrust alleges that its vendor pricing arrangements constituted confidential business information and trade secrets; that it took reasonable steps to protect the secrecy of that information, including by requiring its vendors and the GPO members to enter confidentiality agreements; that it repeatedly reminded its vendors and CommonSpirit during the spring of 2020 that this information was confidential; and that CommonSpirit induced vendors to share their confidential pricing arrangements with HealthTrust either directly or indirectly with Premier, through CommonSpirit, all while knowing that the vendors, too, had signed confidentiality agreements with HealthTrust. (*See* Doc. No. 35 ¶¶ 54–59 and Exs. 5–7.) Although HealthTrust's factual allegations are not strong or particularly detailed, they are sufficient. And, while the construction of the various exhibits is contested, they may reasonably be understood as HealthTrust proposes, and only discovery will fill out the context of the communications and further clarify their meaning.

Finally, CommonSpirit asserts that HealthTrust does not adequately allege that it was damaged by any alleged trade secret misappropriation. It is not clear, however, that HealthTrust is required to allege or prove actual damages. Under the DTSA, a plaintiff who establishes trade secret misappropriation may, in addition to, or *in lieu of*, "damages for actual loss," be entitled to an injunction to prevent actual or threatened misappropriation or to condition future use on the payment of a reasonable royalty, damages for any unjust enrichment caused by the misappropriation, or "the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." 18 U.S.C. § 1836(b)(3).

CommonSpirit's motion, insofar as it seeks dismissal of the trade secret misappropriation claim under the DTSA, will be denied.

### B.     Tennessee Trade Secret Claim

Like the DTSA, the TUTSA provides a private cause of action for injunctive relief and/or damages for the misappropriation of trade secrets. *Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *5 (Tenn. Ct. App. Aug. 25, 2015) (citing Tenn. Code Ann. §§ 47-25-1703 and -1704). It is similar to the DTSA, except its definition of "trade secret" is even broader than that provided by federal law. *Id.*

CommonSpirit's arguments for dismissal of the TUTSA claim mirror those asserted in support of dismissal of the DTSA claim. The court declines to dismiss the TUTSA claim for the same reasons as those articulated above in denying the motion to dismiss the DTSA claim.

### C.     Breach of Contract – Confidentiality Provisions

#### 1.     *Displacement of the Claim*

CommonSpirit first argues that HealthTrust's breach of contract claim, insofar as it is premised upon the alleged breach of the confidentiality provisions of the Participation Agreement, is "preempted" by the TUTSA, Tenn. Code Ann. § 47-25-1708(a). (Doc No. 51-1, at 10.) This provision states, "(a) Except as provided in subsection (b), this part displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." *Id.*

As HealthTrust points out, however, subsection (b) of the same provision expressly excepts contract claims. *See id.* § 47-25-1708(b)(1) ("This part does not affect: (1) Contractual remedies, whether or not based upon misappropriation of a trade secret . . . ."). HealthTrust's breach of contract claim is not foreclosed by the TUTSA.

2.    *Failure to State a Claim*

Under Tennessee law, the elements of a breach of contract claim are: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005). CommonSpirit does not dispute the existence of an enforceable contract (the Participation Agreement) or that the contract imposes confidentiality requirements upon it. Instead, it asserts that the Counterclaims fail to state a colorable claim for breach of the confidentiality provision of the Participation Agreement, because HealthTrust simply alleges, in a wholly conclusory fashion, that "CommonSpirit breached [the confidentiality provision] when it instructed vendors to disclose HealthTrust's prices to Premier." (Doc. No. 35 ¶ 70.)

The factual assertion that CommonSpirit induced HealthTrust's vendors to breach their own confidentiality agreements with HealthTrust by disclosing HealthTrust's prices to Premier, accepted as true and viewed in the light most favorable to HealthTrust, would not establish that CommonSpirit breached its own confidentiality obligations. Rather, it would show that CommonSpirit induced others to breach their contracts with HealthTrust. But the Counterclaims do not purport to state a claim for inducement of breach of contract.

In addition, however, HealthTrust argues that the confidentiality provision is broad enough to prohibit CommonSpirit from disclosing confidential pricing information that it derived from vendors to Premier. (*See* Doc. No. 56, at 1 ("[CommonSpirit], in breach of its confidentiality obligations, directly disclosed confidential HealthTrust pricing information to Premier.").) Indeed, the Participation Agreement defines confidential information very broadly to include confidential information exchanged under the individual vendor agreements, and it prohibits its disclosure, regardless of how CommonSpirit obtained it:

> [A]ll information, documents and instructions (including, without limitation, all information regarding pricing, rebates, discounts, shipping terms and other terms and conditions of the Vendor Contracts, as well as information relating to quantities of Products and Services purchased by Participant and/or its Facilities) delivered or otherwise provided by [HealthTrust] to Participant or its Facilities . . . or by Participant and/or its Facilities to [HealthTrust] is confidential information (hereinafter, "Confidential Information"). The parties agree that, subject to the more restrictive confidentiality provisions contained in any Vendor Contract, they shall maintain all Confidential Information in strict confidence, shall use such Confidential Information only as is required in connection with their obligations under this Agreement and the provision of healthcare services by Participant and/or its Facilities, and may disclose such Confidential Information only on a "need to know" basis to their duly authorized officers, directors, representatives, consultants . . . subject to the confidentiality and limitations on use provision contained in this Agreement and any Vendor Contract. . . .

(Doc. No. 1-1, at 22, Participation Agreement § 9.1.)

Although the allegations in the Counterclaims in support of this theory are lacking in detail, they are not wholly without support, as HealthTrust asserts that CommonSpirit "shared HealthTrust's prices with Premier in breach of CommonSpirit's obligations under the Participation Agreement." (Doc. No. 35 ¶ 43.) And it explains how, with reference to the February 28 email and spreadsheet. The court finds that the Counterclaims state a colorable claim against CommonSpirit for breach of the confidentiality provision of the Participation Agreement, based on its alleged direct or indirect disclosure of HealthTrust's confidential pricing information to Premier.

### D. Breach of Contract – Exclusivity Provisions

The Participation Agreement contains exclusivity provisions. On January 28, 2020, CommonSpirit's Vice President of Supply Chain Management, Daniel DeLay, sent a letter to Edward Jones, HealthTrust's President and CEO, "in follow-up" to previous discussions and to "propose a meeting" to discuss a number of matters relating to the anticipated transition from CommonSpirit's using HealthTrust as its GPO to its using Premier instead, including:

- a rolling approach (with agreed timelines) for transitioning purchases under the Vendor Contracts (as defined under the Agreement), starting as soon as

practicable with the objective for such transitions to be completed on or before December 31, 2020; [and]

- CommonSpirit's continued access to the benefits under the Agreement, including access to and purchasing through the Vendor Contracts, access to resources (including Dedicated Resources and Custom Resources), the HealthTrust Website (including the HPG Vendor Lists), and to the Spend Analytics Tools, as well as receipt of shareback of the GPO Fees and the Partnership Interests, throughout the term of the Agreement.

(Doc. No. 35-7, at 1–2.) With regard to the latter item, CommonSpirit noted that it "recognize[d] the need to consider a fair way to address GPO Fees that are not earned due to the *necessary transition of the Vendor Contracts prior to contract expiration* and are open to your proposal in this regard." (*Id.* at 2 (emphasis added).)

Elsewhere in the letter, DeLay "assure[d]" Jones that CommonSpirit "intends to continue to meet its obligations under the Agreement and expects HPG to do the same," but he qualified that expectation with reference to a need for the parties to "jointly and collaboratively agree on a transition plan in light of the expected expiration of the Agreement." (*Id.* at 1; *see also id.* at 2 ("[W]e certainly share the goals of conducting a reasonable, efficient and orderly process that would balance maximum value to CommonSpirit and to HPG in a manner which respects both parties' rights and obligations under the Agreement, while cooperating with CHI's critical need to align with CommonSpirit's new arrangement.").)

HealthTrust's Counterclaim for breach of the exclusivity provision of the Participation Agreement is primarily—but not solely—premised upon its reading of the DeLay Letter as expressing CommonSpirit's "intention to breach the Participation Agreement" and "constitut[ing] a repudiation of the Participation Agreement." (Doc. No. 35 ¶¶ 77, 78.) In addition to the DeLay Letter, however, HealthTrust also points to Premier's press release, issued on January 28, 2020, as well as the Supplier Letter, announcing to vendors that CommonSpirit had selected Premier to be its GPO effective January 1, 2020, with an anticipated "go live date" of April 1, 2020, and the

February 28, 2020 email to vendors regarding the process for submitting pricing proposals. (Doc. No. 35 ¶¶ 36–37; Doc. Nos. 35-3, 35-4, 35-5.)

CommonSpirit's motion to dismiss this claim is primarily premised upon the face of the letter itself. It emphasizes the portions of the DeLay Letter stating CommonSpirit's intent to be bound by the terms of the parties' agreement through the end of the year, while working out mutually agreeable terms for transitioning to a different GPO under a "mutually agreed upon . . . transition plan." (Doc. No. 51-1, at 13.) CommonSpirit also argues that, to the extent HealthTrust's "repudiation" theory is premised on a press release issued by Premier, the claim fails, because the press release was issued by *Premier*, not CommonSpirit, and it simply announces a fact already known to HealthTrust—that CommonSpirit had selected Premier as its new GPO—and anticipates a future relationship based on that selection. (*See* Doc. No. 35-3.)

In response, HealthTrust argues that, viewing the facts in the light most favorable to it, it is reasonable to construe the DeLay Letter as demanding a "rolling approach" to the transition "starting as soon as practicable" and that it constitutes a demand that it be prematurely released from its obligations, despite also paying lip service to its commitment to comply with the exclusivity provision. (Doc. No. 56, at 7.) HealthTrust points to the other evidence of repudiation referenced above and asserts that, "[a]t the very least, for purposes of this motion, CommonSpirit's attempt to excuse its announced intention to breach is not an inference that can be drawn in its favor." (*Id.*)

The court again finds that the allegations in the Counterclaims are not particularly robust but, at this stage in the proceedings, the DeLay Letter, read in conjunction with the Supplier Letter and the February 28 email, provides a sufficient basis for HealthTrust's claim that CommonSpirit committed the first breach of the exclusivity provision of the Participation Agreement, thus

justifying HealthTrust's termination of the Agreement. The motion to dismiss this claim, too, will be denied.

### E. Declaratory Judgment Claim

Because CommonSpirit's assertion that the declaratory judgment claim should be dismissed is premised entirely on the proposition that HealthTrust's other Counterclaims must be dismissed, the court denies this portion of its motion as well.

## IV. CONCLUSION

For the reasons set forth herein, the court will deny CommonSpirit's Motion to Dismiss HealthTrust's Counterclaims. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge